## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | Chapter 11 |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | Case No. 23-00623 (TJC) |
| Debtors. | Jointly Administered |
| MERCY HOSPITAL LIQUIDATION TRUST OVERSIGHT COMMITTEE as designee of the MERCY HOSPITAL LIQUIDATION TRUST, | |
| Plaintiff, | Adversary No. 25-_____ |
| v. | |
| MERCY HEALTH NETWORK, INC. d/b/a MERCYONE, SEAN WILLIAMS, and CATHOLIC HEALTH INITIVATIVES – IOWA, CORP. d/b/a IOWA HEART CENTER, | **JURY TRIAL DEMANDED** |
| Defendants. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS, VOIDABLE TRANSFERS, BREACH OF CONTRACT, UNJUST ENRICHMENT, NEGLIGENT MISREPRESENTATION, BREACH OF FIDUCIARY DUTIES, AND OTHER RELIEF

The Trust Oversight Committee (the "OC" or "Plaintiff"), as representative of the Liquidation Trustee (the "Trustee") of the Mercy Hospital Liquidation Trust (the "Trust") and successor to Mercy Hospital, Iowa City, Iowa ("MIC") and its debtor affiliates (collectively, the "Debtors") brings this complaint (the "Complaint") (i) to avoid fraudulent transfers to and recover transferred property from Mercy Health Network, Inc. d/b/a MercyOne ("MercyOne") pursuant to sections 544, 547, 548, 550, and 551 of title 11 of the United States Code (the "Bankruptcy Code"); (ii) to avoid fraudulent transfers to and recover transferred property from Catholic Health Initiatives – Iowa, Corp. d/b/a Iowa Heart Center ("Iowa Heart") pursuant to sections 544, 547,

1

548, 550, and 551 of title 11 of the United States Code (the "Bankruptcy Code"); (iii) to avoid and

recover voidable transfers and recover transferred property from Iowa Heart pursuant to chapter

684 of the Iowa Code; (iv) to avoid and recover voidable transfers  from MercyOne pursuant to

chapter 684 of the Iowa Code; (v) to award damages under state law against Sean Williams for

breach of fiduciary duty, and (vi) to award damages under state law against MercyOne for breach

of contract, unjust enrichment, breach of fiduciary duty, and negligent misrepresentation. In

support of this Complaint, Plaintiff hereby alleges upon information and belief as follows:

## NATURE OF THE CASE

1.      This Complaint seeks on behalf of MIC's creditors to recover at least $55 million

in damages caused to MIC by the Defendants.

2.      MIC transferred funds to MercyOne as required by the *Management Services and

Strategic Affiliation Agreement* and the *First Amendment to Management Services and Strategic

Affiliation Agreement* (collectively the "Affiliation Agreement") that MIC initially entered into

with MercyOne on or around May 1, 2017. MIC entered into the Affiliation Agreement with

MercyOne because MercyOne represented that it could assist MIC with strategizing solutions for

and remediating a number of the financial and operational issues MIC was experiencing at the

time. Critically, in connection with the Affiliation Agreement and through its subsequent conduct,

MercyOne made numerous representations to MIC that it would work toward implementing a

"complete and strategic affiliation relationship" that would have effectively merged MIC with

MercyOne.

3.      MercyOne was aware that full strategic affiliation in the future was critical to

MIC's continued existence as a viable, operating healthcare organization. Individuals at MIC

viewed the Affiliation Agreement as an "engagement ring," with the details and formalities of the corporate "wedding" left to be worked out.

4.      Rather than helping MIC address these serious problems, however, the Affiliation Agreement exacerbated them. The Affiliation Agreement saddled MIC with steep payment obligations to MercyOne in exchange for a number of services that MercyOne did not provide. Additionally, despite continuing representations to MIC, MercyOne did not make material efforts to plan, evaluate, and implement strategic affiliation between MercyOne and MIC.

5.      In particular, the Affiliation Agreement required that MercyOne—in exchange for substantial payments from MIC: (a) provide services and staff to MIC including, for example, services related to financial management, purchasing and supply chain, risk management, human resources, clinical and quality oversight, medical staff peer review and credentialing, strategic planning, evaluation of continuing existing service lines, performance improvement, physician practice management support, and IT implementation; (b) provide legal services through MercyOne's retained counsel; (c) provide services through MercyOne's physician recruiters; (d) develop and implement telemedicine services; and (e) make material efforts to fully affiliate with MIC.

6.      Despite agreeing to provide the above services and staff during the life of the Affiliation Agreement, MercyOne failed to provide all of the services required by the Affiliation Agreement.

7.      That failure exacerbated MIC's difficult financial situation and forced MIC to pay excessive fees to MercyOne under the Affiliation Agreement for services that MIC did not receive. It further required MIC to engage its own staff and resources for financial management, overseeing its own Medical Staff peer review and credentialing review, physician recruiting, telemedicine,

and IT implementation. MIC was also forced to engage additional consultants to perform work that should have been performed by MercyOne.

8.      Further, despite continuing representations to MIC that MercyOne was in the process of creating a plan for full strategic affiliation between MIC and MercyOne, behind the scenes MercyOne did not make any material efforts to do so. Rather than immediately pursuing a different strategic partner, MIC was induced to continue on in an expensive relationship with MercyOne for over four years. When MercyOne finally told MIC in the summer of 2021 that it was no longer planning on strategically affiliating with MIC, MIC's deteriorating financial condition—caused in significant part by MercyOne's mismanagement of MIC—left MIC much less attractive to any potential acquirer.

9.      This action is commenced pursuant to sections 544, 547, 548, 550, and 551 of the Bankruptcy Code and Chapter 684 of the Iowa Code to avoid and recover from MercyOne the fraudulent and voidable transfers made by MIC to MercyOne. MIC did not receive reasonably equivalent value for the transfers made to MercyOne required by the Affiliation Agreement, and those transfers were made either at a time that MIC was insolvent or was incurring debts beyond its ability to pay them as they became due.

10.      Further, this action is commenced under Iowa law for MercyOne's breach of the Affiliation Agreement, unjust enrichment resulting from its failure to fully perform under the Affiliation Agreement, and due to its receipt of fees for services it did not provide.

11.      This action is also commenced under Iowa law for Sean Williams' breach of his fiduciary duty to MIC resulting from his actions and conduct while President and CEO of MIC and as a Board Member of MIC during which time he used his position and authority to advance MercyOne's financial and operational interest to the financial and operational detriment of MIC.

12.     Moreover, this action is commenced under Iowa law for MercyOne's negligent and injurious representations to MIC regarding MercyOne's stated goal of acquiring MIC made as inducement for MIC's continued participation under MercyOne's Management Services and Affiliation Agreement.

13.     Finally, this action is commenced pursuant to sections 544, 547, 548, 550, 551 of the Bankruptcy Code and Chapter 684 of the Iowa Code to avoid and recover from Iowa Heart the fraudulent and voidable transfers made by MIC to Iowa Heart for which MIC did not receive reasonably equivalent value.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this adversary proceeding arising under the Bankruptcy Code and related to the Debtors' above-captioned bankruptcy cases (the "Chapter 11 Cases") pending before the United States Bankruptcy Court for the Northern District of Iowa (the "Court"), pursuant to 28 U.S.C. §§ 157 and 1334.

15.     The causes of action set forth herein concern the avoidance and recovery of transfers pursuant to 11 U.S.C. §§ 547, 548, 550, and 551, and, as such, constitute a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).

16.     The causes of action set forth herein for breach of contract, unjust enrichment, breach of fiduciary duty, and negligent misrepresentation constitute noncore proceedings that impact the recovery and payment of claims under the Debtor's plan and constitute "related to" proceedings that may be heard and determined by this Court pursuant to 28 U.S.C § 1334(b).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

18.     The statutory and legal predicates for the relief sought herein are sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, chapter 684 of the Iowa Code, and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

19.     Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

20.     MIC is an Iowa not-for-profit corporation that did business in Iowa City, Iowa.[1]

21.     On or about August 7, 2023 (the "Petition Date"), the Debtors filed their voluntary petition for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code.

22.     Daniel Childers is the duly appointed trustee (the "Liquidation Trustee") of the Liquidation Trust (the "Trust") formed pursuant to *Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* (the "Plan") and the *Liquidation Trust Agreement* provided for by the Plan (the "Liquidation Trust Agreement").

23.     Pursuant to the Plan, the Debtors' assets, including their claims and choses of action, were transferred to the Trust. The Plan estimated that MIC's general unsecured creditors would receive a distribution of between 8-10% of their claim.

24.     The OC has authorized the bringing of this Complaint and prosecution of these causes of action on behalf of the Trust pursuant to the Liquidation Trust Agreement.

25.     The OC is filing this Complaint in light of the Bankruptcy Court's order confirming the Debtors' Plan (the "Confirmation Order"). For the avoidance of doubt, to the extent, if at all, the Confirmation Order or Liquidation Trust Agreement are later modified or

---

[1] Pursuant to MIC's confirmed Plan of Liquidation, all right, title, and interest the Debtors possessed was transferred to the Liquidating Trust.

otherwise changed to affect the OC's authority, under the Plan and Liquidation Trust Agreement, to bring this Complaint, the filing of this Complaint is intended to, inter alia and at a minimum, toll any applicable statute of limitations, statutes of repose, or otherwise and to place the Defendants (as defined below) on notice. Any and all rights, remedies, theories, arguments, or otherwise to which the Plaintiff or any successor or predecessor in interest are entitled are not waived and instead are specifically preserved and reserved.

26.     Defendant MercyOne is a Delaware not-for-profit corporation, with a primary contact with MIC located in Des Moines, Iowa.

27.     MercyOne was party to a joint operating agreement between Trinity Health and Catholic Health Initiatives, and pursuant to a 2022 merger is a wholly owned subsidiary of Trinity Health.

28.     MercyOne is an "insider" as defined by Bankruptcy Code § 101(31).

29.     MercyOne is an "insider" as defined in Iowa Code § 684.1.

30.     Defendant Sean Williams ("Williams" and, together with MercyOne and Iowa Heart, the "Defendants") is an individual residing in Jones County, Iowa.

31.     Defendant Iowa Heart is an Iowa not-for-profit corporation and wholly owned subsidiary of MercyOne, with a primary contact with MIC located in Des Moines, Iowa.

32.     Iowa Heart is an affiliate of MercyOne.

33.     Iowa Heart is an "insider" as defined by Bankruptcy Code § 101(31).

34.     Iowa Heart is an "insider" as defined in Iowa Code § 684.1.

35.     Non-party Bob Ritz ("Ritz") is the President and Chief Executive Officer of MercyOne.

36.    Non-party Mike Wegner ("Wegner"), during the course of the Affiliation Agreement, served as an executive of MercyOne, including as its Executive Vice President of Operations, Chief Operating Officer, and Chief Financial Officer.

37.    Non-party Michael Trachta ("Trachta"), during the course of the Affiliation Agreement, served as an executive of MercyOne, including as its Vice President of Network Affiliates.

## BACKGROUND FACTS

I.    **The Affiliation Agreement**

   *A.  Entry into the Affiliation Agreement*

38.    Starting by at least 1998, MercyOne began soliciting MIC about the prospect of a partnership or merger with MIC—termed a "strategic affiliation" by the parties—as part of MercyOne's goal of having a unified Catholic healthcare system in Iowa.

39.    Starting in fall 2013, MIC's 100% corporate sponsor, Sisters of Mercy of the Americas, West Midwest Community (the "Sisters of Mercy") advised MIC's then-CEO Mr. Ronald Reed that the Sisters of Mercy believed MIC needed to pursue a long-term strategic affiliation with another party given the existing difficulties involved in operating an independent community hospital in the current healthcare marketplace.

40.    The Sisters of Mercy encouraged MIC to consider and seek out fellow Catholic-sponsored healthcare institutions for strategic affiliation, and specifically identified MercyOne as a potential acquirer.

41.    In late 2013 or early 2014, MIC executives began having serious conversations with MercyOne regarding MercyOne's previous strategic affiliation solicitations.

42.     To that end, in or around 2014, the Board of Directors for MIC (the "Board")
elected to begin a search for a strategic partner to address a number of operational and financial
issues that MIC was experiencing and to secure MIC's future as a going concern.

43.     Given the dramatic and ongoing changes in the national healthcare landscape
during this period of time, the Board and MIC's then-management determined that MIC needed to
affiliate, join, or otherwise partner with an outside organization to ensure continuation of
community healthcare services for tens of thousands of patients in Eastern Iowa. They concluded
that any affiliation or partnership needed to provide MIC with assistance identifying and
implementing a replacement for its existing Electronic Health Record ("EHR") system, meeting
evolving software and hardware needs, providing telehealth services to patients, turning around its
financial condition, and providing managerial and operational support.

44.     During the summer of 2016, MIC believed that after two years of discussions it
had found a strategic affiliation partner in MercyOne.

45.     In fall 2016, however, MercyOne informed MIC that it was no longer interested
in strategic affiliation and, instead, proposed that MIC enter into a management agreement with
MercyOne rather than the strategic affiliation agreement previously discussed. The Board rejected
this offer.

46.     Following MercyOne's change in course, MIC solicited additional regional and
national healthcare organizations in an effort to locate a strategic affiliation partner.

47.     Despite the absence of a strategic affiliation in 2016, MercyOne remained a
potential strategic partner and was one of several organizations that submitted proposals to MIC
to enter into a strategic relationship.

48.     In the spring of 2017, MIC and MercyOne discussed potential paths to full strategic affiliation via an initial management agreement whose goal would be eventual strategic affiliation.

49.     Following careful consideration and evaluation of its potential options, the Board determined that entering into an agreement with MercyOne would provide the greatest benefit to MIC, particularly based on representations in the agreement that the parties would work towards strategic affiliation.

50.     MercyOne, for its part, sought affiliation with MIC to expand into the Eastern Iowa medical market through execution of management agreements with other regional clinics and hospitals which MercyOne would later integrate into its network. MercyOne saw MIC as a potential regional "hub" in Eastern Iowa for MercyOne's operations through which other MercyOne regional clinic and hospital affiliates could access care in the MercyOne network.

51.     MercyOne expressed an ability to provide necessary turnaround support for MIC's financial condition, support for MIC's faltering EHR system and aging technology infrastructure, legal and legislative support, assistance with managerial and operational functions, and the synergies and leverage offered by having access to the business resources and networks of MercyOne's then-parent companies—Trinity Health ("Trinity") and Catholic Health Initiatives ("CHI").

52.     MercyOne repeatedly asserted that the express purpose of the Affiliation Agreement was to turnaround MIC's financial performance and make operational changes to facilitate MIC's full integration into MercyOne. Additionally, MercyOne committed to planning and implementing a path to strategic affiliation between MIC and MercyOne, including through CHI and/or Trinity.

53.    On May 1, 2017, MercyOne and MIC executed the Affiliation Agreement. A copy of the Affiliation Agreement has been attached as Exhibit 1.

### B.  Terms of the Affiliation Agreement

54.    The Affiliation Agreement provided for an initial three-year term, from June 1, 2017 to June 30, 2020, but that term could be extended for one or more three-year terms.

55.    The Affiliation Agreement sets forth certain services that MercyOne agreed to provide to MIC and dictates the relationship between the parties, such that MercyOne agreed to, among other things:

> i.    Form a strategic counsel with MIC to help further the "Affiliation Goals" outlined in the Affiliation Agreement;
> ii.    Provide management services, including a full time CEO;
> iii.    Establish an effective Corporate Responsibility Program which was to report to and prepare educational programs for the Board;
> iv.    Provide management support to MIC leadership including financial management, purchasing and supply chain support, risk management, human resources, clinical and quality support, medical staff peer review and credentialing, advocacy, strategic planning, evaluation of service lines, performance improvement, physician practice management support, and information technology and EHR implementation and support ("IT Support");
> v.    Provide Legal services;
> vi.    Provide Telehealth support, including developing telehealth services between MIC and MercyOne;
> vii.    Provide physician recruitment and physician compensation review;
> viii.    Facilitate the purchasing of products for MIC for products available through the CHI GPO;[2] and
> ix.    (Optionally) provide on demand the lease of a COO to MIC, a Nurse Executive, consultation services, temporary administrative staffing, educational services, and a pharmacy director.

56.    As part of the Affiliation Agreement, MIC was required to indicate its affiliation with MercyOne on its letterhead and signage, identifying that it was a member of MercyOne or whatsoever other name MercyOne dictated be used.

---

[2] CHI GPO comprised MercyOne's existing Group Purchasing Organization through its part owner Catholic Health Initiative. MIC opted out of participation in CHI GPO upon agreement with MercyOne.

57.     The Affiliation Agreement prohibited MIC from affiliating with any other health care system operating in Iowa or participating in any other accountable care organization or integrated network other than those expressly approved by MercyOne.

58.     The Affiliation Agreement required that MIC participate in, and implement the programs and initiatives recommended by MercyOne's Accountable Care Organization and Clinically Integrated Network.

59.     The Affiliation Agreement permitted MIC's Board to make final decisions for MIC, but provided MercyOne with multiple seats on the Board and the power to dictate what information would be provided to the Board.

60.     In particular, following execution of the Affiliation Agreement, MIC expanded the number of Board seats to include three representatives from MercyOne and the appointed CEO for MIC, such that MercyOne had at least four seats on the Board and no less than 25% of the total Board seats during the life of the Affiliation Agreement. Beyond MIC's CEO, appointed by MercyOne, MercyOne also appointed Ritz, Williams, Dave Vellinga, MercyOne's current CEO and President ("Vellinga"), and Doug Davenport, MercyOne's CFO for MIC; before later appointing Jack Dusenbery, President and CEO of MercyOne Waterloo to replace Williams after Williams became MIC's CEO.

61.     During the life of the Affiliation Agreement, MercyOne provided MIC with three different interim, acting, or actual Chief Executive Officers (each a "CEO")[3] including Shane Cerone ("Cerone") who was named as CEO by MercyOne from July 1, 2017 until April 30, 2018. During his first few months at MIC, Cerone met with MIC staff to explain MercyOne's goal to

---

[3] Casey Greene, MIC's COO, served as temporary interim CEO for several weeks during the transition between MercyOne-selected CEOs Cerone and Williams.

fully integrate MIC, to oversee MercyOne's performance improvement plan, and to serve as an interim CEO until a replacement CEO could be identified.

62.     The Affiliation Agreement outlined several categories of fees payable by MIC including:

> i.      Monthly fees for the salary, bonuses and benefits paid by MercyOne, for provision of any CEO, and reasonable recruitment and moving expenses approved in writing by the Board. MIC's obligation to pay any bonuses is limited to 20% of the CEO's salary;
>
> ii.     Monthly fees for the salary and benefits paid by MercyOne for the provision of any CFO, Nurse Executive or pharmacy director, and reasonable recruitment and moving expenses approved by the Board; and
>
> iii.    Monthly installments of an annual fee equal to 0.5% of the unaudited operating expenses for the prior financial year, escalating to .75% the next year and then 1% for each year thereafter, including amounts paid under the Affiliation Agreement, depreciation, and other operational expenses under generally accepted accounting principles, with MercyOne to audit MIC's financials by October 31 of each year followed by presentation of the annual fee by December 31 of each year.

### C.  Extension of the Affiliation Agreement

63.     On September 1, 2019—following more than two years of MercyOne's representations that due to MIC's performance MercyOne intended to complete its strategic affiliation with MIC—MercyOne and MIC entered into the *First Amendment to Management Services and Strategic Affiliation Agreement* under which they mutually agreed to extend the term of the Affiliation Agreement to June 30, 2023.

64.     The First Amendment to Management Services and Strategic Affiliation Agreement reincorporated the terms of the Affiliation Agreement as part of the extension, including MercyOne's continuing representations that it would plan and implement strategic affiliation with MIC.

II.     **Conduct Under the Affiliation Agreement**

*A. MercyOne's Failures to Perform and Provide Services*

65.     MIC suffered significant financial losses during the approximately six-year term of the Affiliation Agreement.

66.     These losses are attributable in part to MercyOne's conduct and failure to perform under the Affiliation Agreement.

67.     Given the Affiliation Agreement's title as a management and strategic affiliation agreement and the receipt of significant fees thereunder, numerous individuals in MIC leadership roles believed that the Affiliation Agreement obligated MercyOne to provide staff and other assistance to MIC as requested to assist with various services outlined by the Affiliation Agreement.

68.     Nevertheless, MercyOne leaders took conflicting positions regarding their role under the Affiliation Agreement. At times, MercyOne leaders viewed the Affiliation Agreement as merely a "consulting agreement," where MercyOne was under no obligation to provide anything other than advice to MIC. Bob Ritz, MercyOne's President and CEO in 2021, however, advised Williams, MercyOne's appointed CEO for MIC and Trachta, MercyOne's COO for MIC, that he disagreed with their characterization of MercyOne's obligations under the Affiliation Agreement as those of a "consulting agreement." Rather, Ritz viewed MercyOne's role as manager of MIC.

69.     MercyOne failed to provide a number of services that were required under the Affiliation Agreement, requested by MIC, or both.

70.     For example, on or around March 25, 2020, MIC contacted Heather Campbell ("Campbell"), MercyOne's Chief Legal Officer, and Patty Armstrong MercyOne's Chief

Compliance and Privacy Officer, requesting assistance for the preparation and submission of an electronic prescription waiver in response to the COVID-19 Pandemic.

71. This request occurred after MIC was prohibited by MercyOne from submitting any waiver request to the Centers for Medicare and Medicaid Services, Office of Civil Rights, Iowa Department of Human Services, Iowa Department of Public Health, Iowa Department of Inspections and Appeals, or any other federal or state agency without MercyOne's prior review and approval.

72. MercyOne advised that it did not believe a waiver was needed to use an electronic prescription system in response to the COVID-19 pandemic as an emergency.

73. On March 27, 2020, MercyOne circulated a memo to MIC and other MercyOne affiliates directing them to report and follow the direction of MercyOne's system command structure for any COVID-19 planning, response, and communication, and further provided that any resources, funding, or support requests should only proceed through MercyOne to ensure that MercyOne extended its market position.

74. Thereafter, MIC and its employees were required to attend and participate in MercyOne COVID-19 response meetings, planning sessions, and work groups and to follow MercyOne's COVID-19 policies without substantial deviation.

75. During August 2020, MIC again requested assistance from MercyOne under the Affiliation Agreement, this time to determine whether MIC qualified for relief under the CARES Act.

76. MercyOne declined to provide assistance to MIC, despite previously advising MIC and its other affiliates that any requests for assistance, funding, or other relief in response to COVID-19 were only to be conducted by MercyOne.

15

77. On or around August 16, 2021, MIC again requested guidance from MercyOne regarding administration of a third dose of COVID-19 vaccines, but MercyOne declined to provide further guidance regarding dosing information for immunocompromised individuals. MercyOne declined to provide legal or other guidance.

78. As another example, on November 18, 2020, MIC, through its Director of Compliance, requested that MercyOne assist with contract negotiation with Press Ganey for physician and patient satisfaction surveys, but Trachta informed MIC that MercyOne would not help MIC with its contract negotiation, regardless of MIC's existing role as a party to MercyOne's Master Service Agreement with Press Ganey.

79. As further example, on or around December 8, 2020, Ritz requested that MIC change the layout and content of its daily reports to match MercyOne's model. MIC requested that MercyOne provide assistance with collecting the requested information and connecting the information to MercyOne's system; MercyOne declined to provide any assistance.

80. As further example, on or about January 26, 2021, MIC requested assistance from CHI and MercyOne regarding obtaining a new managed print services vendor as part of the supply chain services covered by the Affiliation Agreement.

81. MIC learned from CHI that MercyOne affiliates contracted for managed print service through their GPO, but each entity was ultimately responsible for its own activity with regard to print services. CHI advised that MIC could not receive services under MercyOne's existing managed print services contracts.

82. As further example, shortly after MIC's new EHR system's go-live date in 2021, MIC requested assistance from MercyOne for the formation and implementation of a telehealth system so that MIC could provide its patients with healthcare consultation and some healthcare

services in their homes. MercyOne offered to place MIC in contact with individuals who might be able to discuss its own telehealth system, but MercyOne did not otherwise provide any meaningful support for the evaluation of MIC's telehealth needs or development of any software, license, or other solution to allow MIC to implement its desired telehealth services. Rather than provide assistance with the formation and implementation of a telehealth system, MercyOne advocated that MIC should execute service agreements with third-party telehealth service providers to address its service needs

83.     As further example, on March 1, 2021, following review and approval of MIC's EHR proposal, Ritz advised that MIC needed to implement a new performance improvement plan, but MercyOne declined to provide any operational or managerial tools to assist with the development of a new performance improvement plan. MercyOne also did not provide any administrative tools to track, monitor, or report performance improvement initiatives. MercyOne further required that MIC bear the burden and expense of developing its own performance improvement plan.

84.     As further example, on or around June 2, 2021, Trachta informed MIC's CEO and other members of MIC's leadership team that despite their request and provisions in the Affiliation Agreement, MercyOne would not provide MIC any physician recruiter assistance because that service was no longer provided under MercyOne's affiliation agreements. He advised that MercyOne could only provide MIC with some practical advice, even though MercyOne currently had a physician recruiter on staff.

85.     As further example, on or about February 14, 2022, Ritz observed that MIC's most recent financial statements for Fiscal Year 2022 required MIC to implement a mitigation plan, and

he advised that MIC needed to formulate such a plan for presentation to the Board. MercyOne did not provide any other assistance.

86.     As further example, on August 31, 2022, MIC's Vice President of Patient Care Services and Chief Nursing Officer contacted MercyOne's Vice President of Integrity and Compliance for assistance because Trachta, MercyOne's interim CEO for MIC, was unavailable until mid-September 2022 regarding issues Trachta had previously discussed with MercyOne but had failed to communicate to members of MIC's leadership team. These requests were not met.

87.     MercyOne understood that it was not satisfying its obligations under the Affiliation Agreement.

88.     For example, on October 27, 2020, Ritz circulated a memorandum to MercyOne executives including Wegner, Campbell, Mary Cownie, Patty Armstrong, Rob Heen, Jodie Roettger, Williams, and Jackie Luecht summarizing MercyOne's responsibilities to MIC under the Affiliation Agreement and advising them that the Affiliation Agreement provides for six core services, including provision of a MercyOne CEO, strategic planning support, physician recruitment, and other services, and observing that "[s]ome of these services are provided by MIC Leaders, yet we should still provide leadership and support from our MercyOne functional leader responsibilities for each of these areas."

89.     Ritz subsequently wrote in an internal memorandum that "MercyOne takes its responsibilities to manage MIC in a very serious manner. However, we do not discharge these responsibilities through the placement of leaders in MIC unless the leaders of MercyOne are working together." He further advised that "[o]ur [Affiliation] Agreement is clear, we have reviewed it recently and yet it does not appear we are fulfilling our responsibilities in the manner

in which they are described in the Agreement." Ritz's Memorandum is attached hereto as Exhibit 2.

90.     Despite the Affiliation Agreement allowing MIC "to do business with any other party or parties for whatever purpose it so desires," MercyOne required MIC to obtain its approval before hiring third-parties to perform services.

91.     For example, on January 13, 2021, Ritz informed MIC that it was not permitted to employ consultants without MercyOne's prior approval. In so doing, MercyOne directed MIC to obtain approval before employing anyone other than H2C Securities, Inc. ("H2C"). Ritz informed Williams and Dawna Miller, MIC's CFO, that "[MercyOne's] responsibility as the management team is to make sure we provide our support for operational and strategic work. It seems there has been a breakdown in understanding and/or communication about our authority to act and level of decision making. We can re-educate on this."

92.     Eventually, and prior to termination of the Affiliation Agreement, MercyOne determined that though MIC was paying the fees under the Affiliation Agreement, MercyOne did not need to provide IT support for MIC implementation of a new EHR system, further turnaround support beyond the initial hiring of Insight Advisors in summer 2017, or necessary financial or managerial support from MercyOne staff other than by acting as broker for MIC to hire other consultants to provide services contemplated under the Affiliation Agreement.

93.     Despite MIC's financial condition and MercyOne's failure to perform under the Affiliation Agreement, MercyOne refused to reduce its management fees to MIC until summer 2022.

94.     In fact, on June 15, 2020, Williams—MercyOne's own employee—emailed Ritz requesting that MercyOne reduce its management fee as part of MercyOne's request that MIC

correct is financial performance and reduce expenses. Ritz flatly refused after observing that other entities MercyOne was managing could make the same request, leading to financial loss for MercyOne.

### B. MercyOne's Failures Regarding EHR Implementation and IT Support

95.     In 2015, the United States Department of Health and Human Services–Centers for Medicare and Medicaid ("CMS"), in addition to the Office of the National Coordinator for Health Information Technology established certain standards for the structure of electronic health records to qualify for and be eligible for Medicare reimbursement, which required that MIC have a certified and fully functional EHR system by April 2022.

96.     As a result of the new EHR standards, the failure to have a certified and fully functional EHR system by April 2022 would result in in reimbursement reductions of approximately $1.38 million per year, exclusion from Value Based Purchasing Program, and difficulties transferring or receiving patient transfers. Additionally, it would result in challenges collecting payment from insurance providers, complying with state regulators, and complying with data privacy regulations, among other issues.

97.     As of May 2017, MIC's existing EHR vendor did not meet the CMS requirements and was scheduled to sunset in March 2018, which would result in escalating costs for continued use of the service.

98.     MercyOne's promise in the Affiliation Agreement to assist MIC in replacing its EHR system "not later than November 1, 2018" was a significant reason that MIC entered into the Affiliation Agreement. MIC recognized the financial and operational issues posed by an inadequate EHR system and estimated that the failure to timely implement and maintain its EHR system would result in millions of dollars of escalating expenses and potential penalties from CMS.

99.     Nevertheless, MIC's EHR system was not replaced until almost two and a half years after the deadline set forth in the Affiliation Agreement.

100.    The failure to timely implement the new EHR system in accordance with the Affiliation Agreement caused significant harm to MIC and its ability to care for its patients.

101.    At the beginning of the Affiliation Agreement, MercyOne directed MIC to utilize EPIC as its EHR system with the recommendation that a transition to EPIC would facilitate better integration between MIC and MercyOne. However following testing of the EPIC system, site visits, and considerable review and evaluation, MIC determined that it lacked the financial resources to expend the approximately $10 million required for the first year of transitioning to EPIC. MIC also determined that it lacked the operational and IT support necessary to implement and integrate EPIC as a new EHR system on the timetable MercyOne desired.

102.    On or about July 18, 2017, MIC finalized its evaluation of MercyOne's IT Support services through which MercyOne recommended that MIC license EPIC community connect and placed MIC in contact with Mercy Cedar Rapids and the University of Iowa Hospitals and Clinics ("UIHC") to negotiate a license for a new EHR system. Based on information provided by EPIC, as well as information provided by Mercy Cedar Rapids and UIHC, switching to EPIC would result in a one-time cost of between $12 and $18 million with an estimated annual cost of between $2.1 and $3.3 million dollars. These costs exceeded what MIC could afford.

103.    On June 12, 2018, as part of a Revenue Cycle assessment, Impact Advisors, a consultant employed by MIC, presented an EHR Risk Assessment Final Report to the Board, including the representatives of MercyOne, outlining significant financial and legal compliance risks should MIC fail to timely and effectively implement a new EHR system.

104.     Impact Advisors estimated it would take approximately 28 months from the start of a request for proposal process to final implementation of a new EHR system, exclusive of any support and stabilization concerns resulting from implementation.

105.     On or around November 14, 2018, E-Volve Health Advisors, a consulting firm retained at MIC's expense, presented an Information Technology Strategic Advisory Support report to the Board outlining E-Volve's projected work plan to identify a new EHR vendor for MIC, including the potential to utilize the existing relationship with MercyOne to license EHR services from MercyOne.

106.     On or around February 1, 2019, MIC engaged, at its own cost, E-Volve Health Advisors, to identify replacements for its EHR system through a request for proposal process.

107.     Between February 2019 and June 2019, MIC formed an EHR Selection Steering Committee to investigate, report, and recommend a new EHR vendor to the Board following approval by MercyOne. Ritz participated in Board meetings where the EHR Selection Steering Committee presented on their progress identifying a replacement EHR system, but MercyOne did not provide any further recommendations or assistance.

108.     The EHR Selection Steering Committee initially identified Meditech Expanse as its preferred system and decided to move on from Allscripts[4] Horizon, its existing EHR system for which technical support had terminated. Allscripts had been a potential replacement EHR system candidate, but it was not selected due to outages of Allscripts' Horizon system and harsh criticism regarding the flexibility and ease of use of Allscripts Sunrise, the proposed replacement for

---

[4] On May 6, 2022, Allscripts Healthcare Solutions was acquired by Harris Computer Corp. and subsequently rebranded as Altera Digital Health. For the sake of clarity, the OC uses Allscripts to refer to Allscripts Healthcare Solutions and its rebranded entity Altera Digital Health.

Allscripts Horizon. Ultimately and pursuant to the direction of Williams, the EHR Selection Steering Committee selected Allscripts Sunrise system as its proposed EHR replacement.

109.    On February 1, 2021, dozens of members of MIC's medical staff directed a letter to the Board, including MercyOne representatives, stating, among other things, that "Mercy Hospital will not survive" without a functioning EHR system. Further, it provided, "[t]he people signing this letter are your most senior, experienced, and dedicated medical staff. Please hear us: we cannot work with this medical record system any longer." A copy of MIC's medical staff letter to the MIC Board is attached hereto as Exhibit 3.

110.    On March 1, 2021, Ritz and Wegner had reviewed MIC's EHR proposal, advised MIC's leadership that they saw no issues with the proposal, and recommended that the proposal go before the Board in order for MIC's proposed EHR implementation to proceed.

111.    Additionally, MercyOne required that it review and approve any recommended EHR vendor before a recommendation could go before the Board. To that end, MercyOne reviewed MIC's proposal to use Allscripts as its new EHR system vendor, which included a review of the cashflow projections for the proposed contract, the total cost of ownership over the life of the proposed relationship, the fee structure, the debt structure, and projected impact on MIC's revenue cycle.

112.    On March 9, 2021, the Board's Finance Committee met to discuss the Allscripts EHR system implementation and integration, at which time Ritz advocated for implementation, while others on the Committee observed that success of the Allscripts Sunrise EHR system relied on Allscripts' agreement to provide a preferred cost model as well as Allscripts' agreement to bear the cost burden for implementation of the integration. They also acknowledged that despite the preferential payment terms, the Allscripts investment placed significant pressure on MIC's

finances. Disregarding these concerns, Ritz noted that implementation of Allscripts Sunrise EHR System (the "Allscripts EHR System") would ease MIC's integration with MercyOne.

113.    On March 9, 2021, immediately following the Board vote to approve the Allscripts EHR system acquisition, Williams executed a Master Client Agreement on behalf of MIC. The agreement provided for the replacement of MIC's legacy Allscripts revenue cycle system; clinical infrastructure; and related clinical, financial, and facilities systems. This meant that Allscripts would replace dozens of existing Allscripts systems and nearly one hundred third-party systems covering clinical systems, revenue collection, finance reporting, regulatory and compliance functions, some ancillary functions and facilities, and infrastructure functions. Under the Master Client Agreement, MIC was assessed one-time and recurring fees in addition to costs related to professional services, education and training, and hosting services, which payment would be due on March 9, 2022, thereby deferring any initial deposit and fees for the first year.

114.    In May 2021, employees of MIC voiced a number of concerns to MercyOne representatives that MIC was not ready to "go live" with the Allscripts EHR system.

115.    Nevertheless, on or about May 17, 2021, MercyOne's representatives directed that the Allscripts EHR system go live.

116.    The Allscripts EHR system suffered critical failures. Those failures included issues related to the integration and implementation of systems covering clinical coding and records, finance and revenue cycle functions, regulatory and compliance tracking, and ancillary facility and infrastructure management functions. Those failures resulted in significant issues integrating clinical and medical records and also resulted in major revenue cycle issues, delaying billing, cash collection, and financial record generation, thereby limiting cash collection on accounts receivable ("AR") and payment requests to individual, government, and insurance payors.

117.    Thereafter, Allscripts worked with MIC to continue integrating MIC's existing systems with Allscripts. As a result of continuing issues with the Allscripts system, MIC was unfortunately forced to engage iMethod who began work on August 15, 2021 to resolve the Allscripts integration impact on MIC's clinical operations.

118.    Despite being aware of the EHR integration issues facing MIC, MercyOne did not offer or provide any material IT support.

119.    MercyOne, however, worked with Allscripts on behalf of MercyOne's other strategic partners, including hospitals and clinics located throughout Iowa, as an alternative to those partners who could not transition to EPIC on the same timeline as MercyOne.

120.    On June 25, 2021, a number of MIC's medical providers directed a letter to MercyOne, among others, noting the serious operational failures at MIC, including a "sluggish EHR [that] is steadily deteriorating." A copy of the June 25, 2021 letter is attached hereto as Exhibit 4.

121.    Between July 22 and July 25, 2022, MIC's CFO Miller and Stuart Elkins, MIC's Vice President of Fiscal Management, reiterated earlier warnings to MercyOne leaders that MIC had liquidated large portions of its investment portfolio as a result of billing problems stemming from the Allscripts implementation. They informed Trachta that due to the Allscripts implementation, MIC's average unbilled AR balance had increased from $43 million to $61 million compared to before implementation.

122.    Trachta was further advised that MIC had employed iMethods to help work through the EHR revenue cycle disruption but that recovery of the unbilled AR was unlikely due to a lack of adequate support and resources, combined with Allscripts' failure to meet deadlines and address

concerns, and due to staffing reductions imposed by MercyOne's current performance improvement plan.

123.     Miller reminded Trachta that he, Ritz, and Wegner were aware of the issues due to the weekly MercyOne calls, and that as a result of the lack of support and the implementation issues, MIC had been unable to recover large portions of its billed services, which in turn required MIC to liquidate investments to fund operations.

124.     Miller advised that the substantial losses from uncollectable AR and liquidation of investment accounts resulted from ongoing pervasive issues with MIC's EHR system and poor operating performance, which losses could not be recovered while MIC's poor operations continued.

125.     On or about July 27, 2022, Insight Health Partners provided MIC with a new performance improvement plan to address cashflow concerns and inadequate capitalization resulting from outstanding AR, following MercyOne's requirement that MIC retain and pay Insight for its strategic planning services. MercyOne did not provide any material assistance with the development of a turnaround plan; rather, upon request from MIC's Board chairman, MercyOne agreed to reduce its monthly management fee to permit MIC to fund a turnaround process.

126.     On July 29, 2022, Trachta was informed that MIC had been unable to bill numerous patients' insurers because the Allscripts system had defaulted to billing patients directly by treating the patients as the primary financial responsibility party rather than by billing their respective insurers followed by requests for payment of any unreimbursed sums from the patients. In response, Trachta merely recommended that the problem needed to be fixed because it harmed MIC's reputation and cashflow, but he took no definitive action.

127. On or about September 6, 2022, MIC executed a Master Service Agreement with Revology to perform administrative services related to the collection of past due AR and otherwise resolve revenue cycle issues due to Allscripts integration issues.

128. Prior to engagement of Revology, a MercyOne employee had visited MIC and provided a few samples of MercyOne's revenue collection processes to MIC's revenue cycle team, but MercyOne did not provide material assistance with the collection of AR or addressing MIC's revenue cycle issues.

129. On June 26, 2023, during MIC's Board meeting, Tom Clancy, MIC's acting CEO, advised the Board that as a result of the problems related to the transition to Allscripts, MIC had identified approximately $37.53 million in losses traceable to issues with the EHR implementation and attributable to inadequate revenue cycle and financial management support.

### C. MercyOne's Failures to Pursue Strategic Affiliation

130. The Affiliation Agreement memorialized MercyOne and MIC's intention of planning for MIC's full strategic affiliation with MercyOne.

131. The Affiliation Agreement provided that MercyOne and MIC believed a strategic relationship between them would be "mutually beneficial" and that the parties "desire[d] to explore a path by which MIC [would] fully affiliate with MercyOne, including transfer of Catholic sponsorship of MIC to one of its Catholic Sponsors," CHI and Trinity.

132. The very first provision of the Affiliation Agreement established a "Strategic Council" (the "Strategic Council") by which MercyOne and MIC's leadership teams would collaborate to establish a plan for completing a strategic affiliation, including by evaluating the process for transfer of the Sisters of Mercy sponsorship, development of performance metrics and timeline for strategic affiliation, review and approval of the strategic affiliation by CHI and Trinity, as well as other traditional due diligence matters.

133.    In the days following execution of the Affiliation Agreement, MIC agreed to update its tagline to advertise that it was "[A]n affiliate of Mercy Health Network" on its communications and public facing information. MIC also informed its staff that as part of the integration and rebranding they could access updates on the integration with MercyOne through links on Mercy Central (MIC's information and staff portal), including links to MercyOne's website, MercyOne's monthly e-newsletter, and video messages from Ritz, president and CEO of MercyOne.

134.    The first Strategic Council meeting convened in May 2017. MercyOne's representatives were Ritz as MercyOne's incoming President and CEO, Wegner as MercyOne's COO, Vellinga as MercyOne's then-President and CEO, and Davenport, CFO at MercyOne Waterloo. MIC's representatives were Mike Heinrich, Cindy Penney, Casey Greene, Dena Brockhous, and interim MIC CEO Shane Cerrone.

135.    The Affiliation Agreement required the Strategic Council to meet "as necessary" in the first 90 days of the Affiliation Agreement term to "work[] with management and the governing board of each of the Parties…to develop and finalize the Parties' approach to meeting the Affiliation Goals."

136.    Thereafter, the Affiliation Agreement required the Strategic Council to meet at least once per quarter.

137.    The concept of the Strategic Council was unique to the MIC-MercyOne relationship and is not included in any other management agreement between MercyOne and the numerous other rural third-party hospitals to which MercyOne provides management services.

138.    Instead, the Strategic Counsel was specifically included in the Affiliation Agreement in order to advance the "Affiliation Goals" thereunder and to serve as an important vehicle to achieve MIC's strategic affiliation with MercyOne.

139.     The Strategic Council met on May 19, 2017, June 1, 2017, June 16, 2017, July 7, 2017, July 26, 2017, December 20, 2017, January 15, 2018, February 19, 2018, and April 16, 2018. Thereafter, the Strategic Council ceased meeting.

140.     As part of those meetings and through later communications, MercyOne repeatedly represented to MIC that it was planning for strategic affiliation.

141.     On December 5, 2017, MercyOne circulated an update to the Board advising that MercyOne had seen significant progress under the performance improvement plan resulting in a $3,903,727 net loss compared to $8,984,435 for the previous year, outlining MercyOne's plan to begin studying full strategic affiliation and integration starting in June 2018 with due diligence to follow, and informing the Board that MercyOne had several discussions with UIHC regarding development of a potential collaboration between MIC, MercyOne, and UIHC as part of its planned integration.

142.     On January 10, 2018, Ritz circulated a memo to Cerone as a follow-up to the January 9, 2018 MIC Board meeting in which Ritz emphasized that MercyOne's intention was to develop a plan for the full integration of MIC into MercyOne with the initial development of a business plan for integration to occur around July 1, 2018. Ritz noted that MIC's Board agreed to MercyOne's plan to strengthen MercyOne's position in Eastern Iowa as part of the focus on fully integrating MIC.

143.     As of March 19, 2018, MercyOne, through Trachta, then serving as its VP of Rural Hospitals and Affiliates, had used MercyOne's relationship with MIC to discuss possible affiliation and or management of six other hospitals or medical groups located near Iowa City— including Jefferson County Hospital and Clinics, Washington County Hospital and Clinics, Henry

County Health Center, Great River Medical Center, Fort Madison Community Hospital, and Keokuk County Health Center.

144.    In April 2018, MercyOne developed a Planning & Business Development – Mercy Iowa City plan as the first and only strategic plan developed by MercyOne for MIC, which plan identified two areas of opportunity, 1) Trachta would use MIC to develop local and rural hospital affiliations in southeast Iowa, with a focus on hospitals currently receiving specialty services from MIC, and 2) development of an acute inpatient rehabilitation center with the potential to generate a positive financial return to MercyOne.

145.    On May 31, 2018, Ritz circulated a memo to Williams and MIC's leadership celebrating MIC's success under MercyOne's performance improvement plan. Ritz indicated that the performance improvement plan had resulted in an operating performance improvement of approximately $20 million, and that it had helped as MercyOne and MIC "developed a stronger relationship and a shared Vision for our larger, more integrated relationship in the future."

146.    In July 2018, MercyOne presented to the Board on Mercy Hospital, Iowa City: Pathway to Full Integration, observing that the goal of the Affiliation Agreement was to plan and implement MIC's full affiliation with MercyOne.

147.    On August 28, 2018, Ritz and Williams met with Sister Susan Sanders and Sister Margeret Hinz of the Sisters of Mercy, sponsor of MIC. During that meeting, Ritz advised the sisters regarding MIC's progress under the Affiliation Agreement, MercyOne's performance improvement plan, and MercyOne's anticipated integration of MIC.

148.    On August 28, 2018, during MIC's Board meeting, Ritz congratulated MIC executives on their success under MercyOne's performance improvement plan, and he advised

that he anticipated MercyOne would begin planning a full integration of MIC in the spring or summer of 2019.

149.    Ritz further advised that MercyOne would continue working with other health facilities in Eastern Iowa to continue MercyOne's growth in the region.

150.    MercyOne, however, took very little further action or initiative with respect to planning or pursuing strategic affiliation with MIC beyond representations that MercyOne anticipated continuing to pursue that purpose.

151.    On or about September 1, 2019, MIC and MercyOne entered into the First Amendment to the Affiliation Agreement, extending all of the terms of the original Affiliation Agreement and extending the period of the relationship until June 30, 2023. MercyOne represented to MIC the continued viability of full acquisition of MIC and integration into MercyOne as contemplated in the Affiliation Agreement.

152.    According to Ritz, however, MercyOne's board of directors did not discuss, consider, or evaluate strategic affiliation with MIC following the extension of the Affiliation Agreement until it elected to inform MIC in the spring of 2021 that strategic affiliation was no longer an option for MIC.

153.    According to Ritz, neither he nor MercyOne held MIC strategic affiliation discussions with CHI or Trinity after some initial investigations.

154.    On April 30, 2021, Ritz circulated a letter and memo to Bishop Zinkula of the Diocese of Davenport requesting the Bishop's support for MercyOne to disassociate from MIC due in part to Ritz's view that "[a] preliminary liquidation analysis indicates the organization's assets would not be able to cover all of MIC's liabilities by approximately $40 million if the ministry closed at this time. The pension liability is a long term-liability and does not need to be

paid off now, but it …. confirms the need to address the justice issue for the pensioners with the current underfunded liability over $78 million." A copy of Ritz's April 30, 2021 Letter and Memorandum to Bishop Zinkula is attached hereto as Exhibit 5.

155.    On or about May 16, 2021, MercyOne appeared before the Board and recommended that MIC find a different strategic partner, while advising that MercyOne would continue to provide services under the Affiliation Agreement until the earlier of MIC's execution of a new affiliation agreement with a different strategic partner or expiration of the term of the existing Affiliation Agreement.

156.    MercyOne advised that though the initial goal of the Affiliation Agreement had been a complete integration of MIC into MercyOne, MercyOne could not accomplish this goal because MIC had experienced negative financial impacts due to COVID-19, MercyOne anticipated that it would face increased competition from UIHC, MercyOne had limited access to capital to support an integration, the need for investment in virtual care and digital strategies, MercyOne had concerns about the geographic distance between MIC and MercyOne's Des Moines operations, and MercyOne had no desire to take on MIC's existing pension liabilities.

157.    On June 6, 2021, the Board approved a resolution to engage H2C at MercyOne's request as a strategic advisor to assist MIC in developing a request for proposal process to locate a different long-term strategic affiliate.

158.    Thereafter, MIC attempted to locate a replacement long term strategic partner using MercyOne's approved consultant H2C, which service was paid for by MIC.

159.    On June 12, 2021, Williams advised members of the Board that MercyOne would handle legal review of the H2C contract rather than MIC's outside counsel.

160.    On or about April 4, 2023, Ritz prepared an internal memo observing that he had made multiple requests that MIC terminate the Affiliation Agreement because MercyOne had no interest in completing an integration with MIC.

161.    MercyOne's lack of interest was due in part to MercyOne's own existing operating losses and the desire to avoid any financial obligations to MIC, including MIC's pension underfunding, beyond MercyOne's existing obligations as manager of MIC.

162.    Ritz observed that he anticipated MercyOne would be subject to suit for unfunded liabilities or management malpractice due to MercyOne's failure to provide management services required by the Affiliation Agreement, but that despite those issues, MIC continued to require services under the Affiliation Agreement during its transition to a new strategic partner.

163.    On April 6, 2023, Ritz circulated a memorandum of understanding to the Board reflecting that the Affiliation Agreement would terminate on April 7, 2023, and the Board Members appointed by MercyOne—including Ritz, Trachta, Vellinga, and Jack Dusenbery ("Dusenbery")—would resign immediately, which was confirmed by Vellinga in an email on April 7, 2023.

164.    On April 7, 2023, MercyOne and MIC executed a Mutual Termination of Management Services and Strategic Affiliation Agreement.

165.    Despite MercyOne's contentions in 2021 that it was unable to enter into a strategic affiliation with MIC because of, among other things, its impending merger with Trinity, its own financial struggles, and the geographic distance between Iowa City and Des Moines, MercyOne completed the acquisition of Davenport-based Genesis Health Systems in March 2023.

166.    Davenport is approximately 60-miles further east from Des Moines than Iowa City.

167.     While MercyOne wanted to be in the Eastern Iowa market, it did not want to achieve such market foothold through MIC in large part because of MIC's underfunded pension obligations which obligations MercyOne would not assume.

### D.  Conduct of CEOs Provided to MIC by MercyOne

168.     During the March 6, 2018 Board meeting, MercyOne presented Defendant Williams as its preferred candidate for CEO and President of MIC. Williams had previously served as MercyOne's CEO for its Mercy Medical Center - Clinton and was part of MercyOne's executive leadership team.

169.     During that meeting, MIC's Board voted to approve Williams's employment as CEO and President. The Board did not, however, approve payment of a sign-on bonus; relocation payment; payment for lodging, furniture, or living expenses; or severance payment for Williams.

170.     Williams served as CEO and President from May 1, 2018 until September 30, 2021, when he was strongly encouraged to and did resign.

171.     During his tenure as CEO, Williams was regularly absent from MIC during business hours, and his absence from MIC was well-known around the hospital.

172.     On one of his first days of employment with MIC, Williams directed MIC staff to remove the desktop computer that had been set up for him in MIC's office. Williams stated that he did not need a desktop computer.

173.     During his tenure as CEO, Williams was rarely seen using a laptop to conduct MIC business. Instead, Williams largely attempted to perform his role as CEO of MIC from a smart phone and was known to have issues reviewing or accessing important documents.

174.     Beginning at the start of the COVID-19 pandemic and continuing through his resignation in September 2021, Williams refused to wear a mask at MIC despite the mask-related orders from the State of Iowa and MercyOne's own mask policy.

175.     Numerous staff and medical providers at MIC were furious that their CEO risked their safety during the pandemic by refusing to wear a mask.

176.     Williams placed MIC's reputation and, most importantly, the health and lives of MIC's employees, at significant risk during the COVID-19 pandemic by refusing to wear a mask.

177.     MercyOne received multiple reports of Williams' refusal to wear a mask, but MercyOne did not take immediate or effective action to gain Williams' compliance with the mask mandate, report the matter to the Board, or obtain Williams' expeditious removal as CEO.

178.     Early in Williams' tenure as CEO, Doug Davenport—MIC's part-time CFO employed by MercyOne—identified an opportunity for MIC involving open heart surgery cases. In particular, Davenport, who also served as MercyOne Waterloo's part-time CFO, reported to MIC that MercyOne Waterloo could send up to approximately 90 open heart surgery cases per year to MIC, rather than MIC's competitors. Rather than allowing this "network leakage," Davenport recommended that MercyOne redirect these open-heart surgery cases to MIC. MIC staff estimated that MIC's receipt of these open-heart cases had the ability to generate for MIC approximately $400,000.00 in net revenue every year, starting in fiscal year 2020.

179.     The perks of being in MercyOne's larger "network" were, of course, one of the key benefits to MIC that MercyOne emphasized when negotiating entry into the Affiliation Agreement.

180.     Nevertheless, Williams and MercyOne failed to take any action to ensure that MIC received any of these approximately 90 open-heart surgery cases per year.

181.     MercyOne was aware of Williams' poor performance as CEO.

182.     On December 1, 2020, Ritz called Williams and expressed his concern regarding Williams' performance, and Ritz advised Williams that he would be placed on a performance improvement plan.

183.    Ritz drafted a summary of his call with Williams and noted that Williams' performance fell well below MercyOne's expectations. Ritz further noted that Williams' performance as President and CEO of MIC and as an employee of MercyOne required monthly review and was cause for concern regarding his contribution to high turnover of MIC's leadership team and the quality of the leaders selected as replacements.

184.    On December 8, 2020, Ritz emailed Williams observing that MIC was not meeting the performance improvement goals set by MercyOne, and Ritz directed that MIC introduce Trachta to staff as acting COO so that Trachta could implement the operational changes that MercyOne wanted, following Trachta's time visiting MIC on a regular basis starting in October 2020 to observe and evaluate MIC's operational performance.

185.    Trachta was then employed as System Vice President and President of Affiliate Hospitals at MercyOne and retained that position, albeit with some changes to the title, throughout his tenure at MIC.

186.    Between October 27, 2020, and September 30, 2021, Trachta provided limited guidance to MIC with regard to its operations, instead primarily monitoring MIC's operations and finances in greater detail.

187.    On October 29, 2020, Williams emailed Ritz regarding MIC staff concerns about Trachta's involvement in MIC and the degree of oversight Trachta was exerting over work streams outside his role, Trachta's requests for information and reports on topics unrelated to his work, concerns regarding Trachta's review of staff schedules, and Trachta's inquiries regarding time staff spent teleworking. Sean stated "I will take your lead and support the goals you have with him being here as I am part of your team first and with you I am here to represent MercyOne."

188.     Also on January 26, 2021, following MIC's January 19 Board meeting, Ritz drafted a memorandum to file summarizing a discussion of Williams' performance with the Board and noting that individuals who worked closely with Williams ranked his performance lower than others, such that the MIC leadership team ranked his performance well below acceptable levels.

189.     Ritz's January 26 memorandum noted that due to Williams' absences from MIC, his performance improvement plan deadlines would be pushed back, and the feedback from the Board indicated the need to "really consider significant change if the approach we have taken thus far in our relationship with Mercy Iowa City vis-a-vis Sean's appointment as President and CEO."

190.     The January 26 memorandum further observed that Williams' leadership and high leadership turnovers were cause for concern; that Williams struggled to make decisions or implement decisions; that Williams needed to strongly enforce MercyOne policies, structures, systems; and that he generally struggled as a leader. Moreover, the memorandum recognized that those issues raised real concerns about MercyOne's leadership effectiveness during a difficult time in addition to raising general structural concerns about systems in place at MIC and how MercyOne was fulfilling its leadership obligations.

191.     Ritz stated in his January 26 memorandum "we need to recognize Mercy Iowa City deserves a full-time leader who is effective at making decisions, developing a team, representing the organization and the community and producing good results. It is a time for us to reflect on where we are on that scale and make decisions accordingly."

192.     During an August 2, 2021 Board meeting, then-Board chairman Tom McLaughlin ("McLaughlin") and Ritz announced that they had met with Williams to review his performance and that during that meeting Williams had announced his decision to resign.

193.   McLaughlin and Ritz further announced that Trachta, then System Vice President and President of Affiliate Hospitals for MercyOne and acting Chief Operating Officer of MIC, would assume the position of acting CEO and President of MIC.

194.   No other candidates were presented to MIC's Board, and the Board voted to approve Trachta as acting CEO and President of MIC effective October 1, 2021. The Board did not vote or otherwise address any severance payments for Williams, though MercyOne invoiced MIC approximately $475,974.99 for severance payments to Williams and an additional $14,940.93 for COBRA, though MIC was not Williams' employer.

195.   Between October 1, 2021 and April 6, 2023, Trachta continued concurrently working for MercyOne and working part time for MIC as CEO, despite the Affiliation Agreement requiring MercyOne to provide MIC a full-time CEO.

196.   He worked part of each week for MIC, occasionally travelling to Iowa City, while spending the remainder of the week working for MercyOne in Des Moines, during which time he hosted events for MercyOne affiliates, potential new MercyOne rural hospital affiliate targets, met with MercyOne executives, corresponded about MercyOne projects, attended conferences, and otherwise continued his work as System VP and President of Affiliate Hospitals for MercyOne.

197.   During his time working from Des Moines, Trachta was known to frequently be unresponsive to MIC leadership or unavailable to make decisions regarding MIC's strategic plan and operations.

198.   In May 2023, MIC received notice from CMS that due to MIC's failure to meet the requirements for CMS's Phase 2 review during 2022 because of MIC's failure to submit Hospital Consumer Assessment of Healthcare Providers and Systems ("HCAHPS") Survey Data, MIC's Medicare and Medicaid Reimbursement rate would be reduced by one fourth.

199.    HCAHPS survey information was to be provided by Press Ganey, who was employed by MercyOne and reimbursed by MIC under the Affiliation Agreement, and the provision of such information should have been overseen by Trachta.

200.    MercyOne invoiced MIC monthly for management fees, CEO fees for Cerone and Williams, CFO fees for Davenport, and Executive fees for Trachta while he served as acting CEO and President.

201.    MercyOne also invoiced MIC for lodging, furniture, and living expenses for Cerone and Williams; severance for Williams; and travel reimbursement for Trachta.

202.    However, MercyOne did not receive Board approval for any lodging, furniture, or living expense reimbursement; severance; or travel reimbursement for those three individuals.

203.    Because the Affiliation Agreement required MercyOne to provide MIC a full-time CEO, MIC should not have paid for lodging, furniture, living expenses, or travel reimbursements for any CEO for travel from their residence to MIC.

### III.    MercyOne Uses Affiliation Agreement to Further Its Own Interests

#### A.    Control of MIC to Benefit MercyOne

204.    MercyOne used its placement with MIC in Iowa City to solicit numerous third-party rural healthcare organizations in Eastern Iowa to enter into management agreements with MercyOne.

205.    Any such management agreements would benefit MercyOne through receipt of management fees and driving referrals back to MercyOne's owned hospitals, including its headquarters in Des Moines.

206.    MercyOne understood that it both actually controlled MIC as a result of the Affiliation Agreement and that the public viewed MercyOne as operating MIC.

207.    For example, between August 15 and 16, 2020, Mike Wegner as MercyOne Executive Vice President of Operations and CFO, Ritz as MercyOne President and CEO, and Williams exchanged a series of emails raising concerns about MIC's financial performance, including concerns regarding MIC's implementation of MercyOne's performance improvement goals. Ritz noted that he was concerned the Board would terminate the Affiliation Agreement due to MercyOne's management and MIC's financial issues.

208.    For example, on or about September 22, 2020, Ritz demanded that MIC provide MercyOne with copies of material to be presented to the Board several days in advance of any Board meeting because "it is really important we have these materials in advance for our review and approval. Presumably, from the Board's perspective, any [performance improvement] plan like this we submit for their consideration, is coming from MercyOne as the management team overseeing Mercy Medical Center, Iowa City . . . [w]e are here to help with the development of the plan, the administration of the plan and the achievement of the plan goals and targets."

209.    As further example, on January 21, 2021, Ritz emailed Miller, MIC's CFO, stating that regardless of Miller's confidence in MercyOne's forecasts, MIC's leadership team need to design and execute a plan to achieve the forecast because the MercyOne forecast was required for MIC to be viable. Ritz advised that MercyOne would need to approve any new forecasts followed by subsequent presentation to the Board, and that despite having developed three performance improvement plans since September 2020, MercyOne expected MIC would mitigate any gaps between actual performance and plan goals rather than adjusting forecasts.

210.    On January 26, 2021, Ritz emailed Williams and Trachta, informing them that he was aware Miller did not believe the forecasts and financial plans presented to the Board were reasonable or achievable and that Miller's position posed a problem for the organization.

211.    That same day, Ritz drafted a memo to file addressing his concerns with Miller, noting that Miller believed MIC would experience losses of approximately $8 million rather than MercyOne's estimate of $2.5 million, and Ritz advised that MercyOne's perspective was that MIC should not focus on whether they believe MercyOne's forecasts are accurate but instead should execute the steps identified by MercyOne.

212.    As noted above, in contravention of the Affiliation Agreement, MercyOne required MIC to obtain its consent to employ any third-parties and proposed "re-educat[ion]" was needed of MIC's executive team if they did not recognize MercyOne's "authority to act" and support MercyOne's level of decision making at MIC.

213.    On March 24, 2021, in connection with MercyOne and MIC's efforts to contest UIHC's North Liberty certificate of need, MercyOne's Chief of Staff, Mary Cownie, informed Williams, Trachta, Ritz, Wegner, and Campbell (MercyOne's Chief Legal Officer), that MercyOne originally entered into the Affiliation Agreement to "force a potential partnership that would allow Mercy Iowa City [to] survive . . . our efforts were designed to protect our ability to build our own new facilities and compete in the same saturated region." Cownie noted that it would be difficult to explain how MercyOne has the capital to support the construction of new facilities, while MIC struggles with financial instability and possibly closure down the road.

214.    On or about April 21, 2021, MercyOne engaged with H2C to facilitate the search for a replacement strategic partner for MIC, prior to proposing dissociation to the Board and before any vote could take place.

215.    On April 27, 2021, Ritz emailed Williams and Trachta advising them that MercyOne had engaged with H2C to conduct a RFP for a new partner for MIC, informing them that Ritz was meeting with the Sisters of Mercy to discuss disassociation, and requesting that

Williams and Trachta review the proposed engagement. Williams recommended that the H2C proposal should be addressed to Ritz as President and CEO of MercyOne since the recommendation would be coming to the Board from MercyOne as the "Management [C]ompany" and not just Williams as the local CEO. Williams further recommended that because Ritz had been in communication with the Sisters of Mercy, H2C and others, Ritz should explain the "very hefty fee" and what would happen if no transaction occurred within six months since MIC would be responsible for the fees.

216.    Ritz disregarded these concerns.

217.    On or about March 15, 2022, Ritz directed MIC to eliminate its agency staffing and special programs and report back to MercyOne with proposed solutions so that MercyOne could approve those changes.

218.    Despite claims that it was recusing itself from MIC's search for a new strategic partner with H2C, MercyOne continued to assert influence in MIC's search process.

219.    This conduct was taken, in part, in an effort to further MercyOne's—rather than MIC's—interests.

220.    The H2C engagement letter, for example, provides that MercyOne was entitled to receive confidential information related to MIC's efforts to find a new strategic partner.

221.    As further example, in Spring 2022, Ritz contacted a strategic partner of MIC, Steindler Orthopedics, which was party to a series of agreements with MIC related to orthopedic services the parties provided to the community.

222.    In that communication, despite the appearances that MercyOne was recusing itself from the search process, Ritz indicated he was familiar with MIC and UIHC's discussions regarding strategic partnership.

223.     Ritz requested that Steindler release its existing agreements with MIC, otherwise MIC would be unable to enter into a management agreement or purchase by UIHC.



226.     On or around March 1, 2023, Trachta attempted to lease physicians from MercyOne's affiliate, Iowa Heart, until MercyOne's legal counsel changed its position and rejected the proposed leases.

227.     Despite knowledge of MIC's deteriorating financial condition and following termination of the Affiliation Agreement, MercyOne continued to insist on MIC's payment for a partial month of management fees, executive fees, and expenses up to termination of the Affiliation Agreement on April 7, 2023.

**B.  *Iowa Heart***

228.     On June 1, 2017, pursuant to MercyOne's initial performance improvement plan for MIC, MIC entered into a locums agreement for the provision of cardiovascular services with Catholic Health Initiatives-Iowa, Corp., d/b/a Mercy Medical Center-Des Moines and Iowa Heart through which Iowa Heart would provide cardiologists and other staff necessary for MIC to provide cardiology services to its patients.

229.     As a condition of providing further services to MIC, MercyOne and Iowa Heart required that MIC (a) sell to Iowa Heart its existing cardiology practice, including all equipment, personal property, and contracts; (b) enter into a sweetheart lease for use of MIC's existing

cardiology practice space; (c) enter into a Cardiology Administrative Clinical Services Agreement; and (d) fully support Iowa Heart's acquisition and provision of cardiology services at MIC.

230.    On June 7, 2018, Williams, with the approval of MercyOne, executed a transaction through which Iowa Heart purchased MIC's cardiology practice, including its tangible and intangible personal property for the price of $378,805. This price was comprised of the alleged value of the medical, office, communication, computer and other equipment located in MIC's cardiology practice space as well as the furniture located therein. This price did not include compensation for inventory of goods or supplies, intellectual property, licenses or permits, goodwill, or patient records, such that the price fell far below fair market value.

231.    As part of the Iowa Heart transaction, MIC executed a Cardiology Administrative and Clinical Services Agreement under which MIC agreed to pay Iowa Heart on monthly invoices for Iowa Heart's provision of administrative services for a Medical Director for Cardiology and Electrophysiology, Administrative and Management Services, and General Electrophysiology and Interventional Cardiology services. MIC also executed a Shared Services Agreement through which it agreed to pay Iowa Heart for use of support staff to greet and register patients and for the use of common waiting areas.

232.    On June 9, 2018, Williams terminated MIC's locums agreement with Iowa Heart, entered into a lease with Iowa Heart for MIC's former cardiology space, executed a Cardiology Administrative and Clinical Services Agreement for Iowa Heart's provision of Cardiology and Electrophysiology services to MIC, and entered other agreements for the use and or lease of MIC employees and physicians.

233.    Under these agreements, MIC would retain all hospital revenue, while clinic assets and physician contracts were assigned to Iowa Heart. Moreover, MIC would no longer bill for the

cardiology services provided by Iowa Heart, which would instead bill and generate revenue for those services.

234.    The Iowa Heart lease, and subsequent extensions and amendments, did not require that Iowa Heart reimburse MIC for utilities, taxes, maintenance, or other services provided as a typical "triple net" commercial lease would require. The Iowa Heart lease required MIC to also pay for Iowa Heart signage.

235.    On May 27, 2021, Williams executed an amendment to the Iowa Heart lease to increase the square footage available under the lease, effective January 1, 2021, and increasing the rental price per square foot from $26.72 to $27.25 per square foot.

236.    On July 21, 2021, Williams executed a second amendment to the Iowa Heart lease to further increase the square footage available to Iowa Heart under the lease.

237.    Prior to executing the second amendment to the Iowa Heart lease, Iowa Heart had been using more than a thousand square feet of space without paying for use of that space.

238.    The Iowa Heart lease and their amendments provided Iowa Heart with equipment, leased space, parking, staff sharing, and other benefits without renumeration to MIC, such that although MIC's ordinary practice was to lease space on triple net terms, Iowa Heart was provided a sweetheart deal.

239.    In June 2022, Iowa Heart doctors located in Iowa City explored the possibility of leaving Iowa Heart and affiliating with Mercy Cedar Rapids or UIHC due to dissatisfaction with Trachta and MercyOne's oversight of their Iowa City practice.

240.    In Fall of 2022, once UIHC became the likely successor strategic partner to MIC, Iowa Heart provided notice that it would terminate its services to MIC at the conclusion of the Affiliation Agreement.

241.     Iowa Heart, in fact, terminated its agreements with MIC contemporaneously with MercyOne's termination of the Affiliation Agreement in spring 2023.

242.     Iowa Heart paid tens of thousands of dollars per year less than the fair market value of the property it leased from MIC between 2019 and spring 2023 as a result of below market preferential lease terms for Iowa Heart and Iowa Heart's use of significant space without compensating MIC.

243.     In particular, the price per square foot charged to Iowa Heart under the initial lease agreement was approximately $7.33 less than the fair market value of the property had Iowa Heart paid under a triple net lease, due in large part to Iowa Heart's payment of the equivalent of $17.67 per square foot after application of estimated CAM, taxes, insurance, and maintenance expenses compared to the average price of around $25.00 per square foot chargeable under a triple net lease for comparable space in Iowa City.

244.     Likewise, following execution of the first and second lease amendments, the price charged to Iowa Heart was approximately $6.80 less than the fair market value of the property had Iowa Heart paid under a triple net lease, due to Iowa Heart's payment of the triple net lease equivalent price of $18.20, after application of estimated CAM, taxes, insurance, and maintenance expenses compared to the average rate of around $25.00 per square foot chargeable for comparable space leased under a triple net lease in Iowa City.

245.     Between August 8, 2019 and August 7, 2023, Iowa Heart's use of MIC's property for less than that property's fair market value amounted to at least $291,486.51 of value lost to MIC, in addition to the amounts MIC should have received for Iowa Heart's use of MIC's own facilities, staff, and provision of cardiology services to MIC and its patients.

246.     Between August 8, 2021 and August 7, 2023, Iowa Heart's use of MIC's property for less than that property's fair market value amounted to at least $132,947.00 of value lost to MIC, in addition to the amounts MIC should have received for Iowa Heart's use of MIC's own facilities, staff, and provision of cardiology services to MIC and its patients.

247.     Between August 8, 2022, and August 7, 2023, MIC paid Iowa Heart $728,400 for use of its own facilities, staff, and provision of cardiology services to MIC and its patients.

### C.  Teleneurology Services

248.     Starting in May 2020, MIC negotiated an agreement with a third-party teleneurology partner who agreed to provide stroke, emergency neurology, and inpatient neurology consultation at an estimated annual cost of approximately $150,000 per year. Upon Trachta taking a more active role at MIC in October 2020, he and MercyOne strongly encouraged MIC to instead engage MercyOne for teleneurology services anyway.

249.     MercyOne initially offered to provide stroke telemedicine and emergency phone consultation for $900 per day at an estimated annual cost of approximately $328,000, which MIC declined. But MIC was directed to wait for another MercyOne proposal which contemplated 24/7 acute stroke care and phone consultation for stroke and emergency neurology services at $500 per day, with the understanding that MIC would retain a neurologist to run its existing neurology clinic and support other hospital consultations. MercyOne's quote represented a significant cost discrepancy from other options available to MIC, but Williams and Trachta directed MIC leadership to engage MercyOne for teleneurology services.

250.     On February 23, 2021, following nearly six months of negotiation, MercyOne executed a Teleneurology Services Agreement (the "February Teleneurology Agreement"),

████████████████████████████████████████████████████████

███████████████████████████

251.    The February Teleneurology Agreement contemplated that MIC would pay MercyOne $500 per day for access to services under that agreement. This rate was far higher than other available options, but Williams and Trachta supported the February Teleneurology Agreement as a means of strengthening the relationship between MIC and MercyOne and as part of the path toward full integration of MIC into MercyOne.

252.    Despite its significantly higher price tag, individuals at MIC decided to enter into the February Teleneurology Agreement with MercyOne as a show to MercyOne of good faith and cooperation on MIC's behalf with regard to strategic affiliation, which MIC still thought MercyOne was actively pursuing.

253.    Following execution of the February Teleneurology Agreement and pursuant to a performance improvement plan overseen by MercyOne, MIC provided notice to two of its three neurologists employed at the time that it would not renew their contracts. This resulted in MIC having inadequate coverage of its neurological service needs absent the receipt of services under the February Teleneurology Agreement.

254.    On March 16, 2021, Dr. William Vandiver, President of MercyOne Medical Group -Central Iowa, MercyOne's service provider under the February Teleneurology Agreement, informed MIC that MercyOne needed to cancel the February Teleneurology Agreement. MercyOne VP Trachta, who was also the acting COO for MIC, confirmed that MercyOne would not fulfill the terms of the February Teleneurology Agreement.

███    █████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

256.     On May 15, 2021, MercyOne executed a Neurology Telemedicine Services Agreement (the "May Teleneurology Agreement") ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

257.     The services provided to MIC under the May Teleneurology Agreement were inadequate for MIC and not suited to its needs because MIC had terminated its neurologists in anticipation of entering into a larger teleneurology agreement with MercyOne.

258.     On or about May 27, 2021, MIC entered into a long term teleneurology services agreement with CarePoint, P.C., d/b/a Blue Sky Telehealth ("CarePoint") under which CarePoint agreed to provide stroke and teleneurology support, consultations, and imaging interpretation.

259.     MIC only utilized MercyOne's services under the May Teleneurology Agreement for approximately three months before fully utilizing Carepoint's services starting on September 1, 2021.

### D. Rehabilitation Hospital

260.    In or around 2017 and 2018, executives at MIC began substantive discussions with Encompass Health ("Encompass") to design and build a rehabilitation hospital in North Liberty in which MIC would be a joint venture partner.

261.    MIC desired to build a rehabilitation hospital in North Liberty as a result of market research that indicated that North Liberty could support a 40-bed in-patient rehabilitation facility.

262.    Encompass produced plans for such rehabilitation hospital and was prepared to seek a certificate of need from the State of Iowa, which was required to operate such a facility.

263.    Days before MIC and Encompass were prepared to go before the State of Iowa's licensing agency, however, MercyOne directed MIC to stop the process.

264.    MercyOne then directed MIC to restart the building, design, and certificate of need process from scratch using Kindred Healthcare ("Kindred"). MercyOne was working with Kindred and had opened a joint venture with it on a rehabilitation hospital in Clive, Iowa in June 2018.

265.    Encompass was upset at the sudden turn of events. Having plans for a rehabilitation hospital in North Liberty, however, Encompass approached UIHC about constructing a similar 40-bed facility. UIHC agreed to enter into an agreement with Encompass and build such a facility.

266.    Thereafter, Kindred and MIC spent significant time, effort, and additional resources developing a new plan for a joint venture rehabilitation hospital in North Liberty.

267.    Despite the certain survey information available to MIC that demonstrated a need for only one 40-bed facility in North Liberty, both MIC-Kindred and Encompass-UIHC approached the State of Iowa about obtaining certificates of need for each group to construct separate 40-bed facilities.

268.    The State of Iowa Department Health Facilities Council held a hearing on both group's certificates of need on the same day and approved both 40-bed projects for a certificate of need.

269.    On MercyOne's direction and advice, MIC continued with building its 40-bed rehabilitation hospital at the same time as UIHC built its separate facility, despite MIC's survey indicating the need for only one such facility in North Liberty.

270.    MIC-Kindred's facility opened in May 2020 (the "Rehab Hospital").

271.    The Rehab Hospital was never profitable as a result of competition from UIHC and contributed to MIC's financial decline.

272.    MercyOne's conduct in requesting MIC use MercyOne's joint venture partner Kindred as MIC's joint venture partner damaged MIC by opening the door for UIHC to create a competing facility.

273.    MercyOne's conduct was taken with the best interests of MercyOne, rather than MIC, in mind.

## **TRANSFERS**

274.    Certain of the conveyances that the OC seeks to avoid as fraudulent transfers are identified on the Debtors' *Notice and Initial Report on Potential Actions or Proceedings* [Docket No. 457].

275.    Between July 2017 and June 2023, MercyOne submitted monthly invoices for fees purportedly due under the Affiliation Agreement (each an "Invoice").

276.    Each Invoice broke out the individual expenses included therein by identifying amounts due as management fees, as well as a rebill of fees for MercyOne's provision of a CEO,

a CFO, Trachta as an "Executive;" fees for lodging, furniture, and related expenses; fees for travel

reimbursement; and other fees MercyOne believed fell under the Affiliation Agreement.

277.    MIC remitted payment for each monthly invoice (the "<u>Transfers</u>"), initially by

check until July 2022, then by wire transfer through automatic ACH draw.

278.    The Transfers include:[5]

i.      Between June 1, 2017 and December 31, 2017, MIC paid MercyOne for

invoices tendered under the Affiliation Agreement totaling $615,662.65,

comprised of $461,740.08 for management fees, $138,571.95 for CEO fees,

and $24,545.50 for other fees (including lodging and housing expenses and

communications services).[6]

ii.     Between January 1, 2018 and December 31, 2018, MIC paid MercyOne for

invoices tendered under the Affiliation Agreement totaling $2,199,223.90,

comprised of $1,143.540.43 for management fees, $620,224.29 for CEO

fees, $13,509.13 for lodging and housing expenses, $39,821.44 in

miscellaneous expenses, and $400,690.44 for CFO fees.

iii.    Between January 1, 2019 and August 6, 2019, MIC paid MercyOne for

invoices tendered under the Affiliation Agreement totaling $1,135,545.31,

comprised of $954,524.69 for management fees, $246,819.78 for CEO fees,

$25,031 for survey fees and other miscellaneous fees, and $166,806.66 for

CFO fees.

---

[5]     Unless otherwise noted, the fees for services were for the month preceding the invoice month.
[6]     Though invoiced in 2017, MercyOne's October 2017 invoice was not paid until July 2018 and so has been
included in the 2018 transfers.

iv.     Invoice No. MHNMIC7172019 dated July 17, 2019, due on receipt and paid

on August 13, 2019, in the amount of $265,823.35, of which $172,892.50

were management fees; $61,264.07 were CEO fees for June 7, June 21, and

July 5, 2019; and $31,666.78 were for shared CFO fees for June 7, June 21,

and July 5, 2019.

v.      Invoice No. MHNMIC8192019 dated August 19, 2019, due on receipt and

paid on September 10, 2019, in the amount of $243,629.90, of which

$172,892.50 were management fees, $46,633.17 were CEO fees for July 19

and August 2, 2019, and $24,104.23 were for shared CFO fees for July 19

and August 2, 2019.

vi.     Invoice No. MHNMIC9202019 dated September 20, 2019, due on receipt

and paid on October 15, 2019, in the amount of $239,425.47, of which

$172,892.50 were management fees, $43,759.93 were CEO fees, and

$22,733.04 were CFO fees.

vii.    Invoice No. MHNMIC10212019 dated October 21, 2019, due on receipt

and paid on November 13, 2019, in the amount of $239,108.31, of which

$172,892.50 were management fees, $43,645.85 were CEO fees, and

$22,569.96 were for shared CFO fees.

viii.   Invoice No. MHNMIC11112019 dated November 11, 2019, due on receipt

and paid on December 16, 2019, in the amount of $234,846.40, of which

$172,892.50 were management fees, $40,842.71 were CEO fees, and

$21,111.19 were for shared CFO fees.

ix.     Invoice No. MHNMIC12122019 dated December 12, 2019, due on receipt

and paid on January 14, 2020, in the amount of $250,368.71, of which

$172,892.50 were management fees; $43,250.95 were CEO fees for

November 2, November 16, and November 30, 2019; and $34,225.26 were

for shared CFO fees for November 2, November 16, and November 30,

2019.

x.      Invoice No. MHNMIC1162020 dated January 16, 2020, due on receipt and

paid on February 10, 2020, in the amount of $247,482.64, of which

$172,892.50 were management fees, $40,804.04 were CEO fees,

$21,270.61 were for shared CFO fees, and $12,515.49 were fees for Press

Ganey second half of 2019 spring surveys.[7]

xi.     Invoice No. MHNMIC2142020 dated February 14, 2020, due on receipt and

paid on March 19, 2020, in the amount of $315,336.47, of which

$172,892.50 were management fees, $120,860.69 were CEO fees, and

$21,583.28 were for shared CFO fees. The listed CEO fees do not reflect

any bonuses, additional payments, or other expenses beyond payment for

two January 2020 pay periods.

xii.    Invoice No. MHNMIC3242020 dated March 24, 2020, due on receipt and

paid on April 27, 2020, in the amount of $226,963.60, of which $172,892.50

were management fees, $37,373.48 were CEO fees, $4,183.62 were shared

---

[7]     On or around January 21, 2020, MIC informed MercyOne that MercyOne billed for services not provided,
specifically $12,515.49 for the second half of a survey by Press Ganey, a MercyOne contractor, where no
survey or interviews were conducted with MIC staff; no refund occurred.

CFO fees, and $12,514.00 were fees for Press Ganey first half of 2020
spring survey expense.

xiii.   Invoice No. MHNMIC04082020 dated April 8, 2020, due on receipt and
paid on May 26, 2020, in the amount of $213,845.88, of which $172,892.50
were management fees and $40,953.38 were for CEO fees.

xiv.   Invoice No. MHNMIC05132020 dated May 13, 2020, due on receipt and
paid on June 15, 2020, in the amount of $206,960.01, of which $172,892.50
were management fees and $34,067.51 were for CEO fees.

xv.   Invoice No. MHNMIC06152020 dated June 15, 2020, due on receipt and
paid on August 3, 2020, in the amount of $202,010.72, of which
$172,892.50 were management fees and $29,118.22 were for CEO fees.

xvi.   Invoice No. MHNMIC07222020 dated July 22, 2020, due on receipt and
paid on September 1, 2020, in the amount of $210,578.26, of which
$176,103.00 were management fees and $34,475.26 were for CEO fees for
June 19 and July 3, 2020.

xvii.   Invoice No. MHNMIC08192020 dated August 19, 2020, due on receipt and
paid on September 14, 2020, in the amount of $218,470.23, of which
$176,103.00 were management fees and $42,367.23 were for CEO fees.

xviii.   Invoice No. MHNMIC09102020 dated September 10, 2020, due on receipt,
and paid subsequently, in the amount of $213,414.14, of which $176,103.00
were management fees and $37,311.14 were for CEO fees.

xix. Invoice No. MHNMIC10122020 dated October 12, 2020, due on receipt, and paid subsequently, in the amount of $213,414.14, of which $176,103.00 were management fees and $37,311.14 were for CEO fees

xx. Invoice No. MHNMIC11092020 dated November 9, 2020, due on receipt and paid on December 14, 2020, in the amount of $216,256.99, of which $176,103.00 were management fees and $40,153.99 were for CEO fees for October 9, October 23, and November 6, 2020.

xxi. Invoice No. MHNMIC12092020 dated December 9, 2020, due on receipt and paid subsequently, in the amount of $214,641.09, of which $176,103.00 were management fees and $38,538.09 were for CEO fees for November 20, and December 4, 2020.

xxii. Invoice No. MHNMIC1182021 dated January 18, 2021, due on receipt and paid on February 15, 2020, in the amount of $215,919.98, of which $176,103.00 were management fees and $39,816.98 were for CEO fees.

xxiii. Invoice No. MHNMIC2082021 dated February 8, 2021, due on receipt and paid on March 12, 2021, in the amount of $297,569.37, of which $176,103.00 were management fees and $121,466.37 were for CEO fees for January 15, 2021 and January 29, 2021. The listed CEO fees do not reflect any bonuses, additional payments or other expenses beyond payment for two January 2021 pay periods.

xxiv. Invoice No. MHNMIC3102021 dated March 10, 2021, due on receipt and paid on May 11, 2021, in the amount of $216,201.43, of which $176,103.00 were management fees and $40,098.43 were for CEO fees.

xxv.   Invoice No. MHNMIC4092021 dated April 9, 2021, due on receipt and paid on May 13, 2021, in the amount of $226,090.66, of which $176,103.00 were management fees, $41,806.41 were for CEO fees, and $8,181.25 were for communication services provided by Wixted & Co Inc.

xxvi.   Invoice No. MHNMIC5122021 dated May 12, 2021, due on receipt and paid on June 21, 2021, in the amount of $218,084.41, of which $176,103.00 were management fees, $41,806.41 were for CEO fees, and $175.00 were for communication services provided by Wixted & Co. Inc.

xxvii.   Invoice No. MHNMIC6112021 dated June 11, 2021, due on receipt and paid on June 28, 2021, in the amount of $246,279.69, of which $176,103.00 were management fees; $42,611.05 were for CEO fees for May 7, May 21, and June 4, 2021; $27,565.64 were for Press Ganey 2021 Engagement Survey; and $2,537.50 were for communication services provided by Wixted & Co. Inc.

xxviii.   Invoice No. MHNMIC792021 dated July 9, 2021, due on receipt and paid on July 13, 2021, in the amount of $217,908.18, of which $178,059.00 were management fees and $39,849.18 were for CEO fees

xxix.   Invoice No. MHNMIC8112021 dated August 11, 2021, in the amount of -$30,111.45, of which $178,059.00 were management fees, $40,109.24 were for CEO fees, less credits totaling $248,279.69.

xxx.   Invoice No. MHNMIC9142021 dated September 14, 2021, due on receipt and paid on October 12, 2021, in the amount of $217,993.72, of which

$178,059.00 were management fees and $39,934.72 were for CEO fees, less the preceding month's $30,111.45 statement credit.

xxxi.   Invoice No. MHNMIC10122021 dated October 12, 2021, due on receipt and paid on November 2, 2021, in the amount of $209,322.31, of which $178,059.00 were management fees and $31,263.31 were for CEO fees.

xxxii.   Invoice No. MHNMIC11152021 dated November 15, 2021, due on receipt and paid on December 9, 2021, in the amount of $724,980.58, of which $178,059.00 were management fees; $2,648.24 were CEO fees for Williams for October 2, 2021; $475,974.99 were for severance for 12 months, $14,940.93 were for COBRA for 12 months; $50,823.46 were for Trachta's fees for October 2, October 16, and October 30, 2021; and $2,533.96 were for travel reimbursement.

xxxiii.   Invoice No. MHNMIC12102021 dated December 10, 2021, due on receipt and paid on December 21, 2021, in the amount of $215,350.57, of which $178,059.00 were management fees, $36,074.75 were for Executive fees, and $1,216.82 were for travel reimbursement.

xxxiv.   Invoice No. MHNMIC1142022 dated January 14, 2022, due on receipt and paid on February 8, 2022, in the amount of $215,483.76, of which $178,059.00 were management fees, $34,980.09 were for Executive fees, and $2,444.67 were for travel reimbursement.

xxxv.   Invoice No. MHNMIC2142022 dated February 14, 2022, due on receipt and paid on March 9, 2022, in the amount of $217,444.93, of which $178,059.00

were management fees, $38,248.26 were for Executive fees, and $1,137.67 were for travel reimbursement.

xxxvi. Invoice No. MHNMIC3142022 dated March 14, 2022, due on receipt and paid on April 13, 2022, in the amount of $216,297.77, of which $178,059.00 were management fees, $36,325.47 were for Executive fees, and $1,913.30 were for travel reimbursement.

xxxvii. Invoice No. MHNMIC4132022 dated April 13, 2022, due on receipt and paid on April 27, 2022, in the amount of $219,025.51, of which $178,059.00 were management fees, $37,473.39 were for Executive fees, and $3,493.12 were for travel reimbursement.

xxxviii. Invoice No. MHNMIC5132022 dated May 13, 2022, due on receipt and paid on June 16, 2022, in the amount of $260,510.37, of which $178,059.00 were management fees; $53,855.44 were Executive fees for April 8, April 22, and May 6, 2022; $3,567.93 were for travel reimbursement; and $25,028.00 were for Press Ganey Colleague and Physician Engagement 2022 Survey.

xxxix. Invoice No. MHNMIC5152022 dated May 15, 2022, due on receipt and paid on July 6, 2022, in the amount of $215,356.22, of which $178,059.00 were management fees, $36,325.50 were for Executive fees, and $971.72 were for travel reimbursement.

xl. Invoice No. MHNMIC7152022 dated July 15, 2022, due on receipt and paid on July 29, 2022, in the amount of $213,360.14, of which $173,849.00 were

management fees, $36,325.50 were for Executive fees, and $3,185.64 were for travel reimbursement.

xli.   Invoice No. MHNMIC8162022 dated August 16, 2022, due on receipt and paid on August 31, 2022, in the amount of $213,208.28, of which $173,849.00 were management fees, $35,963.81 were for Executive fees, and $3,395.47 were for travel reimbursement, though Trachta was unavailable and out of the country between July 17 and July 25, 2022.

xlii.   Invoice No. MHNMIC9152022 dated September 15, 2022, due on receipt and paid on October 31, 2022, in the amount of $106,595.46, of which $72,088.00 were management fees, $35,761.98 were for Executive fees, and $2,267.48 were for travel reimbursement, less $3,522.00 as a management fee adjustment for July and August 2022.

xliii.   Invoice No. MHNMIC10142022 dated October 14, 2022, due on receipt and paid on November 29, 2022, in the amount of $208,755.42, of which $72,088.00 were management fees, $135,001.39 were for Executive fees and incentive compensation, and $1,666.03 were for travel reimbursement. Though Trachta was unavailable between August 31 and September 15, MercyOne invoiced MIC as if he were fully available.

xliv.   Invoice No. MHNMIC11162022 dated November 16, 2022, due on receipt and paid on December 30, 2022, in the amount of $129,759.27, of which $72,088.00 were management fees; $54,314.08 were for Executive fees for October 7, October 21, and November 4, 2022; and $3,357.19 were for travel reimbursement.

xlv. Invoice No. MHNMIC12142022 dated December 14, 2022, due on receipt and paid on December 30, 2022, in the amount of $108,457.76, of which $72,088.00 were management fees, $34,168.14 were for Executive fees and $2,201.52 were for travel reimbursement.

xlvi. Invoice No. MHNMIC1162023 dated January 16, 2023, due on receipt and paid on January 31, 2023, in the amount of $113,363.06, of which $72,088.00 were management fees, $38,863.76 were for Executive fees, and $2,411.30 were for travel reimbursement.

xlvii. Invoice No. MHNMIC2172023 dated February 17, 2023, due on receipt and paid on February 28, 2023, in the amount of $128,569.34, of which $72,088.00 were management fees, $18,278.91 were for "Common Spirit Health 40 Hours in January", $36,607.00 were for "Trinity Health 137 hours in January", and $1,595.43 were for travel reimbursement.

xlviii. Invoice No. MHNMIC3172023 dated March 17, 2023, due on receipt and paid on March 31, 2023, in the amount of $116,339.04, of which $72,088.00 were management fees and $42,230.66 were for "Trinity", and $2,020.38 were for travel reimbursement.

279. The Transfers between August 8, 2019 to August 7, 2023, reflect that MercyOne invoiced MIC $9,833,189.49 in total, which included $6,968,797.55 for Management Fees under the Affiliation Agreement, $2,536,569.46 for CEO fees, $203,447.97 for CFO fees, and $124,374.51 for other fees.

280. MercyOne did not receive Board approval for payment of Cerone and Williams' lodging, furniture, and living expenses; severance and COBRA for Williams; or travel

reimbursement for Trachta; despite invoicing MIC for those expenses under the Affiliation Agreement.

## MIC'S INSOLVENCY

281.    As a condition of the Affiliation Agreement, MIC agreed to institute a performance improvement plan overseen by MercyOne in order to accomplish a turnaround of MIC's financial condition.

282.    Said performance improvement plan required MIC to provide MercyOne with regular updates regarding its financial information, including balance sheets, public and non-public financial statements, reports filed with state and federal government entities, and information provided to credit rating organizations or other creditors.

283.    Between June 2017 and April 2023, MIC provided Ritz and others in MercyOne's leadership with regular updates regarding MIC's financial condition. This included monthly, quarterly, semiannual, and annual audited and unaudited financial statements and disclosures, as well as publicly available disclosures such as MIC's Electronic Municipal Market Access ("EMMA") filings. MercyOne also received regular updates on MIC's financial condition through its role on MIC's Board.

284.    Beyond transmission of financial information, Ritz—as MercyOne's President and CEO—and Wegner—as MercyOne's Vice President of Operations and CFO—regularly corresponded about MIC's financial condition and performance and met with MIC's leadership team about changes to MIC's financial condition.

285.    Between July 2017 and September 2018, MercyOne expressed a positive outlook on MIC's financial health as it observed that MIC's financial condition experienced a positive

improvement during Fiscal Year 2018 as MIC decreased its net negative revenue, while increasing its AR and other assets, achieving results near those budgeted by MercyOne.

286.    However, MercyOne's view of MIC's financial condition began to sour in November 2018, as MercyOne modified the payment terms on its invoices to require payment "upon receipt" rather than by a date certain or on net-15 terms as had been the previous practice, following MIC provision of its October 2018 financial statements.

287.    MIC's October 2018 financial statements, emailed to Ritz and Wegner, reflected that MIC experienced an operating loss of $866,000 compared to MercyOne's performance improvement plan's budgeted loss of $73,000.

288.    On or around November 8, 2018, Davenport, MercyOne's CFO for MIC, advised that as a result of the October 2018 Financial Statements, MIC would undertake corrective action through claims reprocessing to attempt to offset monthly and year to date financial issues.

289.    On or around December 10, 2018, Ritz and Wegner acknowledged they had received MIC's November 2018 Financial Statements reflecting further operating losses and MIC's leadership team's assurances that further corrective action would be taken.

290.    MIC's financial condition and MercyOne's favor further soured, so that over the course of March 2019, Ritz exchanged a series of emails with Williams and Davenport raising MercyOne's concerns that MIC's current and projected liabilities exceeded its assets, at which time Ritz expressed concerns that MIC lacked the cashflow to satisfy its performance improvement plan and concern that MIC would miss the numbers budgeted for Fiscal Year 2019.

291.    MercyOne's concern remained as it continued invoicing MIC monthly, while requiring payment on "due on receipt" terms.

292.   MIC struggled to pay MercyOne's invoices, taking in excess of a month to pay many of MIC's invoices, and taking approximately one year to tender payment for MercyOne's May 2019 Invoice.

293.   MIC's Consolidated Statements of Financial Position for Fiscal Year 2019, covering the period between June 30, 2018 and June 30, 2019, reflected that MIC experienced approximately $3,701,309 in negative net revenue compared to MercyOne's budgeted net income for MIC of $7,004,399, and experienced a decrease of net assets of $16,822.171. These Consolidated Statements were provided to Ritz and were also presented to the Board for its review.

294.   On or around October 14, 2019, following transmission of MIC's year to date financial statements for September 2019, Wegner, MercyOne's Executive Vice President of Operations and CFO, observed that "it appears contractual allowances, and to a lesser extent, charity have consumed most of the increase, leaving net revenue short of budget and insufficient to cover the higher salary and other operating costs."

295.   MIC's Consolidated Statement of Operations and Changes in Net Assets Month Ended September 30, 2019 and 2018 reflected that MIC experienced a $600,000 loss of revenue, contributing to an approximately $726,000.00 operating loss, as well as an approximately $36,700,000.00 loss of total assets from approximately $69,000,000.00 on September 30, 2018 to $32,600,000.00 on September 30, 2019, with a run rate of approximately $1,100,000.00 per month as of September 30, 2019. MIC's Combined Statements of Cash Flow further reflected that MIC had experienced negative cashflow of $2,721,298 between July 1 and September 30, 2019.

296.   On November 8, 2019, Davenport circulated MIC's October Financial Statements reflecting that MIC had missed its goal under the 2017 MercyOne Performance Improvement Plan,

resulting in net negative operating income of $1,544,105 compared to negative net income of $2,464,938 for October of 2018.

297.    Between July 1, 2019 and December 31, 2019, MIC's Consolidated Statements of Operations for the periods ending December 31, 2019 and 2018 reflected that MIC experienced $2,810,972 of net income year over year.

298.    However, MIC's Consolidated Statements for Fiscal Year 2020, provided to MercyOne and presented during MIC's August 18, 2020 Board meeting, disclosed that between July 1, 2019 and June 30, 2020, MIC experienced a negative net income of approximately $23,000,382. This was due in large part to reductions in patient volume from COVID-19 with some offset from government grants and loans. Those Consolidated Statements also disclosed that MIC experienced a loss of approximately $33,503,476 of assets over the fiscal year.

299.    MIC's Consolidated Financial Statements and Supplemental Schedules as of and for the Years Ended June 30, 2020 and 2019 and Independent Auditors' Report reflected that MIC experienced an approximately $11,908,231 loss of revenue, which along with $2,074,710 and other expenses resulted in a total loss from operations of $23,000,382, compared to the previous year's total operating loss of $13,070,222.

300.    Following the Board's December 8, 2020 meeting, Ritz advised Wegner and Campbell, MercyOne's Chief Legal Officer, that he was concerned that MIC's self-insurance trust possessed a negative asset value and that the self-insurance trust and MIC's other assets posed a potential risk to MercyOne.

301.    During MIC's Board's January 19, 2021 Finance Committee meeting, MercyOne and the Board were presented with MIC's Consolidated Statements of Operations for the period between December 31, 2019 and December 31, 2020, which reflected that MIC experienced

positive net revenue of approximately $9,047,300. Those Consolidated Statements further reflected that MIC experienced approximately $2,388,513 of negative income which was only offset by approximately $12,397,208 of investment and other income.

302.    MIC's Audited Consolidated Statements of Operations for Fiscal Year 2021 reflected that MIC experienced an approximately $8,286,507 loss of revenue, offset by an $18,670,211 gain from pension settlement and investment income, resulting in net revenue of approximately $10,383,704. That Consolidated Statement of Operations also disclosed that MIC's Fiscal Year 2020 reflected a decrease in net assets of $35,153,702, with the primary financial improvement coming from reductions in pension liabilities and increases in the value of lease assets. The increased assets also included MIC's sale of property, drawdown of investments, a $23.5 million loan from Medicare, and COVID-19 relief funds (split among fiscal years).

303.    On April 30, 2021, Ritz circulated a letter and memo to Bishop Zinkula indicating that MercyOne believed MIC's liabilities exceeded its assets by at least $40 million.

304.    MIC's Consolidated Statements of Operations for Fiscal Year 2022 reflected that MIC experienced an approximately $38,404,000.00 loss of revenue between June 30, 2022 and June 30, 2021, resulting from a reduction in advanced payments, delays and difficulties collecting AR, and significant loss of value from investment assets.

305.    MercyOne also agreed that starting with its June 2022 Invoice, it would reduce its invoiced management fees so that MIC would have sufficient available capital to engage a new strategic partner and employ consultants and professionals to facilitate a turnaround of its financial condition.

306. However, starting with its July 2022 Invoice, MercyOne required that MIC tender payment by automatic ACH drawn from MIC's accounts so that payments were received within approximately 15 days of the tender of each invoice.

307. MercyOne continued requiring ACH draws until termination of the Affiliation Agreement in March 2023.

308. Each of MIC's Consolidated Statements listed MIC's AR at their face value, rather than the amount MIC expected to recover from the AR, thereby inflating MIC's asset values and without reflecting the actual value of its assets compared to its liabilities.

309. On March 23, 2023, Ritz sent the Board a letter observing that MercyOne had reduced its management fee by 50% starting July 1, 2022, due to MIC's inability to pay those fees, and he noted that MIC had needed to engage in a restructuring process. He proposed that MercyOne and MIC terminate the Affiliation Agreement effective at the end of March 2023.

310. Through that letter, Ritz acknowledged that in 2018, MIC improved its financial condition from a $35.5 million to a $3.2 million loss, but that improvement was insufficient to place MIC in the position that MercyOne would continue as a strategic partner.

311. Regardless of MIC's provision of financial statements to MercyOne, MercyOne was or should have been aware that MIC lacked the financial resources to satisfy its existing payment obligations as a result of MIC's inconsistent payment of MercyOne's invoices, MercyOne's modification of its payment terms, MercyOne's requirement that MIC tender payment through ACH draw, MIC's inability to afford a new EHR system, and MercyOne's management of MIC.

312.    MIC was insolvent by at least the third quarter of 2019, as it lacked the cash flow to meet its existing and expected obligations, resulting in delays in payment to its creditors and requiring liquidation of its existing investments and other assets to continue operations.

313.    MIC remained insolvent until the Petition Date.

314.    Under Iowa Code Section 684.2(1), "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."

315.    Under Iowa Code Section 684.2(2), "[a] debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence."

316.    Throughout MercyOne and MIC's relationship under the Affiliation Agreement, MercyOne knew that MIC had underfunded pension liabilities.

317.    MIC's financial statements and its payment history reflected that it was insolvent at least as early as the first quarter of 2019, and due to ongoing negative cashflow, asset losses, and inability to meet its current and expected obligations requiring extended payment terms, payment deferments, and liquidation of investments accounts to continue operations.

318.    MercyOne was well aware of MIC's financial condition as it was engaged as part of the Affiliation Agreement to provide MIC with turnaround and restructuring services, which were provided in part through MercyOne's provision and supervision of performance improvement plans. MercyOne required MIC to use H2C to liquidate certain of MIC's assets, directed MIC modify the format of its financial statements to bring it in line with MercyOne's preferred format, and otherwise MercyOne was aware or should have been aware of MIC's financial condition during the term of the Affiliation Agreement.

**MERCYONE CONTROL**

319.    During the term of the Affiliation Agreement, MercyOne had the power and did appoint four members to MIC's Board, which included Ritz, Trachta, Dusenbery, and Vellinga, as well as the ability to direct MIC's CEO. Each of MercyOne's appointed Board members had the power to and actively participated at Board meetings, had access to information presented to the Board, and voted on resolutions placed before the Board.

320.    During the term of the Affiliation Agreement, MercyOne, through its officers and through its position on MIC's Board, controlled and managed operation of MIC's business pursuant to the Affiliation Agreement and held the power to vote four or more of the Board's votes, in excess of 20% of the available votes.

321.    Moreover, MercyOne exercised additional control over MIC by, among other things:

    i.    Directly presenting proposed resolutions and information to the Board, which included at any given time at least three executives of MercyOne;

    ii.    Directing MIC to follow MercyOne policies and procedures for hiring contract physicians;

    iii.    Requiring that MIC receive approval for any projects involving ambulatory surgical services, and that MIC follow MercyOne's existing ambulatory clinic procedures;

    iv.    Requiring that MIC provide Ritz with copies of communications with outside parties, including Wellmark and other insurance payors;

    v.    Requiring that MIC receive MercyOne pre-approval before hiring its own consultants;

    vi.    Requiring that MIC receive MercyOne approval of any selected EHR provider before any vote could be put before the Board;

    vii.    Requiring approve of MIC's operational and financial changes before those changes could go before the Board for a vote;

    viii.    Requiring that MIC include MercyOne's mission statement and values for MIC's executive level job postings;

    ix.    Directing MIC's response to the COVID-19 pandemic, including requiring implementation of MercyOne's cost cutting measures, personal protective equipment policies, vaccine and dosing policies, COVID-19 statistic reporting policies, billing codes, insurance payor forms, and communication policies;

x.      Requiring that MIC adopt MercyOne's code of conduct and related policies;

xi.     Requiring regular updates on MIC's financial condition, and directing implementation of performance improvement plans to correct perceived concerns;

xii.    Requiring that contractors direct their proposals to MercyOne because MercyOne would ultimately decide whether to present the proposal to the Board;

xiii.   Requiring that MIC maintain or modify insurance policies to better reduce potential claims against MercyOne;

xiv.    Directing the content of negotiations on Master Service Agreements between MIC and its business partners, including Steindler Orthopedic;

xv.     Directing that MIC and its providers submit letters in support of MercyOne's preferred legislation and its resistance to UIHC's Certificate of Need application;

xvi.    Directing that MIC employees were required to cancel or rearrange other meetings to accommodate Ritz's mandatory meeting invitations;

xvii.   Directing that MIC modify the format of its financial statements and budgets to better reflect MercyOne's preferred format;

xviii.  Requiring that MIC letterhead, branding, and communications prominently disclose that it was a part of MercyOne, including all signature blocks, job postings, internal and external publications, and signage;

xix.    Requiring that MIC integrate with MercyOne's employee portal and internally publicize MercyOne newsletters, memoranda, policies, procedures, and other media created by MercyOne;

xx.     Regularly advising MIC staff and employees that the purpose of the Affiliation Agreement was to integrate MIC into MercyOne; and

xxi.    Advising MIC that MercyOne would be changing its branding and that MIC as an affiliate would adopting the new colors, graphics, name, and design elements in materials, advertising, web site, signage, and other material to identify that MIC is part of MercyOne's system.

322.    Moreover, on or about November 30, 2022, Ritz sent the Board a letter notifying them that MercyOne would not be renewing the Affiliation Agreement upon its expiration on June 30, 2023, while also advising that MIC would need to continue normal operations and continue utilizing all the services it was currently receiving from MercyOne until termination of the term of the Affiliation Agreement or mutual agreement between MIC and MercyOne.

323.    During MercyOne's tenure as manager of MIC, the Board was composed almost exclusively of volunteer members without substantial experience with hospital governance, and those members understood MercyOne's presentations and recommendations as those of experts.

324.    During MercyOne's tenure, no member of the MIC Board voted in opposition to a report, presentation, or recommendation by MercyOne due to the other Board members' reliance on MercyOne's perceived knowledge and experience managing, operating, and acquiring health systems in Iowa.

325.    Other than parts of the process to select a new strategic partner following MercyOne's recommended disassociation and Ritz's refusal to participate in Board meetings regarding the potential use of a bankruptcy filing, MercyOne's representatives on MIC's Board actively participated in discussions and declined to abstain from voting on matters possessing an inherent conflict of interest between MIC and MercyOne—including, for example, MercyOne's February Teleneurology Agreement and May Teleneurology Agreement, the purchase of MIC's cardiology program, and the lease of MIC's cardiology space.

**TRANSFER INVESTIGATION BY THE OC**

326.    The OC has performed its own due diligence and evaluation of the reasonably known affirmative defenses available to MercyOne.

327.    After conducting its due diligence and taking into account reasonably knowable affirmative defenses, the OC has determined that the OC may avoid the Transfers as fraudulent.

328.    The Transfers were fraudulent and/or voidable because they were made without MIC's receipt of reasonably equivalent value.

329.    During the course of this adversary proceeding, the OC may learn (through discovery or otherwise), of additional transfers made by the Debtors to MercyOne or Iowa Heart between August 8, 2021 and August 7, 2023 (the "Fraudulent Transfer Period") or between August 8, 2019 and August 7, 2023 (the "Voidable Transfer Period"). It is the OC's intention to avoid and recover all transfers made by the Debtors of an interest of the Debtors in property and to or for the

benefit of MercyOne, Iowa Heart, or any subsequent or intermediate transferee. The OC reserves the right to amend this original Complaint to include: (i) further information regarding the Transfers, (ii) additional transfers, (iii) modifications of and/or revisions to the Defendant's name, (iv) additional defendants, and/or (v) additional causes of action upon authorization by this Court, if applicable (collectively, the "Amendments"), that may become known to the OC at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

330.    The OC reserves all rights to bring additional claims against the Defendants or any related parties pursuant to the *Tolling Agreement* between the OC and MercyOne, as a result of documents and communications subsequently provided to the OC by MercyOne in accordance with its continuing obligations under Bankruptcy Rule 2004 as previously ordered by the Court.

## COUNT I
### Avoidance and Recovery of Constructive Fraudulent Transfers to MercyOne
### 11 U.S.C. § 548(a)(1)(B)

331.    The OC incorporates all preceding paragraphs as if fully re-alleged herein.

332.    Section 550 of the Bankruptcy Code allows the Debtors to recover, from an initial transferee or any immediate or mediate transferee of an initial transferee, property transferred in a transfer avoided under sections 544, 545, 548, 549, or 724(a) of the Bankruptcy Code.

333.    MercyOne was an immediate or mediate transferee of the Transfers during the Fraudulent Transfer Period from MIC.

334.    The Transfers during the Fraudulent Transfer Period occurred within two years of the Petition Date.

335.    The Transfers during the Fraudulent Transfer Period constitute "transfers" within the meaning of sections 548, 550, and 551 of the Bankruptcy Code.

336.    MercyOne had access to MIC's financial information by virtue of its role on MIC's Board and as a result of MIC's direct transmission of that information.

337.    MercyOne had direct and indirect knowledge of MIC's financial condition during the term of the Affiliation Agreement; regularly communicated about MIC's financial condition internally and with MIC employees; directed MIC to make operational changes to address perceived financial concerns; modified payment terms due to inconsistent payments by MIC; provided MIC's Board with performance improvement plans in 2017, 2019, and 2020 to turnaround MIC's financial condition; and MercyOne's CEO acknowledged that MIC's liabilities exceeded its assets as of April 2021.

338.    MercyOne therefore had access to MIC's financial information and knew or should have known of MIC's insolvency.

339.    The Transfers during the Fraudulent Transfer Period were made by MIC to MercyOne in the amount of approximately $3,759,551.69.

340.    The Transfers during the Fraudulent Transfer Period were made as payment for services required of MercyOne by the Affiliation Agreement.

341.    MercyOne failed or refused to provide the complete set of services required by the Affiliation Agreement, including but not limited to the services of a physician recruiter, Telehealth support, IT support, and full-time executives.

342.    Moreover, MercyOne characterized its provision of service under the Affiliation Agreement as requiring that it act as MIC's manager. However, other than exercise of financial and operational oversight and providing "consulting," MercyOne believed its obligations under the Affiliation Agreement required that any of MIC requests for services only required that MercyOne provide templates for processes used by MercyOne relating to the requested service

and the contact information for consultants that could provide the requested service to MIC at additional cost.

343.    Despite receiving fewer services than contemplated by the Affiliation Agreement, MIC paid the price agreed to by the parties for the provision of all Affiliation Agreement services, including fees and charges for Trachta though he was merely appointed by MercyOne but not approved by the MIC Board to serve as CEO and such services were only rendered part-time.

344.    In recognition of the lack of value of the services provided by MercyOne and MIC's inadequate capitalization, and following Ritz's preparation of a memo to file reflecting that MercyOne had not provided the services or value contemplated by the Affiliation Agreement, MercyOne agreed to reduce the management fee due under the Affiliation Agreement by one half.

345.    The Transfers during the Fraudulent Transfer Period were made without MIC's receipt of reasonably equivalent value because at the time of the Transfers, MIC was engaged in business for which its remaining assets were unreasonably small in relation to the scale of its business.

346.    Due to the Transfers during the Fraudulent Transfer Period, MIC was left with unreasonably small amounts of capital to meet its existing and expected business and transactional needs, had negative cashflow, and otherwise had liabilities in excess of its assets.

347.    As a result of the Transfers to MercyOne during the Fraudulent Transfer Period, MercyOne received more than it would have received had those transfers not been made.

348.    MIC's bankruptcy estate was damaged by the Transfers.

349.    Pursuant to section 550(a) of the Bankruptcy Code, the OC, as representative of the estate, is entitled to recover from MercyOne all Transfers during the Fraudulent Transfer Period, plus interest thereon to the date of payment and the costs of this action.

350.     Accordingly, the Court should avoid the Transfers during the Fraudulent Transfer Period as constructive fraudulent transfers, and recover the value of such transfers from MercyOne, or any other immediate or mediate transferee of the Transfers, pursuant to 11 U.S.C. §§ 548, 550, and 551.

<u>**COUNT II**</u>
**<u>Avoidance and Recovery of Constructive Voidable Transfers to MercyOne</u>**
**<u>11 U.S.C. §§ 544, 550, 551, and Iowa Code Chapter 684</u>**

351.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

352.     By operation of 11 U.S.C. § 544, the OC, standing in the shoes of the Debtors, is entitled to utilize any applicable non-bankruptcy law to seek avoidance of any transfer.

353.     The State of Iowa has adopted the Iowa Uniform Voidable Transactions Act. Iowa Code § 684.15.

354.     Under the Iowa Uniform Voidable Transactions Act:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation… [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation . . . and:
>> (1) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction[or]
>> (2) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

Iowa Code § 684.4.

355.     Under the Iowa Uniform Voidable Transactions Act:

> 1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation

> 2. A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Iowa Code § 684.5.

356.   At all relevant times, and as of the Petition Date, there existed actual unsecured creditors of MIC who could have avoided any transfer of an interest of MIC in property that is avoidable under the Iowa Code pursuant to 11 U.S.C. § 544(b).

357.   The Transfers during the Voidable Transfer Period constitute "transfers" within the meaning of Iowa Code § 684.

358.   The Transfers made during the Voidable Transfer Period were made within four years of the Petition Date.

359.   MIC made Transfers to MercyOne during the Voidable Transfer Period without receiving reasonably equivalent value for the payment of services under the Affiliation Agreement.

360.   MIC made the Transfers during the Voidable Transfer Period totaling approximately $9,833,189.49 under the Affiliation Agreement for services promised by MercyOne but that were not provided or for which MIC was required to obtain a substitute service—including but not limited to MercyOne's (1) failure to provide the services of a full time CEO; (2) refusal to provide a physician recruiter; (3) failure to provide  IT support or Telehealth support—which forced MIC to employ EHR implementation consultants; and (4) failure to provide additional turnaround and strategic planning services—which required MIC to retain additional advisors for that purpose.

361.   During the Voidable Transfer Period, MIC failed to pay MercyOne's invoices when due, resulting in MercyOne's modification of its payment terms and the requirement that payments be made by automatic ACH withdrawal.

362.    After requests that MercyOne reduce its fees in June 2020 and upon MercyOne's recommendation that MIC find a different strategic partner in May 2021, MercyOne agreed to reduce its invoiced management fees between June 2022 and the end of the Affiliation Agreement at the request by the Board to enable MIC to fund some of its existing liabilities.

363.    MIC was insolvent at the times of the Transfers during the Voidable Transfer Period. MIC had incurred debts beyond its ability to pay and was unable to meet its current obligations, including underfunded pension liabilities in excess of MIC's existing assets.

364.    MIC was engaged in business for which its remaining assets were unreasonably small in relation to its business and obligations, had negative cashflow, and otherwise had liabilities in excess of its assets.

365.    MercyOne was aware during the Voidable Transfer Period that MIC was engaged in business for which its remaining assets were unreasonably small in relation to its business and obligations, had negative cashflow, and otherwise had liabilities in excess of its assets. For example, on November 19, 2020, Ritz advised MIC's leadership that he was uneasy about MIC's liquidation of its reserve investments to fund its operations and observed that MIC needed to add a cash to net revenue tracker for MIC's monthly financial updates to MercyOne.

366.    Despite making the Transfers during the Voidable Transfer Period for services under the Affiliation Agreement, MIC was required to engage other entities for services required but not provided under the Affiliation Agreement, including, for example, strategic planning, turnaround planning, revenue cycle support, EHR implementation, and IT Support. As a result, MIC received services worth less than the Transfers during the Voidable Transfer Period.

367.    MIC did not receive reasonably equivalent value for payment of at least $500,000.00 to MercyOne as reimbursement for Williams' severance obligations.

368.    Because the Transfers during the Voidable Transfer Period were made without MIC's receipt of reasonably equivalent value in exchange of the Transfers, the Transfers were made in violation of Iowa Code § 684.4(1)(b).

369.    MercyOne was an insider of MIC under Iowa Code § 684.1(8).

370.    Each of the Transfers made to MercyOne during the Voidable Transfer Period is avoidable within the meaning of Iowa Voidable Transfers Act.

371.    MIC's creditors held antecedent debts against MIC before, during, and after the Transfers to MercyOne, including MIC's pension plan which held a debt resulting from significant underfunding of MIC's pension plan as of April 2023.

372.    The OC is entitled to judgment against MercyOne in the amount of the Transfers during the Voidable Transfer Period pursuant to Iowa Code §§ 684.7 and 684.8(2)(a)(1).

373.    Accordingly, the Court should avoid the Transfers during the Voidable Transfer Period as constructive fraudulent transfers, and enter judgment against MercyOne to recover the value of such transfers from MercyOne, or any other immediate or mediate transferee of the Transfers, pursuant to 11 U.S.C. §§ 544, 550, 551 and Iowa Code §§ 684.4, 684.5, and 684.7.

## COUNT III
## Avoidance of Insider Transfers to MercyOne
## 11 U.S.C. §§ 544, 550, 551, and Iowa Code Chapter 684

374.    The OC incorporates all preceding paragraphs as if fully re-alleged herein.

375.    By operation of 11 U.S.C. § 544, the OC, standing in the shoes of the Debtors, is entitled to utilize any applicable non-bankruptcy law to seek avoidance of any transfer.

376.    The Iowa Uniform Voidable Transactions Act has a 1-year look back period for transfers made by a debtor to an insider for an antecedent debt, if the debtor was insolvent at the

time and the insider had reasonable cause to believe that the debtor was insolvent. Iowa Code § 684.4, 684.7.

377.    The Transfers between August 8, 2022 and August 7, 2023 from MIC to MercyOne were made on account of an antecedent debt.

378.    MIC's creditors held antecedent debts against MIC before, during, and after the Transfers to MercyOne, including the Pension Plan which as of April 2023 possessed a claim against MIC for underfunded pension liabilities.

379.    As set forth herein, MercyOne is a statutory and nonstatutory insider of MIC.

380.    As set forth herein, MIC provided MercyOne with regular reports regarding MIC's financial performance and financial condition; MercyOne executives regularly communicated with MIC's leadership regarding MIC's financial performance and condition, and MercyOne knew or should have known that MIC was insolvent during the one-year period before the Petition Date.

381.    As further set forth herein, MIC struggled to make timely payments to MercyOne, such that MercyOne modified the payment terms for its invoices to require payment on receipt and eventually payment by ACH draw, as a result of MercyOne's direct knowledge of MIC's inability to satisfy its financial obligations as they came due.

382.    In fact, MIC was insolvent as a result of the Transfers to MercyOne during the 1-year period before the Petition Date.

383.    Under the Affiliation Agreement, MercyOne received transfers of $1,125,047.63 between August 8, 2022 and August 7, 2023 (the "Insider Transfers").

384.    However, MIC's Combined Disclosure Statement and Plan of Liquidation projected that MIC's general unsecured creditors would receive an approximate 10% recovery on

their claims, *see, e.g.*, Disclosure Statement, Docket No. 927, Exh. A, far less than the amount received by MercyOne.

385.    The OC is entitled to judgment against MercyOne in the amount of the Insider Transfers pursuant to Iowa Code §§ 684.7 and 684.8(2)(a)(1).

386.    Accordingly, the Court should avoid the Insider Transfers as constructive fraudulent transfers, and enter judgment against MercyOne to recover the value of such transfers from MercyOne, or any other immediate or mediate transferee of the Payments, pursuant to 11 U.S.C. §§ 544, 550, 551 and Iowa Code §§ 684.4, 684.5, and 684.7.

**COUNT IV**
**Recovery of Insider Preference Payments to MercyOne**
**11 U.S.C. §§ 547, and 550**

387.    The OC incorporates all preceding paragraphs as if fully re-alleged herein.

388.    Under the Affiliation Agreement MercyOne received transfers of $1,125,047.63, between August 8, 2022 and August 7, 2023 (the "Preference Transfers").

389.    At the times of the Transfers, MercyOne was a statutory and nonstatutory insider.

390.    At the times of the Preference Transfers, MIC was insolvent.

391.    Between August 8, 2022 and August 7, 2023, MIC lacked sufficient capital to meet its needs for current and future projects, had negative cashflow, and otherwise had liabilities in excess of its assets, including, for example, MIC's existing pension obligation.

392.    MIC's confirmed Combined Disclosure Statement and Plan of Liquidation contemplated that general unsecured creditors would recover approximately 10% of their claim, but MercyOne received $1,125,047.63.26 during the preference period.

393.     By virtue of its receipt of the Preference Transfers between August 8, 2022 and August 7, 2023, MercyOne received more than it would have received had MIC filed under Chapter 7 or what it otherwise would have received under the Bankruptcy Code.

394.     Accordingly, the Court should avoid all Preference Transfers between MIC and MercyOne as preference payments, and enter judgment against MercyOne to recover the value of such transfers from MercyOne, pursuant to 11 U.S.C. §§ 544, 547, and 550.

### COUNT V
### MercyOne Breach of Contract: Affiliation Agreement

395.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

396.     The Affiliation Agreement, its extensions and modifications, and policies and practices promulgated therein constitute a valid and enforceable contract between MIC and MercyOne.

397.     At all relevant times, MercyOne, through its agents, officers, employees, and affiliates supervised and directed MIC's business and affairs, through direction to MIC's CFO, Davenport; MIC's interim and acting CEOs, Williams and Trachta; and MIC's acting COO, Trachta; who along with a substantial portion of MIC's Board were selected and/or employed by MercyOne.

398.     The Affiliation Agreement required that MercyOne provide certain services to MIC, including but not limited to provision of IT Support, physician recruiters, support for and the development and implementation of telehealth equipment and services, a full time CEO, and Management Services.

399.     MercyOne failed to provide assistance to MIC in evaluating options to replace its existing information technology system, requiring MIC to implement its own EHR and

information technology replacement, including replacement of its managed print services and other IT services.

400.    MercyOne failed to provide a physician recruiter to MIC, while directing MIC to implement MercyOne's own physician compensation policy.

401.    MercyOne failed to provide support to MIC for Telehealth Services. Rather than assist MIC with development of Telehealth Services as required of MercyOne under the Affiliation Agreement, MercyOne required that MIC enter into additional agreements for MercyOne providers to provide telehealth services.

402.    MercyOne invoiced MIC for provision of Davenport as part time CFO, but invoiced MIC for Trachta and Williams as a full time CEO though their work at MIC or for MIC comprised substantially less than full time work.

403.    MercyOne invoiced MIC for Trachta's travel to and from Iowa City from Des Moines during the time he worked as CEO of MIC, without receiving approval of the Board and in contravention of the Affiliation Agreement.

404.    MercyOne invoiced MIC for Williams' severance and COBRA without approval by the Board.

405.    MercyOne failed to provide meaningful assistance to MIC with the identification, adoption, or integration of a new EHR system as required by MercyOne's agreement to provide IT support after MIC and MercyOne determined in late 2017 and early 2018 that MIC's transition to EPIC, the EHR system at that time used by UIHC, Mercy Cedar Rapids, and eventually by MercyOne, would cost more than MIC could afford to pay during 2018. After that initial determination, MercyOne provided little further IT implementation support; rather MIC was required to engage its own EHR implementation consultant. Due to MercyOne's approval of

MIC's use of Allscripts and MercyOne's failure to provide IT support necessary for the proper evaluation, implementation, and correction of the Allscripts issues, MIC experienced losses of approximately $37.53 million as a direct consequence of MercyOne's failure to provide EHR and IT support services under the Affiliation Agreement.

406.     MercyOne failed to provide guidance and direction with regard to legal questions posed by MIC to MercyOne regarding providing COVID-19 vaccine doses.

407.     MercyOne failed to act in good faith in its performance under the Affiliation Agreement and management of MIC.

408.     MercyOne failed to deal fairly with MIC in its performance under the Affiliation Agreement and management of MIC.

409.     MercyOne failed to use reasonable business efforts to perform its obligations under the Affiliation Agreement in a diligent, professionally responsible, and efficient manner and in accordance with all applicable statutory and regularly requirements and basic industry standards.

410.     During the nearly six-year term of the Affiliation Agreement, MercyOne invoiced MIC $13,783,621.35 for services under the Affiliation Agreement but failed to provide numerous services required by the Affiliation Agreement.

411.     Accordingly, the Court should enter judgment against MercyOne for breach of the Affiliation Agreement and award damages in an amount to be determined at trial.

## COUNT VI
## MercyOne Unjust Enrichment

412.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

413.     MIC transferred approximately $13,783,621.35 to MercyOne on account of the Affiliation Agreement ("Affiliation Agreement Transfers").

414.     MIC received fewer services than it bargained for under the Affiliation Agreement or received incomplete or partial services provided by the Affiliation Agreement.

415.     MIC incurred additional expenses to obtain the services it did not receive from MercyOne or for substitute services to those MercyOne should have provided.

416.     MercyOne invoiced MIC for a full time CEO, for management fees, and for additional services, without MIC's receipt of the value of those services.

417.     MercyOne was enriched as a result of the Affiliation Agreement Transfers.

418.     MercyOne will be unjustly enriched unless the OC is allowed to recover the value of the services MIC did not receive under the Affiliation Agreement.

419.     MercyOne will be unjustly enriched unless the OC is allowed to recover the damages MIC incurred by MercyOne's failure to pursue strategic affiliation with MIC.

420.     MercyOne was enriched at the expense of the Debtors, the bankruptcy estate, and the Debtors' creditors.

421.     Accordingly, the Court should enter judgment against MercyOne for unjust enrichment and award damages in an amount to be determined at a later date.

## COUNT VII
## MercyOne Breach of Contract: Teleneurology

422.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

423.     The February Teleneurology Agreement comprised a valid and enforceable contract under which MIC agreed to compensate MercyOne for provision of certain Teleneurology services.

424.     In March 2021, in reliance on MercyOne's promise to provide Teleneurology services starting on April 1, 2021, MIC provided notice to its employed neurologists that MIC would not renew their August contracts, and as a result MIC would have had only one neurologist

available to provide stroke and neurological consults. Also in March 2021, MIC commenced the credentialing process for MercyOne's neurologists so those neurologists would have privileges at MIC by April 1, 2021.

425.     MercyOne     did     not     perform     under     the     February     Teleneurology Agreement, it did not provide neurologists to MIC for video consultation, and it did not provide neurologists to MIC for review of scans.

426.     MIC was forced to pay neurologists, physicians, and staff to meet MIC's neurology service needs, which should have been provided by MercyOne.

427.     MIC was required to enter into a new service agreement with CarePoint for the provision of teleneurology services that should have been provided by MercyOne under the February Teleneurology Agreement.

428.     MIC was required to enter into the May Teleneurology Agreement for neurological services at the same rate as the February Teleneurology Agreement, but for fewer services, until CarePoint could obtain certifications and otherwise provide the services contemplated by its own agreement with MIC.

429.     As a result, MIC suffered damages from MercyOne's failure to perform under the February Teleneurology Agreement and MIC's replacement of the services due under the February Teleneurology Agreement. Accordingly, the Court should enter judgment against MercyOne for breach of contract and assess damages in an amount to be determined at trial.

## COUNT VIII
## Breach of Fiduciary Duty: MercyOne

430.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

431.    During the course of the Affiliation Agreement, MercyOne employed Ritz, Williams, Wegner, Trachta, Vellinga, and Dusenbery as executives who received bonuses for MercyOne's annual performance.

432.    During the course of the Affiliation Agreement, MercyOne served as manager of MIC, such that it owed a fiduciary duty of care and loyalty to MIC.

433.    MercyOne was under a duty to act for MIC pursuant to the terms of the Affiliation Agreement and their ongoing relationship, through which MercyOne purported to advise MIC leadership and the Board with respect to the turnaround of MIC; financial and strategic performance; operational guidance; compliance and regulatory advice; and advice regarding supply chain, purchasing, facilities use, and IT support.

434.    MercyOne represented to MIC and the Board that it was acting on MIC's behalf.

435.    MercyOne influenced MIC's financial and operational performance, and the Board viewed MercyOne as an expert. Consistent with that perception that MercyOne was providing its expertise to MIC and its Board, MercyOne represented and advised the Board regarding MIC's business endeavors, and MercyOne had and exercised the power to direct MIC's business such that MIC was dependent on MercyOne for its continued survival.

436.    By virtue of their relationship and the Affiliation Agreement, MercyOne held a position of trust with MIC, and MIC relied on MercyOne to provide short and long term guidance that MIC believed would ensure its long term viability and strategic affiliation with MercyOne.

437.    MercyOne, as manager and through its agents—including Ritz, Vellinga, Wegner, Dusenbery, as well as Trachta and Williams during their respective tenures as President and CEO of MIC, as members of MIC's board of directors[8]—owed MIC a duty of care and loyalty.

---

[8] These individuals are referred to collectively hereafter as MercyOne's "agents".

438.     MercyOne, by and through one or more of its agents, did not act in good faith or deal fairly with MIC by engaging in conduct that advanced MercyOne's interests to the detriment of MIC.

439.     MercyOne, by and through one or more of its agents, engaged in self-dealing by causing MIC to enter into transactions with Iowa Heart for the purchase of MIC's cardiology practice, related assets, and the lease of MIC space on terms below market and providing a disproportionally large benefit to MercyOne, by causing MIC to enter into the February Teleneurology Agreement and May Teleneurology Agreement for services available for less from other providers, and by causing MIC to engage consultants to perform services required under the Affiliation Agreement that MercyOne should have performed.

440.     MercyOne, by and through one or more of its agents, engaged in self-dealing by causing MIC to engage in transactions that would provide MercyOne with potential future business and strengthen MercyOne's business relationships to the detriment of MIC.

441.     During the course of the Affiliation Agreement, MercyOne, by and through one or more of its officers, executives, and agents, breached its duty of care by disregarding MIC's financial condition and requiring MIC to engage and employ consultants to perform services, thereby imposing unnecessary financial burdens to MIC.

442.     MercyOne did not believe that the actions set forth herein were in the best interests of MIC.

443.     MercyOne acted with a lack of objectivity with regards to MIC as a result of financial benefits received from MIC under the Affiliation Agreement and business relationships in the Iowa healthcare marketplace.

444.     MercyOne asserted domination and control over its representatives serving on the Board such that the relationship, domination, and control asserted reasonably affected such representatives' judgment with regard to MIC.

445.     Under the Affiliation Agreement, MercyOne received financial benefit to which it was not entitled under applicable law.

446.     The harm to MIC was proximately caused by MercyOne's actions.

447.     Following MercyOne's decision to disassociate from MIC, Ritz and other MercyOne representatives on the Board stopped participating in Board meetings though the Affiliation Agreement remained in effect, particularly following MIC's consideration of filing bankruptcy in spring 2023.

448.     As a result, MIC sustained damages in an amount that shall be determined at trial.

## COUNT IX
## Breach of Fiduciary Duty: Sean Williams

449.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

450.     During his time as CEO of MIC, Williams was employed by and reported to MercyOne.

451.     Williams served as President and CEO of MIC between May 1, 2018 and August 30, 2021, and he also served as a member of MIC's Board of Directors as a result of his role as President and CEO.

452.     Williams owed MIC fiduciary duties of care and loyalty.

453.     While serving as MIC President and CEO, Williams believed that his primary duty was to pursue the interests of MercyOne before addressing MIC's own interests.

454.     Williams failed to act in good faith or to deal fairly with MIC by engaging in conduct that advanced MercyOne's interests ahead of those of MIC, including

i.      Entering into the Iowa Heart Transaction without negotiating an arm's length transaction;

ii.     Entering into the February Teleneurology Agreement and May Teleneurology Agreement at nearly double comparable prices without negotiating in an effort to strengthen the relationship with MercyOne;

iii.    Compelling MIC to engage and pay for Insight Health Partners as a turnaround advisor without negotiating for or requesting that MercyOne provide that service and pay for it pursuant to the Affiliation Agreement; and

iv.     Repeatedly representing to MIC's Board and Leadership that MercyOne would acquire MIC though no steps were taken by MercyOne to pursue integration, and Williams was aware MercyOne did not intend to fully integrate.

455.    Williams failed to exercise due care by, among other things:

i.      Failing to regularly  access a desktop or laptop computer during his time at MIC in order to perform work for MIC;

ii.     Failing to provide full time availability to MIC by regularly departing early in afternoon and by being inaccessible to MIC leadership while away from MIC,

iii.    For not monitoring or reviewing information provided by MIC leadership or professionals in advance of Board meetings or prior to discussions with MIC leadership;

    iv.    Refusing to wear a mask or otherwise act in a safe and responsible manner when interacting with MIC staff and physicians while MIC had a mandatory masking policy in place due to COVID-19; and

    v.    Directing MIC leadership to implement MercyOne policies, structures, and forms without considering feedback of MIC's leadership.

456. Williams failed to exercise his duty of loyalty to MIC by negotiating and entering into deals that advantaged MercyOne over MIC, by representing to Ritz and other Board members that Williams's loyalty lay first with MercyOne and that his goal was to promote MercyOne's interests.

457. The actions set forth herein by Williams were not fair to MIC because they furthered MercyOne's interests ahead of those of MIC.

458. Williams took advantage of MIC through his control and role as President and CEO and also as a member of MIC's Board for the furtherance of MercyOne's interests.

459. Williams' conduct constitutes gross negligence, bad faith, and/or willful misconduct.

460. Williams as President and CEO of MIC and also as a member of MIC's Board failed to act with the care that a person in like position would reasonably exercise under similar circumstances, nor in a manner reasonably in the best interest of MIC resulting in his supervisor and employer MercyOne observing that his conduct jeopardized MIC's interests.

461. As set forth herein, Williams's actions caused harm to MIC, and that harm was proximately caused by him.

462. As a result of Williams's actions, MIC sustained damages in an amount that shall be determined at trial.

## COUNT X
## Negligent Misrepresentation: MercyOne

463.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

464.     Prior to execution of the Affiliation Agreement, MercyOne was aware of MIC's financial position and its need for strategic affiliation with a third-party to remain a going concern.

465.     MIC would not have entered into the Affiliation Agreement but-for MercyOne agreeing to plan and potentially implement strategic affiliation with MIC.

466.     The Affiliation Agreement contains numerous representations that MercyOne would work towards strategic affiliation with MIC.

467.     After execution of the Affiliation Agreement, MercyOne made numerous additional representations to MIC and the Board between May 2017 and May 2021 regarding MercyOne's readiness, willingness, and ability to strategically affiliate with MIC.

468.     MercyOne was under a duty to provide true and accurate information to MIC pursuant to the terms of the Affiliation Agreement and their ongoing relationship, through which MercyOne purported to advise MIC leadership and the Board with respect to the turnaround of MIC; financial and strategic performance; operational guidance; compliance and regulatory advice; and advice regarding supply chain, purchasing, facilities use, and IT support.

469.     Moreover, MercyOne was aware that its financial advice, recommendations on managing MIC, and representations regarding strategic affiliation were relied on by MIC as trustee under that certain single employer defined pension plan qualified under section 401(a) of the Internal Revenue Code titled "Mercy Hospital, Iowa City, Iowa Employees' Pension Plan" (the "Pension Plan"). MercyOne was aware that any deterioration in MIC's financial or operational condition, or the failure of MIC and MercyOne to enter into a strategic affiliation based on advice,

recommendations, and representations from MercyOne, would negatively impact the Pension Plan and harm MIC's pensioners.

470.    MercyOne represented to MIC and the Board that it was acting on MIC's behalf.

471.    MercyOne influenced MIC's financial and operational performance, and the Board viewed MercyOne as an expert. Consistent with that perception that MercyOne was providing its expertise to MIC and its Board, MercyOne represented and advised the Board regarding MIC's business endeavors, and MercyOne had and exercised the power to direct MIC's business such that MIC was dependent on MercyOne for its continued survival.

472.    By virtue of their relationship and the Affiliation Agreement, MercyOne held a position of trust with MIC. The Board and MIC therefore relied on MercyOne to provide short- and long-term guidance that MIC believed would ensure its long-term viability and strategic affiliation with MercyOne, CHI, Trinity, or another entity.

473.    MercyOne owed a duty to MIC to provide true information to guide MIC given MIC's role as trustee under the Pension Plan. MercyOne knew that such information regarding strategic affiliation was critical to MIC's obligations under the Pension Plan as well as to the beneficiaries of the Pension Plan.

474.    MercyOne owed a duty to MIC to provide true information to guide MIC given MercyOne's control and domination of the activities of MIC, whether through the Affiliation Agreement or otherwise.

475.    MercyOne held an interest in pursuing strategic affiliation with MIC through the business opportunities made available to MercyOne—vis-à-vis its relationship with MIC including but not limited to, MercyOne's ability under the Affiliation Agreement to control with whom MIC affiliated.

476.     MercyOne held a pecuniary interest in MIC's continued belief in the viability of strategic affiliation vis-à-vis MercyOne's continued receipt of management fees under the Affiliation Agreement and the first amendment to that agreement.

477.     MIC and the Board reasonably relied on MercyOne's representations that it was pursing strategic affiliation between May 1, 2017 and May 2021.

478.     MercyOne failed to exercise reasonable care and competence in communicating its representations to MIC regarding strategic affiliation.

479.     MIC, the Debtors, beneficiaries of the Pension Plan, and creditors of the Debtors' estates suffered damages as a result of MercyOne's representations and supply of false information regarding its readiness, willingness, and ability to strategically affiliate with MIC.

480.     These damages include the significant underfunding liability of the Pension Plan, liability owed to the Computershare Trust Company N.A. under certain bond obligations, and obligations owed to the Debtors' unsecured creditors.

481.     MercyOne intended for MIC, the Board, and the Debtors' stakeholders to rely on the representations provided by MercyOne regarding strategic affiliation.

482.     MercyOne's representations regarding strategic affiliation are the proximate cause of said damages.

483.     As a result of MercyOne's actions, MIC sustained damages in an amount that shall be determined at trial.

### COUNT XI
### Avoidance and Recovery of Constructive Fraudulent Transfers to Iowa Heart
### 11 U.S.C. § 548(a)(1)(B)

484.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

485.     Section 550 of the Bankruptcy Code allows the Debtors to recover, from an initial transferee or any immediate or mediate transferee of an initial transferee, property transferred in a transfer avoided under sections 544, 545, 548, 549, or 724(a) of the Bankruptcy Code.

486.     At all relevant times, and as of the Petition Date, there existed actual unsecured creditors of MIC who could have avoided any transfer of an interest of MIC in property.

487.     Iowa Heart was an immediate or mediate transferee of certain financial transfers during the Fraudulent Transfer Period from MIC. During the Fraudulent Transfer Period, MIC also transferred a possessory interest to certain rental space to Iowa Heart, transferred usage of certain of MIC's staff and personal property, and tendered payment to Iowa Heart pursuant to the Iowa Heart transaction (collectively, the "Iowa Heart Fraudulent Transfers").

488.     The Iowa Heart Fraudulent Transfers occurred within two years of the Petition Date.

489.     The Iowa Heart Fraudulent Transfers constitute "transfers" within the meaning of sections 548, 550, and 551 of the Bankruptcy Code.

490.     Iowa Heart was a wholly owned subsidiary of MercyOne with access to MIC's financial information by virtue of its relationship with MercyOne, ownership by MercyOne, sharing of directors and officers with MercyOne, and as a result of MIC's direct transmission of that information.

491.     Iowa Heart had direct and indirect knowledge of MIC's financial condition during the term of the Iowa Heart agreements, received information as a result of its relationship with MercyOne, and otherwise received information from MIC regarding its financial condition.

492.     Iowa Heart therefore had access to MIC's financial information and knew or should have known of MIC's insolvency.

493.    The Iowa Heart Fraudulent Transfers were made by MIC to Iowa Heart in the amount of at least $132,947.00, as a result of Iowa Heart's payment of a price approximately $7 below fair market value for that space leased from MIC, in addition to Iowa Heart's receipt of additional benefits from MIC under the various Iowa Heart agreements such that Iowa Heart paid less than the fair market value for the assets transferred to it.

494.    Iowa Heart paid MIC less than the fair market value of its leased space and received more than the fair market value of the personal property and services provided by MIC.

495. The Iowa Heart Fraudulent Transfers were made without MIC's receipt of reasonably equivalent value because at the time of the Iowa Heart Fraudulent Transfers, MIC was engaged in business for which its remaining assets were unreasonably small in relation to the scale of its business.

496.    Due to the Iowa Heart Fraudulent Transfers, MIC was left with unreasonably small amounts of capital to meet its existing and expected business and transactional needs, had negative cashflow, and otherwise had liabilities in excess of its assets.

497.    MIC's bankruptcy estate was damaged by the Iowa Heart Fraudulent Transfers.

498.    Pursuant to section 550(a) of the Bankruptcy Code, the OC, as representative of the estates, is entitled to recover from Iowa Heart the Iowa Heart Fraudulent Transfers, plus interest thereon to the date of payment and the costs of this action.

499.    Accordingly, the Court should avoid the Iowa Heart Fraudulent Transfers as constructive fraudulent transfers, and recover the value of such transfers from Iowa Heart, or any other immediate or mediate transferee of the transfers, pursuant to 11 U.S.C. §§ 548, 550, and 551.

## COUNT XII
### Avoidance and Recovery of Voidable Transfers to Iowa Heart
### 11 U.S.C. §§ 544, 550, 551, and Iowa Code Chapter 684

500.    The OC incorporates all preceding paragraphs as if fully re-alleged herein.

501.    Iowa Heart was an immediate or mediate transferee of property during the Voidable Transfer Period from MIC (the "Iowa Heart Voidable Transfers").

502.    During the Voidable Transfer Period, MIC transferred a possessory interest to certain rental space to Iowa Heart, transferred usage of certain of MIC's staff, transferred certain janitorial services, and paid Iowa Heart for provision of certain staff and cardiology services, such that the transfer of MIC's property, property interest, services, and payments to Iowa Heart comprise transfers under Iowa Code Chapter 684.

503.    The Iowa Heart Voidable Transfers occurred within four years of the Petition Date.

504.    Iowa Heart, by virtue of its status as subsidiary of MercyOne, shared officers and directors with MercyOne, received information regarding MIC's financial condition, and had direct and indirect knowledge of MIC's financial condition during the four years before the Petition Date.

505.    As a result, Iowa Heart knew or should have known of MIC's insolvency.

506.    The Iowa Heart Voidable Transfers were made by MIC to Iowa Heart in the amount of approximately $291,486.51, resulting from Iowa Heart's use of space at the price of $26.72 per square foot, approximately $7 per square foot less than the fair market value of that space and for Iowa Heart's usage of approximately 1,200 square feet of space without tender of payment to MIC. Moreover, Iowa Heart's receipt of payments from MIC under the other Iowa Heart agreements resulted in MIC paying more than the benefit it received.

507.     As a result, during the Voidable Transfer Period, MIC received payment from Iowa Heart for less than the fair market value of the space and services used by Iowa Heart and for less than reasonably equivalent value.

508.     In particular, between August 2019 and May 2021, Iowa Heart utilized approximately 11,100 square feet of space but only paid for approximately 9,900 square feet.

509.     Despite being aware that its space usage exceeded the terms of its lease, Iowa Heart elected to amend the terms of its lease with MIC to reflect that Iowa Heart would in the future continue to use 11,200 square feet of space at the rate provided by the parties' regular price increase.

510.     Iowa Heart paid MIC less than the fair market rental value of its leased space.

511.     As a result of the Iowa Heart Voidable Transfers, MIC was insolvent and lacked adequate capital to meet its needs.

512.     Each of the Iowa Heart Voidable Transfers is avoidable within the meaning of Iowa Voidable Transfers Act.

513.     MIC's creditors held antecedent debts against MIC before, during, and after the Iowa Heart Voidable Transfers, including MIC's Pension Plan which held a debt resulting from significant underfunding of MIC's Pension Plan as of April 2023.

514.     The OC is entitled to judgment against Iowa Heart in the amount of the Iowa Heart Voidable Transfers pursuant to Iowa Code §§ 684.7 and 684.8(2)(a)(1).

515.     MIC's bankruptcy estate was damaged by the Iowa Heart Voidable Transfers.

516.     Pursuant to section 550(a) of the Bankruptcy Code, the OC, as representative of the estates, is entitled to recover from Iowa Heart the Iowa Heart Voidable Transfers, plus interest thereon to the date of payment and the costs of this action.

517.     Accordingly, the Court should avoid the Iowa Heart Voidable Transfers and enter judgment against Iowa Heart to recover the value of such transfers from Iowa Heart, or any other immediate or mediate transferee of the Iowa Heart Voidable Transfers, pursuant to 11 U.S.C. §§ 544, 550, 551 and Iowa Code §§ 684.4, 684.5, and 684.7.

## COUNT XIII
### Avoidance of Insider Transfers to Iowa Heart
### 11 U.S.C. §§ 544, 550, 551, and Iowa Code Chapter 684

518.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

519.     By operation of 11 U.S.C. § 544, the OC, standing in the shoes of the Debtors, is entitled to utilize any applicable non-bankruptcy law to seek avoidance of any transfer.

520.     The Iowa Uniform Voidable Transactions Act has a 1-year look back period for transfers made by a debtor to an insider for an antecedent debt, if the debtor was insolvent at the time and the insider had reasonable cause to believe that the debtor was insolvent. Iowa Code § 684.4, 684.7.

521.     The Transfers between August 8, 2022 and August 7, 2023 from MIC to Iowa Heart were made on account of an antecedent debt (the "Iowa Heart Insider Transfers").

522.     MIC's creditors held antecedent debts against MIC before, during, and after the transfers to Iowa Heart, including the Pension Plan, which as of April 2023 possessed a claim against MIC for underfunded pension liabilities.

523.     As set forth herein, Iowa Heart is an affiliate of MercyOne and therefore comprises a statutory and nonstatutory insider of MIC.

524.     As set forth herein, Iowa Heart by virtue of its relationship with MIC and MercyOne had direct and indirect knowledge of MIC's financial condition and knew or should have known that MIC was insolvent during the one-year period before the Petition Date.

525.     In fact, MIC was insolvent when it made the Iowa Heart Insider Transfers.

526.     The OC is entitled to judgment against Iowa Heart in the amount of the Iowa Heart Insider Transfers between August 8, 2022 and August 7, 2023 pursuant to Iowa Code §§ 684.7 and 684.8(2)(a)(1).

527.     MIC's bankruptcy estate was damaged by the Iowa Heart Insider Transfers.

528.     Pursuant to section 550(a) of the Bankruptcy Code, the OC, as representative of the estates, is entitled to recover from Iowa Heart the Iowa Heart Insider Transfers, plus interest thereon to the date of payment and the costs of this action.

529.     Accordingly, the Court should avoid the Iowa Heart Insider Transfers and enter judgment against Iowa Heart to recover the value of such transfers from Iowa Heart, or any other immediate or mediate transferee of the payments, pursuant to 11 U.S.C. §§ 544, 550, 551 and Iowa Code §§ 684.4, 684.5, and 684.7.

## COUNT XIV
## Recovery of Insider Preference Payments to Iowa Heart
## 11 U.S.C. § 547

530.     The OC incorporates all preceding paragraphs as if fully re-alleged herein.

531.     Under the Iowa Heart Agreements, Iowa Heart received transfers of $728,400.00 between August 8, 2022 and August 7, 2023 (the "Iowa Heart Preferential Transfers").

532.     At the times of the Iowa Heart Preferential Transfers, Iowa Heart was an affiliate of MercyOne and therefore comprised a statutory and nonstatutory insider.

533.     At the times of the Iowa Heart Preferential Transfers, MIC was insolvent. Between August 8, 2022 and August 7, 2023, MIC lacked sufficient capital to meet its needs for current and future projects, had negative cashflow, and otherwise had liabilities in excess of its assets, including, for example, MIC's existing pension obligation.

534. MIC's confirmed Combined Disclosure Statement and Plan of Liquidation contemplated that general unsecured creditors would recover approximately 10% of their claim, but Iowa Heart received $728,400.00 during the preference period.

535. By virtue of its receipt of the Iowa Heart Preferential Transfers between August 8, 2022 and August 7, 2023, Iowa Heart received more than it would have received had MIC filed under Chapter 7 or what it otherwise would have received under the Bankruptcy Code.

536. MIC's bankruptcy estate was damaged by the Iowa Heart Preferential Transfers.

537. Pursuant to section 550(a) of the Bankruptcy Code, the OC, as representative of the estates, is entitled to recover from Iowa Heart the Iowa Heart Preferential Transfers, plus interest thereon to the date of payment and the costs of this action.

538. Accordingly, the Court should avoid the Iowa Heart Preferential Transfers between MIC and Iowa Heart as preference payments, and enter judgment against Iowa Heart to recover the value of such transfers from Iowa Heart, pursuant to 11 U.S.C. §§ 544, 547, and 550.

## JURY DEMAND

539. The OC requests a trial by jury on all issues so triable.

## RELIEF REQUESTED

**WHEREFORE,** the OC respectfully requests that this Court enter an order providing the following relief:

A. On Count I, judgment in favor of the OC and against MercyOne, avoiding the Transfers, and directing MercyOne to return to the OC $3,759,551.69, the amount of the Transfers, pursuant to 11 U.S.C. § 550, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action;

B.      On Count II, judgment in favor of the OC and against MercyOne, avoiding the voidable transfers, and directing MercyOne to return to the OC $9,833,189.49, the amount of the Transfers, pursuant to 11 U.S.C. § 550, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action;

C.      On Count III, judgment in favor of the OC and against MercyOne directing MercyOne to return to the OC $1,125,047.63, the amount received by MercyOne as Insider Transfers from MIC between August 8, 2022 and August 7, 2023, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

D.      On Count IV, judgment in favor of the OC and against MercyOne, receipt of an insider preference, and an award of damages in the amount of $1,125,047, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

E.      On Count V, judgment in favor of the OC and against MercyOne for breach of contract resulting from MercyOne's failure to provide services required by the Affiliation Agreement, with an award of damages to be determined at trial but in an amount of at least $18,765,000.00, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

F.      On Count VI, judgment in favor of the OC and against MercyOne for unjust enrichment resulting from the benefit received by MercyOne under the Affiliation Agreement, with an award of damages in the amount of $14,465,375.20, or the difference of the value provided and what MIC paid, as determined at trial, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

G.      On Count VII, judgment in favor of the OC and against MercyOne for breach of the February Teleneurology Agreement for MercyOne's failure to provide neurology services

required by that agreement despite MIC's performance of its own obligations, with an award of compensatory and consequential damages in an amount to be determined at trial, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

H.     On Count VIII, judgment in favor of the OC and against MercyOne for breach of its fiduciary duties resulting from the actions of MercyOne's directors and officers while those individuals served as fiduciaries for MIC, resulting in MercyOne's pursuit of benefits to MIC's detriment, with an award of compensatory and consequential damages in an amount to be determined at trial but in an amount of at least $5,000,000.00, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

I.     On Count IX, judgment in favor of the OC and against Sean Williams for breach of fiduciary duty resulting from his actions to enhance MercyOne's interests above those of MIC and for his receipt of financial renumeration for those actions, with an award of compensatory and consequential damages in an amount to be determined at trial but in an amount of at least $2,000,000.00, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

J.     On Count X, judgment in favor of the OC and against MercyOne for negligent misrepresentation, with an award of damages in an amount to be determined at trial but in an amount of at least the Pension Plan underfunded liability of $23,480,000.00, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

K.     On Count XI, judgment in favor of the OC and against Iowa Heart avoiding the Iowa Heart Fraudulent Transfers it received within two years of the Petition Date, and directing Iowa Heart to return to the OC at least $132,947.00, pursuant to 11 U.S.C. § 550, plus interest at

the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action;

L.      On Count XII, in favor of the OC and against Iowa Heart avoiding the Iowa Heart Voidable Transfers it received in the four years before the Petition Date, and directing Iowa Heart to return to the OC at least $291,486.51, pursuant to 11 U.S.C. § 550, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action;

M.      On Count XIII, in favor of the OC and against Iowa Heart and order Iowa Heart to return to the OC $728,400.00, the amount received by Iowa Heart as insider transfers from MIC between August 8, 2022 and August 7, 2023, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

N.      On Count XIV, judgment in favor of the OC and against Iowa Heart and an order to return to the OC $728,400.00, the amount received by Iowa Heart as preferential transfers from MIC between August 8, 2022 and August 7, 2023, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law;

O.      Such other relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 6, 2025
  Cedar Rapids, Iowa

       **NYEMASTER GOODE, P.C.**

       */s/ Roy Leaf*
       Roy Leaf, AT0014486
       625 First Street SE, Suite 400
       Cedar Rapids, IA 52401-2030
       Telephone: (319) 286-7002
       Facsimile: (319) 286-7050
       Email:  rleaf@nyemaster.com

       - and -

       Leslie C. Behaunek, AT0011563
       Jaden Banks, AT0016210
       Logan J. Eliasen, AT0013755
       700 Walnut, Suite 1300
       Des Moines, IA 50309
       Telephone: (515) 283-3100
       Fax: (515) 283-8045
       Email: lcbehaunek@nyemaster.com
         jbanks@nyemaster.com
         leliasen@nyemaster.com

       *Counsel for the Mercy Hospital Liquidation Trust*
       *Oversight Committee as Designee of the Liquidation*
       *Trustee*