# MANAGEMENT SERVICES AND STRATEGIC AFFILIATION AGREEMENT

This Management Services and Strategic Affiliation Agreement ("**Agreement**") is made and entered into as of May 1, 2017 (the "**Execution Date**") by and between Mercy Health Network, Inc., a Delaware non-stock corporation ("**MHN**"), and Mercy Hospital, Iowa City, Iowa, an Iowa not-for-profit corporation and its subsidiaries and affiliates ("**Hospital**") (each a "**Party**" and together the "**Parties**").

## WITNESSETH:

**WHEREAS**, Hospital operates an acute care hospital that provides inpatient, outpatient and related services and also operates clinics located in and around Iowa City, Iowa; and

**WHEREAS**, Hospital is governed by its Board of Directors/Trustees ("**Board**"); and

**WHEREAS**, MHN is a joint affiliation between Trinity Health ("**Trinity**") and Catholic Health Initiatives ("**CHI**") (Trinity and CHI may be referred to herein from time to time as "parents"); and

**WHEREAS**, CHI is the sole member of Catholic Health Initiatives-Iowa Corp. d/b/a Mercy Medical Center – Des Moines, which is the entity that will provide, through MHN, the majority of the services hereunder; and

**WHEREAS**, MHN and Hospital have reviewed each other's mission, vision and values statements and believe there is fundamental alignment and compatibility in both the words and meanings of such statements, as well as a shared commitment to expanding Catholic healthcare in Iowa; and

**WHEREAS**, MHN and Hospital believe a strategic relationship between them will be mutually beneficial, and desire to explore a path by which Hospital will fully affiliate with MHN, including transfer of Catholic sponsorship of the Hospital to one of its Catholic Sponsors, and which will help the Hospital address its information technology replacement needs (the "**Affiliation Goals**"); and

**WHEREAS**, in order to further the Parties' strategic alignment while the Parties explore a more complete strategic affiliation relationship which addresses the Affiliation Goals, Hospital wishes to retain MHN, and MHN wishes to be retained, to provide strategic guidance, turnaround management and certain other management services to Hospital in furtherance of preserving Hospital's mission, vision and values and the objectives, including but not limited to those objectives set forth in Exhibit A, attached hereto and incorporated herein by reference; and

**WHEREAS**, MHN and Hospital believe that entering into this Agreement will further the mission and tax-exempt purposes of MHN by promoting health, supporting and improving the availability of health services for residents of Hospital's community, and encouraging the development of a regional health care delivery network; and

**WHEREAS**, the Board of Hospital has authorized Hospital to enter into this Agreement; and

**WHEREAS**, the governing body of MHN has authorized MHN to enter into this Agreement;

36669586.4

EXHIBIT
1

.

**NOW THEREFORE,** in consideration of the mutual promises and covenants contained herein, MHN and Hospital agree as follows:

1. _**Strategic Council.**_ The Parties shall form a Strategic Council comprised of two (2) representatives appointed by each of MHN and Hospital, to be the coordinating body for all collaborative work agreed upon by the Parties. The Strategic Council will provide a platform for (i) ongoing dialogue regarding the Parties' relationship hereunder, (ii) the identification and evaluation of opportunities for the Parties to share information, best practices, processes and expertise, and (iii) collaboration on specific operational and strategic topics and functions with the goal of enhancing the delivery of care and improving the Hospital's operational performance. The Strategic Council will meet at least once per quarter to provide input into Hospital's strategic considerations, including the Hospital's strategic plan, provided however, during the initial ninety (90) day period following the Execution Date (the **"Planning Period"**), the Strategic Council will meet as necessary, working with management and the governing boards of each of the Parties, and will develop and finalize the Parties approach to meeting the Affiliation Goals and appropriate amendments to this Agreement to reflect that approach prior to the expiration of the Planning Period. The Strategic Council will be advisory only and will not exercise control or otherwise limit the authority of the Board to manage the Hospital's activities.

2. _**Management Services to be Provided by MHN.**_ MHN agrees to provide and Hospital agrees to pay for the core services described on Exhibit B1 and the optional services listed on Exhibit B2 that Hospital requests in writing be provided by MHN. Hospital may request, at any time, that a service not listed on Exhibit B1 or Exhibit B2 be provided by MHN; provided, however, the terms of providing any additional services shall be mutually agreed to in advance and in writing by the parties as an addendum to this Agreement, and MHN, at its discretion, shall have the right to decline the invitation to provide any such additional services. MHN has authority to subcontract with its affiliates and other entities to furnish the Management Services to Hospital.

3. _**Liaison.**_ MHN shall designate a qualified individual (the "Liaison") to serve as the primary point of contact between MHN, the Board and the individual MHN assigns to the Hospital as its CEO. The Liaison shall attend meetings of the Hospital Board; promote collaboration between the Hospital, MHN and its affiliates in accordance with applicable antitrust laws; support the CEO; ensure open communication with the Board's chairperson; attend local community meetings and social functions when requested to do so; participate in the Hospital's strategic planning process and budget development process; provide ongoing input to the CEO regarding his/her evaluation; assist in medical staff development plans; and maintain good relations with members of the Hospital's medical staff.

4. _**Turnaround Management.**_ MHN shall engage a turnaround manager, for a reasonable fee at MHN's sole expense, to assist MHN, the CEO and the Board in improving the Hospital's financial performance. MHN shall consult with the Board prior to selecting the person or firm to provide turnaround management services. The selection of the turnaround manager, and the term and scope of this engagement shall be determined by MHN in its sole discretion.

5. _**IT Support.**_ MHN shall assist Hospital in evaluating options for replacing its existing information technology system and implementing the selected option, with the goal of having a plan

36669586.4

developed by January 1, 2018 and implemented as soon as possible but not later than November 1, 2018. The Hospital's Board, working in collaboration with the CEO, shall have sole discretion in determining which option is selected.

6. ***Compensation for Services.*** Hospital shall pay MHN in accordance with Exhibit C as reimbursement of the costs and expenses incurred by MHN under this Agreement.

7. ***Performance Standard.*** MHN shall use its reasonable business efforts to perform its duties and responsibilities hereunder in a diligent, professionally responsible and efficient manner and in accordance with all applicable statutory and regulatory requirements and basic industry standards. MHN agrees to cooperate with Hospital in developing timely responses in support of the business needs of Hospital. Notwithstanding anything to the contrary contained herein, MHN shall not be liable to Hospital for the failure to achieve or obtain a desired aim or result, or for any error or loss, if MHN acted with such reasonable efforts, care and diligence and in a manner reasonably believed to be in the best interests of Hospital. During the Planning Period, MHN and Hospital shall work together to develop acceptable performance targets for the first two (2) years of the Agreement and for meeting the Affiliation Goals.

8. ***Publicity.*** Each Party may publicize the nature and existence of this Agreement including the use of the name of the other parties; provided, however, the Parties agree that they may not use the name of the other Party for any purpose other than those intended by this Agreement without the express written consent of such Party. As practicable, Hospital agrees to indicate its affiliation with MHN on its letterhead and signage with the identifier, "Member of Mercy Health Network", or such other name as MHN has designated.

9. ***Non-Exclusivity.*** This Agreement shall be non-exclusive. Hospital retains its authority to do business with any other party or parties for whatever purpose it so desires. MHN, its parents and their affiliates also retain their authority to do business with any other party or parties for whatever purpose they so desire. Hospital shall not, however, affiliate with any other health care system operating in Iowa or participate in any other accountable care organization or clinically integrated network other than those approved by MHN.

10. ***Ethical And Religious Directives.*** Hospital and MHN, its parents and their affiliates are and shall be operated in accordance with the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the National Conference of Catholic Bishops and the United States Catholic Conference as amended from time to time, and as interpreted by the local bishop (the "***Directives***"). It is the intent and agreement of the Parties that neither this Agreement nor any part hereof shall be construed to obligate Hospital, MHN, its parents or their affiliates to violate in any way the *Directives*.

11. ***Governing Body.*** MHN acknowledges that Hospital is governed by the Board, duly elected and responsible under State law for maintaining all licenses, accreditations or certificates, and for establishing policies for Hospital and assuring quality of care therein. MHN shall render advice concerning such matters, as requested by Hospital, but the final decision in such matters shall remain with the Board. Nothing in this Agreement is intended by either Party to alter, weaken, displace, or modify the authority or responsibility of the Board; provided however, the Hospital shall take the

36669586.4

necessary steps following the execution of this Agreement in order to include representatives designated by MHN to be granted voting representation on the Board such that during the term of this Agreement a minimum of one-quarter of the voting representatives on the Board, including the CEO, are MHN designees.

12.    *MHN Payor Contracts*.

(a)    Hospital hereby appoints MHN as its agent for purposes of negotiating managed care contracts and other third party payer contracts by MHN on behalf of MHN's managed and affiliated hospitals to the extent allowed by the applicable managed care organization or third party payers and antitrust laws. Hospital authorizes the Hospital's CEO to execute managed care contracts and other third party payer contracts negotiated by MHN pursuant to this Section 12 on behalf of Hospital, each Hospital clinic, the professional staff employed by Hospital in each Hospital clinic and any professional staff employed by an affiliate of MHN and assigned to Hospital or a Hospital clinic. Hospital agrees to participate and to cause its employed professionals, if any, to participate in any such contracts negotiated on its behalf by MHN in accordance with the terms and conditions of such contracts.

(b)    Notwithstanding anything to the contrary provided in this Agreement, Hospital shall have the right to individually participate in any managed care contract or third-party payer contract provided it has notified MHN in writing of its desire to participate individually prior to MHN commencing negotiations with such payer and MHN has not already contractually committed Hospital to participate in an MHN contract with such payer.

(c)    Hospital acknowledges that the contract negotiation services provided by MHN pursuant to this Section 12 are done on a statewide basis for multiple MHN hospitals and that MHN does not provide individualized contracting services.

13.    *ACO/CIN*.    Hospital agrees to participate in the accountable care organizations ("ACOs") and clinically integrated networks ("CINs") designated by MHN and, to the extent feasible, to terminate any existing ACO or CIN arrangements it has with third-party payers. Hospital shall establish an Iowa City Chapter of the Mercy ACO and participate in the Mercy ACO statewide CIN work groups. Hospital shall implement the programs and initiatives as recommended by the Iowa City Chapter and Mercy ACO statewide CIN work groups. Hospital's ACO and CIN participation shall be governed by the terms of its participation agreements.

14.    *Compliance with All Laws*. Both Parties shall comply with all applicable Federal, State and local laws and regulations, including but not limited to Federal and State anti-trust laws.

15.    *Corporate Responsibility*. MHN and Hospital recognize that it is essential that MHN, Hospital, and their directors, officers, employees and agents conduct themselves at all times in compliance with the highest standards of business ethics and integrity and applicable legal requirements. Each Party expressly acknowledges and agrees that it shall direct its directors, officers, employees and agents to act at all times in a manner consistent with these requirements. To that end, Board has adopted or shall adopt an effective corporate responsibility program containing the elements described in the U.S. Health and Human Services, Office of the Inspector General, Original and

36669586.4

4

Supplemental Compliance Program Guidance for Hospitals ("**OIG Compliance Guidance**"). Hospital has engaged MHN to assist Hospital in maintaining its corporate responsibility program as part of core services set forth on Exhibit B1.

16. ***Term and Termination***.

(a)    Term. Unless terminated as provided herein, this Agreement shall be effective on June 1, 2017 and shall continue until June 30, 2020 (the "Initial Term"). Upon expiration of the Initial Term, the parties can agree in writing to extend the Agreement for one or more terms of three (3) years' (each a "Renewal Term").

(b)    Termination. Any Party shall have the right to terminate this Agreement, for cause, upon 30 days' written notice to the other Party. Any such notice shall specify the cause upon which it is based. The violating Party shall have 30 days to rectify the cause specified in the notice of termination, and if such cause is not rectified within such 30 day period, this Agreement shall thereupon automatically terminate; provided, however, that if such cause cannot reasonably be rectified within such 30 day period, this Agreement shall not automatically terminate so long as the violating Party has commenced to rectify the cause within such 30 day period and thereafter diligently and continuously proceeds to rectify such cause. It is understood and agreed by the parties that "cause" for termination subject to notice and cure under this Section includes material breach by either Party of any of its obligations under this Agreement.

(c)    Effect of Termination. Other than those rights and obligations expressly made to survive termination, upon termination of this Agreement, the rights and obligations of the Parties hereunder shall terminate, *provided, however*, that such action shall not relieve either MHN or Hospital of obligations imposed with respect to services furnished prior to such termination.

17. ***No Property Ownership***.

(a)    All assets of Hospital of whatever nature or type are and shall remain Hospital's sole and exclusive property. All debts, obligations and other liabilities of Hospital of whatever nature and type are and shall remain its sole and exclusive obligation. Nothing in this Agreement shall be construed as an obligation on the part of MHN to guarantee or otherwise be responsible for the debt, conduct, obligations or other liabilities of Hospital. MHN does not intend to take ownership of any property nor undertake any obligations of Hospital.

(b)    All assets of MHN of whatever nature or type are and shall remain its sole and exclusive property. All debts, obligations and other liabilities of MHN of whatever nature or type are and shall remain its sole and exclusive obligation. Hospital does not intend to take ownership of any property nor undertake any obligations of MHN.

18. ***No Conflict***. Unless otherwise expressly provided herein, this Agreement does not abrogate any responsibilities undertaken by the respective parties regarding agreements or contracts

36669586.4

now existing and in no way limits the right of either Party to enter into other contracts or agreements in the future. Neither Party assumes any debt, obligation or liability of the other under such agreements.

19.   *Indemnification*.  Hospital shall, net of any insurance recovery, defend, indemnify and hold harmless MHN, its parents, directors, officers, employees, agents, representatives, successors, assigns, and subcontractors from and against any and all claims, demands, actions, settlements or judgments, including reasonable attorneys' fees and litigation expenses, arising directly or indirectly out of or in connection with the operation of Hospital, or Hospital's breach of a material provision of this Agreement, where such claims, demands, actions, settlements or judgments relate to the gross negligence or intentional acts or omissions of Hospital.  MHN shall, net of any insurance recovery, defend, indemnify and hold harmless Hospital, its directors, officers, employees, agents, representatives, successors, assigns, and subcontractors from and against any and all claims, demands, actions, settlements or judgments, including reasonable attorneys' fees and litigation expenses, arising directly or indirectly out of or in connection with MHN's provision of services hereunder, or MHN's breach of a material provision of this Agreement, where such claims, demands, actions, settlements or judgments relate to the gross negligence or intentional acts or omissions of MHN.  The duties to defend, indemnify and hold harmless shall survive the termination and expiration of this Agreement.

20.   *Insurance*.

(a)      Hospital agrees to obtain and maintain in force and effect the following insurance coverage issued by an appropriately licensed insurance company, or through an adequately funded self-insurance program, throughout the term of this Agreement: (i) general liability coverage, covering bodily and personal injury, property damage, and contractual liability, with minimum coverage of $1 million per incident and $3 million annual aggregate; (ii) professional liability (malpractice) insurance, with minimum coverage of $1 million per incident and $3 million annual aggregate; (iii) automobile liability insurance with $1 million single limit of liability per occurrence; (iv) workers' compensation insurance in accordance with statutory limits; (v) employers liability with minimum coverage of $1 million per accident per employee; (vi) directors and officers liability coverage with minimum coverage of $1 million per claim, (vii) excess/umbrella insurance coverage of $5 million per claim and $5 million annual aggregate; and (viii) cyber liability insurance (including but not limited to coverage for HIPAA security and privacy breaches, costs incurred in responding to breaches or regulatory actions resulting from such breaches, and any resulting fines and penalties) with limits of not less than $2 million for each occurrence and an annual aggregate of $2 million.   Hospital agrees to obtain or maintain insurance coverage in accordance with these requirements, unless it has good cause not to do so, as determined by MHN in its sole discretion.  MHN and Mercy Medical Center – Des Moines shall be named as additional insureds with respect to work being performed under this Agreement.

(b)      MHN agrees to ensure that the MHN, Mercy Medical Center – Des Moines, and CEO are covered by the following types of insurance policies issued by an appropriately licensed insurance company, or through an adequately funded self-insurance program, throughout the term of this Agreement: (i) general liability coverage, covering bodily and personal injury, property damage, and contractual liability; (ii) automobile liability insurance; (iii) workers' compensation insurance in accordance with statutory limits; (iv) employers liability; (v) directors and officers liability coverage, and (vi) excess/umbrella insurance.  The amounts of each type of insurance coverage shall meet or exceed the limits set forth above.

36669586.4

(c)    Both Parties shall, upon request, furnish to the other Party certificates of insurance evidencing the coverage required under this Section 20.

(d)    By requiring insurance herein, neither Party represents that coverage and limits will necessarily be adequate to protect the other Party, and such coverage and limits shall not be deemed as a limitation on a Party's liability under the indemnities granted in this Agreement.

21.    _**Relationship of Parties**_.  In the performance of the obligations under this Agreement, it is mutually understood and agreed that MHN and its leased staff are at all times acting and performing as independent contractors with respect to Hospital.  It is expressly agreed and understood by the Parties hereto that neither Party is an agent, partner, or joint venturer with or of the other by virtue of this Agreement unless otherwise expressly provided herein.

22.    _**Books and Records**_.  If and to the extent required by Section 1395x(v)(1)(I) of Title 42 of the United States Code, until the expiration of four (4) years after the termination of this Agreement, MHN shall make available, upon written request by the Secretary of the Department of Health and Human Services, or upon request by the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of the costs of the services provided by MHN under this Agreement.  MHN further agrees that in the event MHN carries out any of its duties under this Agreement through a subcontract with a related organization with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period, such subcontract shall contain a provision requiring the related organization to make available until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract upon written request to the Secretary of the United States Department of Health and Human Services, or upon request to the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of such subcontract and such books, documents and records of such organization as are necessary to verify the nature and extent of such costs.

23.    _**Notice**_.  Notices required to be or otherwise which are in writing shall be deemed duly served when personally received by one of the parties as set forth below, or in lieu of such personal service, when deposited in the United States mail, certified, postage prepaid, addressed to such Party at the following addresses:

|  |  |
|---|---|
| If sent to MHN to: | Mercy Health Network<br>Chief Executive Officer<br>1755 59th Place<br>West Des Moines, IA 50266-7736 |
| If sent to Hospital to: | Chair, Board of Trustees<br>Mercy Hospital, Iowa City, Iowa<br>500 East Market<br>Iowa City, Iowa 52245 |

24.    _**Excluded Provider**_.  Each Party represents and warrants that it is not now and at no time has it been excluded from participation in any state or federally funded health care program,

36669586.4

7

including Medicare and Medicaid (collectively referred to as "governmental health care program"). Each Party agrees to immediately notify the other Party of any threatened, proposed, or actual exclusion of it from participation in any governmental health care program during the term of this Agreement. Notwithstanding anything to the contrary contained herein, in the event that a Party is excluded from participating in any governmental health care program during the term of this Agreement, or if at any time after the effective date of this Agreement, it is determined that a Party is in breach of this Section, this Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Each Party agrees to indemnify and hold the other Party harmless against all actions, claims, demands and liabilities, and against all loss, damage, costs and expenses, including reasonable attorneys' fees, arising directly or indirectly out of any violation of this Section by it or due to its exclusion from a governmental health care program.

25. *Use of Protected Health Information.* MHN shall have access to Hospital's protected health information and MHN and Hospital shall execute a Business Associate Agreement substantially in the form of Attachment 1.

26. *Entire Agreement.* This Agreement, together with Exhibits A through C, constitutes the entire understanding between MHN and Hospital with regard to this Management Services Agreement, and all prior negotiations of the parties have been merged into this Agreement. There are no understandings, representations, or agreements either oral or written other than those set forth herein and all prior management agreements are expressly terminated as of the effective date of this Agreement. No amendment, waiver, change, modification, or termination of any of the terms, provisions or conditions of this Agreement shall be effective unless made in writing and signed or initialed by both Parties. Waiver of any provision of this Agreement shall not be deemed a waiver of future compliance therewith and such provisions shall remain in full force and effect.

27. *Invalid Provision.* In the event any provision of this Agreement is held invalid, illegal, or unenforceable, in whole or in part, the remaining provisions of this Agreement shall not be affected thereby and shall continue to be valid and enforceable. In the event any provision of this Agreement is held to be unenforceable as written, but enforceable if modified, then such provision shall be deemed to be amended to such extent as shall be necessary for such provision to be enforceable, and it shall be enforced to that extent.

28. *Assignment.* This Agreement and all rights, privileges, duties, and obligations of the parties hereto may not be assigned or delegated by any Party without the prior written consent of the other Party.

29. *Waiver.* The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that Party of the right thereafter to that term or any other term of this Agreement. No amendment, supplement or termination of this Agreement shall affect or impair any rights or obligations which shall have theretofore matured hereunder.

30 *Governing Law.* This Agreement shall be construed and interpreted according to the laws of the State of Iowa.

31.   ***Third Party Rights.***   Mercy Medical Center – Des Moines shall be an intended beneficiary of the promises made by Hospital pursuant to this Agreement and shall have a right to enforce the obligations and duties of Hospital set forth herein.  This Agreement has been made and is made solely for the benefit of the Parties and Mercy Medical Center – Des Moines and their respective successors and permitted assigns and nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than Mercy Medical Center – Des-Moines and the Parties and their respective successors and permitted assigns.  Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third persons, including Mercy Medical Center – Des Moines, to either Party to this Agreement.

32.   ***Hospital Governance.***   Hospital and the Board agree that nothing in this Agreement alters, weakens, displaces, or modifies its authority or responsibility for operation and administration of Hospital.  Hospital and Board agree that they are responsible for the operation and administration of Hospital.  MHN does not guarantee and is not responsible for the viability or financial success of Hospital.

33.   ***Conflict of Interest Policy.***   Board shall adopt and abide by a conflict of interest policy that is consistent with the sample policy provided as Attachment 2 to this Agreement.

34.   ***Confidentiality.***   The parties acknowledge this Agreement contains certain trade secrets of MHN and as such, will not be disclosed to third parties other than their legal and financial advisors unless required by law or subpoena.


**Exhibits:**

A – Hospital Objectives
B1 – MHN Core Services
B2 – MHN Optional Services
C – Compensation for MHN Services

**Attachments:**

1 - Business Associate Agreement
2 – Sample Conflict of Interest Policy

MERCY HEALTH NETWORK, INC.

BY: _____

DAVID H. VELLINGA
CEO, MERCY HEALTH NETWORK, INC.

DATE: _May 1, 2017_____


MERCY HOSPITAL, IOWA CITY, IOWA

BY: _____

CHAIR, BOARD OF DIRECTORS

DATE: _4/28/2017_____

36669586.4

**IN WITNESS WHEREOF**, pursuant to authorization of its Board of Directors, MHN has caused this Agreement to be signed and executed by its officer as thereunto duly authorized, and pursuant to authorization of its Board of Trustees, Hospital has caused this Agreement to be signed and executed by its officer as thereunto duly authorized as of the day and year first above mentioned.

**MERCY HEALTH NETWORK, INC.**

BY: _____

DAVID H. VELLINGA
CEO, MERCY HEALTH NETWORK, INC.

DATE: May 1, 2017

**MERCY HOSPITAL, IOWA CITY, IOWA**

BY: _____

CHAIR, BOARD OF DIRECTORS

DATE: _____

**ACKNOWLEDGED AND AGREED TO:**

**MERCY MEDICAL CENTER – DES MOINES**

By: _____

DAVID H. VELLINGA
CEO, MERCY MEDICAL CENTER – DES MOINES

DATE: May 1, 2017

36669586.4

10

**IN WITNESS WHEREOF,** pursuant to authorization of its Board of Directors, MHN has caused this Agreement to be signed and executed by its officer as thereunto duly authorized, and pursuant to authorization of its Board of Trustees, Hospital has caused this Agreement to be signed and executed by its officer as thereunto duly authorized as of the day and year first above mentioned.

**MERCY HEALTH NETWORK, INC.**

BY: _____

       DAVID H. VELLINGA
       CEO, MERCY HEALTH NETWORK, INC.

_____

DATE

**MERCY HOSPITAL, IOWA CITY, IOWA**

BY: _____

       CHAIR, BOARD OF DIRECTORS

_____ 4 / 28 / 2017 _____

DATE

- 9 -

MERCY HEALTH NETWORK, INC.

BY: _____

DAVID H. VELLINGA
CEO, MERCY HEALTH NETWORK, INC.

DATE: _May 1, 2017_____


MERCY HOSPITAL, IOWA CITY, IOWA

BY: _____
CHAIR, BOARD OF DIRECTORS

DATE: _4/28/2017_____

36669586.4

**IN WITNESS WHEREOF**, pursuant to authorization of its Board of Directors, MHN has caused this Agreement to be signed and executed by its officer as thereunto duly authorized, and pursuant to authorization of its Board of Trustees, Hospital has caused this Agreement to be signed and executed by its officer as thereunto duly authorized as of the day and year first above mentioned.

**MERCY HEALTH NETWORK, INC.**

BY: _____

   DAVID H. VELLINGA
   CEO, MERCY HEALTH NETWORK, INC.

DATE:_____


**MERCY HOSPITAL, IOWA CITY, IOWA**

BY:_____

   CHAIR, BOARD OF DIRECTORS

DATE:_____


**ACKNOWLEDGED AND AGREED TO:**

**MERCY MEDICAL CENTER – DES MOINES**


By: _____

DAVID H. VELLINGA
CEO, MERCY MEDICAL CENTER – DES MOINES

DATE:_____

## EXHIBIT A
## HOSPITAL OBJECTIVES

Hospital's objectives in entering into this Agreement may include, but are not limited to:

1. Obtaining organized support for Hospital, its medical staff, and employees for requested services, such as, but not limited to, human resources, finance, information systems, clinical services, purchasing (including participation in a GPO), and continuing education.

2. Developing and offering innovative programs for the delivery of health services, which make available to and encourage use by area residents of the Hospital health delivery system.

3. Publicizing the services available at Hospital and its specialty clinics.

4. Obtaining administrative, clinical and business support in the operation of Hospital, including participation in network groups, attendance at appropriate meetings, access to policies and procedures and the like.

5. Improving Hospital's ability to secure future public, private and grant funding for capital and operational needs.

6. Linking diagnostic, therapeutic and rehabilitative services available at Hospital to the complementary and supportive specialized services of other providers, as appropriate.

7. Recognizing and supporting the role of locally provided primary health services through an affiliation with MHN, which facilitates transfer, referral, consultation and follow-up.

8. Augmenting the existing specialized diagnostic, rehabilitative and follow-up services in the Hospital's service area, such as cardiology and cardiac rehabilitation, orthopedics, urology, obstetrics, gynecology, allergy, dermatology, ENT, gastroenterology, general surgery, internal medicine, nephrology, oncology, plastic surgery, pulmonology, and psychiatry, through specialty clinics or diagnostic and consultative arrangements.

9. Extending to residents locally, new diagnostic and supportive resources in fields such as telemedicine.

10. Linking resources of Hospital and its medical staff to innovative marketing and delivery systems such as clinically integrated organizations, accountable care organization, shared savings programs, and managed care entities.

36669586.4

**EXHIBIT B1**
**MHN CORE SERVICES**

*Core Service #1.*     Chief Executive Officer/Administrator.

MHN shall arrange to provide a full-time Chief Executive Officer/Administrator ("CEO") for Hospital. The responsibilities of the CEO shall include, but are not limited to, oversight of personnel recruitment and management, maintenance of adequate Hospital staffing, high-level oversight of billing and collection of accounts receivable, management of Hospital assets, supervision of Hospital operations, coordination of the medical staff of Hospital, development of proposed annual budgets, and other activities as assigned by the Board to efficiently operate the Hospital, all under the supervision and final control of the Board. MHN shall assist and provide support to the CEO in the performance of his or her assigned duties as appropriate.

The hiring, performance review and disciplinary process shall include the following steps:

      (i)     A CEO will be selected by Hospital's Board from among individuals presented by MHN.

      (ii)    The CEO selected shall be leased by MHN from Trinity or CHI or an affiliate of Trinity or CHI. If the candidate is being recruited for the position and is not already an employee of Trinity or CHI or an affiliate of Trinity or CHI, the candidate will not be hired for the position unless and until the Board approves such hiring.

      (iii)   Regular performance reviews will be conducted jointly by MHN and the Hospital Board and furnished to the CEO's employer to ensure ongoing satisfaction.

      (iv)   Hospital Board shall provide MHN written notice of any deficiencies relating to the CEO's performance, and MHN shall have sixty (60) days from the date of such notice to correct such deficiencies. In the event that the deficiencies are not cured to the reasonable satisfaction of Hospital Board after such 60-day period, the parties shall work cooperatively to cure such deficiencies to Hospital Board's reasonable satisfaction or, upon mutual agreement of the parties, to provide a replacement CEO. Whether a replaced CEO continues as an employee of Trinity or CHI or an affiliate of Trinity or CHI remains a decision of the CEO's employer.

      (v)    Hospital Board, after consultation with MHN, has the right to request that the CEO be reassigned, for cause or without cause. Whether the CEO, under those circumstances, continues as an employee of the Trinity or CHI affiliate remains a decision of the CEO's employer. The CEO's employer has the right to terminate its employment relationship with CEO for cause or without cause, after consultation with MHN and the Hospital Board. At the employer's sole discretion, the respective rights and obligations of the CEO may be contained in an Employment/Severance Agreement. If the Hospital Board requests that the CEO be reassigned, and as a result of such request the CEO's employer terminates the CEO's employment, then Hospital shall reimburse the CEO's employer for any severance it is obligated to pay the CEO, provided, however, (A) severance shall not exceed twelve (12) months of CEO's compensation and benefits without the Hospital Board's approval; and (B) if the CEO is reassigned or terminated as a result of a "for cause" breach of his/her employment

36669586.4

obligations or obligations under this Agreement, then Hospital shall not be responsible for any severance payments made.

*Core Service #2*        Corporate Responsibility Program Services.

Consistent with the OIG Compliance Guidance, MHN shall assist Hospital in establishing an effective corporate responsibility program by providing the following services:

1) Assist Hospital staff in the development and distribution of written standards of conduct and written policies and procedures that promote the Hospital's commitment to compliance and that address specific areas of potential fraud and abuse identified by health care regulators.

2) Assist, as needed, the Hospital's compliance officer, appointed by the Hospital CEO and the Hospital's compliance oversight committee, with the operations and monitoring of the compliance program. The Hospital compliance officer will report directly to the CEO and the Board.

3) Make available to the Hospital compliance education programs provided by MHN, its parents and their affiliates, including online learning, teleconference or on-site programs at the affiliate's facility.

4) Use of a compliance program hotline as a vehicle for Hospital staff to report potential violations of laws, regulations or Hospital policies and provide assistance to the chief compliance officer to investigate and resolve such complaints.

5) Assist the Hospital's compliance officer in responding to allegations of improper or illegal activities including appropriate disciplinary action for employees, Medical Staff members, vendors and others who have violated internal compliance policies, applicable statutes, regulations or Federal health care program requirements.

6) Assist the Hospital's compliance officer in developing an annual audit work plan relating to monitoring Hospital operations in support of an effective corporate responsibility program.

7) Assist the Hospital's compliance officer and CEO, as needed, in the investigation and remediation of identified compliance matters.

8) Ensure either the Hospital or the employer of any leased employees conducts required background checks.

*Core Service #3*        Management Support.

Using staff employed by its parents and their affiliates, MHN shall support the CEO and Hospital staff in performing the following functions: financial management, purchasing and supply chain, risk management, human resources, clinical and quality oversight, Medical Staff peer review and credentialing, Federal and State advocacy efforts, strategic planning, evaluation of continuing existing service lines, performance improvement, physician practice management support and IT implementation.

*Core Service #4*        Legal Services.

36669586.4

The CEO and Hospital staff may consult with legal counsel engaged through MHN regarding legal issues affecting MHN and Hospital in accordance with the retainer agreement between MHN and the retained counsel.

*Core Service #5*      TeleHealth Services.

MHN TeleHealth is responsible for leading the growth and development of telehealth solutions across Mercy Health Network that meets the goals of our patients and providers. The Telehealth team will research, assess, implement, evaluate and sustain telehealth programs that create additional clinical and educational value. The TeleHealth staff will recommend telehealth programs that facilitate the successful accomplishment of system strategies, such as utilizing new channels of communication, improving throughput of clinical care, improving access to health care for rural partners, reducing travel time for visiting specialists, reducing implementation time of new telehealth programs, and improving the sustainability of telehealth programs. TeleHealth staff work with managed hospital CEOs, CNOs and education directors to identify the clinical and educational programs that are most needed across MHN, and work with managed hospital IT staff to plan, implement and trouble-shoot equipment and network connectivity. The MHN TeleHealth team writes and reviews business plans for new telehealth programs; tracks all telehealth programs operating within MHN; maintains expert knowledge of industry telehealth practices, emerging technologies, regulatory requirements, and costs and benefits; and, advocates for legislation that promotes telehealth within the states that MHN operates in. MHN TeleHealth will assist with selecting any needed equipment and network connectivity; Hospital is responsible for paying for the equipment and connectivity.

*Core Service #6*      Physician Recruiter.

The responsibilities of the Physician Recruiter shall be to source, market and brand Hospital for purposes of recruiting and retaining primary care physicians and specialists with the best mix of clinical talent. Additionally, the Physician Recruiter will provide need and compensation analysis, develop selection criteria, interview, and assist in retention, on-boarding, mentoring and succession planning.

*Core Service #7*      Supply Chain.

MHN shall facilitate the purchase of products for Hospital that are available through the CHI GPO network to the same extent as CHI's other affiliates. Hospital shall enter into a GPO participation agreement with CHI. Notwithstanding the foregoing, in the event that a vendor refuses to permit Hospital to continue to purchase goods and services, MHN will promptly notify Hospital of such refusal and assist Hospital, upon request, in identifying a new source for the goods and services.

**EXHIBIT B2**
**MHN OPTIONAL SERVICES**

1.    <u>Chief Financial Officer.</u>

MHN shall arrange to provide a full-time Chief Financial Officer ("CFO") to present and report accurate and timely historical financial information, provide advice regarding capital investment strategies, and assist the CEO in developing future business strategies.

(i)    The CFO shall be leased by MHN from an affiliate of Trinity or CHI.

(ii)    Regular performance reviews of the CFO will be conducted jointly by MHN and Hospital and furnished to the CFO's employer to ensure ongoing satisfaction.

(iii)    Hospital Board shall provide MHN written notice of any deficiencies relating to the CFO's performance, and MHN shall have sixty (60) days from the date of such notice to correct such deficiencies. In the event that the deficiencies are not cured to the reasonable satisfaction of Hospital Board after such 60-day period, the parties shall work cooperatively to cure such deficiencies to Hospital Board's reasonable satisfaction or, upon mutual agreement of the parties, to provide a replacement CFO. Whether a replaced CFO continues as an employee of the Trinity or CHI affiliate remains a decision of the CFO's employer.

(iv)    Hospital Board, after consultation with MHN, has the right to request that the CFO be reassigned, for cause or without cause. Whether the CFO, under those circumstances, continues as an employee of the Trinity or CHI affiliate remains a decision of the CFO's employer. The CFO's employer has the right to terminate its employment relationship with CFO for cause or without cause, after consultation with MHN and the Hospital Board. At the employer's sole discretion, the respective rights and obligations of the CFO may be contained in an Employment/Severance Agreement  If the Hospital Board, without cause, requests that the CFO be reassigned, and the CFO's employer cannot find comparable employment for the CFO and must terminate the CFO's employment, then Hospital shall reimburse the CFO's employer for any severance that it agrees to pay the CFO, in such amounts that are consistent with the policies of the CFO's employer.

2.    <u>Nurse Executive.</u>

MHN shall arrange to provide a full-time Nurse Executive to provide oversight of the clinical care provided by Hospital's employees.

(i)    The Nurse Executive shall be leased by MHN from an affiliate of Trinity or CHI.

(ii)    Regular performance reviews of the Nurse Executive will be conducted jointly by MHN and Hospital and furnished to the Nurse Executive's employer to ensure ongoing satisfaction.

(iii)    Hospital Board shall provide MHN written notice of any deficiencies relating to the Nurse Executive's performance, and MHN shall have sixty (60) days from the date of such

36669586.4

notice to correct such deficiencies. In the event that the deficiencies are not cured to the reasonable satisfaction of Hospital Board after such 60-day period, the parties shall work cooperatively to cure such deficiencies to Hospital Board's reasonable satisfaction or, upon mutual agreement of the parties, to provide a replacement Nurse Executive. Whether a replaced Nurse Executive continues as an employee of the Trinity or CHI affiliate remains a decision of the Nurse Executive's employer.

(iv)   Hospital Board, after consultation with MHN, has the right to request that the Nurse Executive be reassigned, for cause or without cause. Whether the Nurse Executive, under those circumstances, continues as an employee of the Trinity or CHI affiliate remains a decision of the Nurse Executive's employer. The Nurse Executive's employer has the right to terminate its employment relationship with the Nurse Executive for cause or without cause, after consultation with MHN and the Hospital Board. At the employer's sole discretion, the respective rights and obligations of the Nurse Executive may be contained in an Employment/Severance Agreement   If the Hospital Board, without cause, requests that the Nurse Executive be reassigned, and the Nurse Executive's employer cannot find comparable employment for the Nurse Executive and must terminate the Nurse Executive's employment, then Hospital shall reimburse the Nurse Executive's employer for any severance that it agrees to pay the Nurse Executive, in such amounts that are consistent with the policies of the Nurse Executive's employer.

3.   Consultation Services.

On-site and telephone consultation to Hospital by MHN and its affiliates staff in administrative areas to include, but not be limited to, financial, clinical and performance improvement, third party reimbursement, medical records management, planning, marketing, public relations, quality assurance, and materials management. Any request for consultation that MHN determines will require more than a minimal amount of staff time to provide and/or involves significant use of materials or out-of-pocket expenses or that Hospital requests be treated as such will be deemed a "Special Administrative Project." Prior to MHN initiating a Special Administrative Project, the parties shall agree to a fee for the Special Administrative Project, which is set in accordance with Exhibit C, Section 4.

4.   Temporary Administrative Staffing.

Upon request of Hospital and subject to the availability of personnel, MHN shall arrange to provide temporary administrative services staff to work on-site at Hospital (the "Temporary Staff"). Temporary Staff shall be provided pursuant to a schedule mutually agreed to by the parties and shall have such qualifications as may be necessary for the administrative position to be temporarily filled by such Temporary Staff. All such Temporary Staff shall not become employees of Hospital. In the event Hospital requires long-term staffing, such staffing may be provided by as agreed to by the parties pursuant to a separate written agreement.

5.   Education Services.

Subject to availability of space and materials, MHN shall arrange for employed staff of Hospital to participate in continuing education programs provided by MHN, its parents and their affiliates (whether by teleconference or on-site at the affiliate's facility) as may be appropriate to each staff employee's position on the same terms and conditions as such continuing education is provided to the

36669586.4

MHN's affiliate staff. Hospital shall provide to MHN a list of the employees who are eligible to participate and shall update such list as necessary. MHN shall provide Hospital on a quarterly basis with a list of continuing education programs provided by MHN's affiliates in which Hospital employed staff may participate. Upon request of Hospital and subject to the availability of personnel, MHN may arrange to provide continuing education programs on-site at Hospital pursuant to a separate written agreement.

6.      Pharmacy Director.

Mercy Medical Center Pharmacy Department and/or departmental leaders will be a resource for hospital staff related to information pertaining to pharmacy operations and/or medication use on an as needed basis. A contract for more formal, well-defined pharmacy services between the Hospital and Mercy Medical Center-Des Moines will be considered if so desired by the Hospital.

36669586.4

## EXHIBIT C
## COMPENSATION FOR MHN SERVICES

1.     <u>Costs and Expenses of CEO</u>.  Hospital shall pay to MHN on a monthly basis, the total amount paid by MHN to obtain the services of the CEO for Hospital.  Such compensation shall include an appropriate amount for both salary and fringe benefits including educational offerings and an annual discretionary bonus based on CEO's annual performance review.  Whether or not the CEO receives an annual bonus and the amount of such bonus shall be within MHN's sole discretion; *provided, however,* the amount of the annual bonus will not exceed twenty percent (20%) of CEO's annual base salary.  MHN shall ensure that the CEO's employer notifies MHN and the Hospital Board of any increase in the CEO's salary at least two weeks before it takes effect.  The Chair of the Hospital Board shall have the right to approve the value of the salaries and benefits paid to the CEO (with the exception of the annual discretionary bonus discussed above), but such information will not be made available to the public.  In addition, Hospital shall pay to MHN all reasonable recruitment and moving expenses as may be required to recruit and/or relocate an individual to serve as CEO, which expenses are subject to the prior approval of the Board.

2.     <u>Costs and Expenses of CFO, Nurse Executive, or Pharmacy Director</u>.  Hospital shall pay to MHN on a monthly basis, the total amount paid by MHN to obtain the services of the CFO, Nurse Executive, or Pharmacy Director as applicable, for Hospital.  Such compensation shall include an appropriate amount for both salary and fringe benefits including educational offerings.  In addition, Hospital shall pay to MHN all reasonable recruitment and moving expenses as may be required to recruit and/or relocate an individual to serve as CFO or Nurse Executive, which expenses are subject to the prior approval of the Board.

3.     <u>Annual Fee</u>.  For the period beginning June 1, 2017 and ending June 30, 2018, the annual fee shall be equal to 0.5% percent of the Hospital's annual audited operating expenses for the prior fiscal year commencing July 1, 2015 and ending on June 30, 2016. For the period beginning July 1, 2018 and ending June 30, 2019, the annual fee shall be equal to 0.75% of the Hospital's annual audited operating expenses for the prior fiscal year commencing July 1, 2016 and ending on June 30, 2017. For the period beginning July 1, 2019 and ending June 30, 2020, and each successive year of any Renewal Term, the annual fee shall be equal to one percent (1%) of the Hospital's annual audited operating expenses for the prior fiscal year commencing July 1 and ending on June 30.  For the purposes of this Section "operating expenses" include, without limitation, amounts paid by Hospital under this Agreement; depreciation of plant and equipment; and other expenses related to operations and treated as operating expenses under generally accepted accounting principles (GAAP), but shall not include contractual allowances, bad debts, charity care, or expenses not normally incurred on an annual basis but are required for GAAP accounting and are onetime adjustments impacting operating expenses on the financial statements (example Bond Issuance Costs, major building disposals).  The Hospital's operating expenses shall be audited by October 31, and the results of the audit and the proposed annual fee shall be presented to Hospital by December 31 of each year.  The annual fee shall be paid in monthly installments, and prorated for any partial year if the Agreement is terminated for cause prior to expiration of the Initial Term or during any Renewal Term. The monthly fee installments are due and payable in advance on or before the 1st day of the month.

4.     <u>Special Projects Fees.</u>  As consideration for each Special Administrative Project, as defined on Exhibit B2, Section 3 provided by MHN, Hospital agrees to pay MHN an amount equal to (i) an hourly rate equal to the then current hourly rate equivalent paid to the staff members who work on the Special

Administrative Project (including an appropriate amount for both salary and fringe benefits) for all hours worked, which shall include all hours of travel to and from Hospital; plus (ii) the cost of any materials used by the staff members in providing the Special Administrative Project; plus (iii) the cost of any out of pocket expenses incurred by MHN in providing the Special Administrative Project. The foregoing notwithstanding, the fee for any Special Administrative Project must be agreed to in writing by the parties in advance.

5. <u>Temporary Staff Fees</u>. If MHN provides any Temporary Staff, as defined on Exhibit B2, Hospital shall pay to MHN an hourly rate equal to the hourly rate equivalent of the Temporary Staff member as calculated from the Temporary Staff member's salary plus an appropriate amount for fringe benefits for all hours worked, which shall include all hours of travel to and from Hospital.

6. <u>Legal Services Fees</u>. Hospital shall reimburse MHN for its pro rata share of the cost of the legal services provided through MHN.

7. <u>Education Services Fees</u>. The following fees shall be charged for the Education Services, as defined on Exhibit B2:

(i)   *Courses at MHN's Affiliates*: Hospital shall reimburse MHN for the actual cost of materials used by each Hospital employee attending a continuing education course at MHN's affiliates in an amount determined by MHN in advance for each course; and

(ii)   *Courses on-site at Hospital*: MHN's affiliates may charge a fee for materials used by each Hospital employee attending a continuing education course on-site at Hospital in an amount determined by MHN in advance for each course. In addition, Hospital shall pay to MHN an hourly rate equal to the hourly rate equivalent of each MHN staff member who provides Education Services on-site at Hospital as calculated from the staff member's salary plus an appropriate amount for fringe benefit for all hours worked, which shall include all hours of travel to and from Hospital.

## ATTACHMENT 1
## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement") is entered into by and between Mercy Hospital, Iowa City, Iowa ("Covered Entity") and Mercy Health Network, Inc. and its affiliated healthcare organizations, including Mercy Medical Center – Des Moines ("Business Associate") and applies to the performance of Business Associate's obligations under the Management Services Agreement dated as of May 1, 2017 ("MSA") between Covered Entity and Business Associate.

A. **HIPAA and HITECH Dominance**. In the event of a conflict or inconsistency between the terms of the MSA and this language, this language controls. This language is intended to comply with the Health Insurance Portability and Accountability Act of 1996 as well as the Health Information Technology for Economic and Clinical Health Act (found in Title XIII of the American Recovery and Reinvestment Act of 2009), as amended, and all final regulations issued pursuant to such Acts ("HIPAA" and "HITECH"). The parties acknowledge and agree that, beginning with the effective dates under HIPAA and HITECH, Business Associate will comply with its obligations under this Agreement and with all obligations of a Business Associate under HIPAA, HITECH and any implementing regulations, as they exist at the time this Agreement is executed and as they are amended from time to time, for so long as this Agreement is in place. (Collectively, HIPAA and HITECH are referred to herein as "HIPAA").

B. **Protected Health Information**. Any Protected Health Information ("PHI") as defined by HIPAA that, on behalf of Covered Entity, was collected, created, received, maintained by or transmitted to or from Covered Entity is PHI. For purposes of these obligations PHI means all PHI in Business Associate's possession or under its control (e.g. employees, workforce members, subcontractors and their downstream entities, and Subcontractors) and all PHI collected, created, received, maintained or transmitted by Business Associates or its Subcontractors on or after the effective date of this Agreement.

C. **Subcontractors**. Business Associate will require that its Subcontractors agree to the same restrictions and obligations as Business Associate. For purposes of the obligations under this Agreement, the term "Subcontractor" means all of the Business Associate's subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate, as well as each of their downstream entities. Business Associate also will require its Subcontractors to agree to implement reasonable administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of all the Covered Entity's PHI. Business Associate and its Subcontractors are directly subject to and must independently comply with the Business Associate provisions of HIPAA notwithstanding the provisions contained in this Agreement.

**D. Permissible Uses of PHI.**

1. *Using and Disclosing PHI.* Business Associate may use or disclose PHI as permitted under the MSA and by this Agreement or as required by law. Business Associate may only use or disclose PHI to the extent that the Covered Entity is permitted to use and disclose PHI, and, only if the Covered Entity has delegated the use or disclosure to the Business Associate.

2. *Business Associate Management Uses of PHI.* Business Associate may use PHI for the internal management and administration of Business Associate, but only in connection with the direct performance by Business Associate through its employees and Subcontractors of services for Covered Entity pursuant to this Agreement.

3. *Minimum Necessary.* Business Associate is permitted to access, use and/or store only the minimum necessary PHI to the extent required to perform its duties under the MSA and this Agreement.

4. *Handling PHI.* Business Associate agrees to return or destroy any PHI that is erroneously shared or delivered to Business Associate.

5. *Data Aggregation.* Business Associate is permitted to use PHI for data aggregation for the health care operations of Covered Entity, only as required by the MSA or upon written request of Covered Entity. Data aggregation means combining Covered Entity's PHI with an unrelated covered entity's PHI for any purpose.

6. *De-Identified – Business Associate Use for Own Purposes.* Business Associate agrees not to sell or use any PHI, de-identified PHI or data that identifies the Covered Entity for its own purposes or for the benefits of its other customers, without the Covered Entity's prior written consent. Furthermore, in cases where the Business Associate requests consent to de-identify PHI, the Business Associate shall specify to the Covered Entity the manner in which the Business Associate will de-identify the information.

**E. Employees, Subcontractors and Disciplinary Action**

1. *Acts/Omissions.* Business Associate will be responsible for all actions and omissions by its employees and Subcontractors' employees and is liable to third parties and Covered Entity for any violation of patients' privacy or security by any person who is granted access or receives PHI through Business Associate. For purposes of this Agreement, the Business Associate's employees include its workforce members.

2. *Employees.* Business Associates agrees to instruct its employees regarding the confidentiality, privacy and security of PHI. Business Associate shall not

36669586.4

2

disclose to its employees or permit them to access, view, obtain, copy, review or use any PHI that is not necessary to their services to Covered Entity. Business Associate agrees to maintain strict performance standards, including disciplinary actions, with respect to wrongful access to, copying, viewing, misuse or disclosure of PHI.

3. *Subcontractors and Downstream Entities.* Business Associate shall ensure its permitted workforce members and Subcontractors are advised in writing of Business Associate's obligations with respect to PHI. Business Associate shall require that the permitted Subcontractors agree in writing to the same permissible uses and disclosures of PHI and the same restrictions and obligations as Business Associate. Business Associate agrees to make a list of such Subcontractors and known downstream entities available to Covered Entity upon request.

4. *Administrative and Disciplinary Action.* Business Associate will take appropriate administrative and disciplinary action with respect to an employees or Subcontractor if a privacy or security violation is substantiated.

F. **Safeguards, Reporting and Mitigation**

1. *Safeguards.* Business Associate agrees to implement reasonable administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of all PHI. Business Associate agrees to implement reasonable electronic security practices for Covered Entity's PHI which is transmitted, stored, collected, created, received, maintained or used in electronic form. Business Associate also shall require its permitted Subcontractors to agree in writing to implement reasonable administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of all Covered Entity's PHI.

2. *Reporting of Actual or Suspected Violations.* Business Associate will report, in writing, within ten (10) business days to the Covered Entity's Privacy Official and/or Security Official, any actual or suspected privacy incident, breach of security, intrusion or unauthorized use or disclosure of PHI not permitted by the MSA or this Agreement, made by its employees or Subcontractors, and will cooperate with Covered Entity in the investigation of these incidents. Furthermore, upon request of Covered Entity, Business Associate will report, in summary form, any unsuccessful security incident of which Business Associate becomes aware. If the definition of "Security Incident" in the HIPAA regulation is modified to remove the requirement for reporting "unsuccessful" security incidents, this paragraph shall no longer apply as of the effective date of such regulation modification.

3. *Content of Report.* Business Associate shall report to the Covered Entity, to the best extent reasonably possible, the identification of each individual whose PHI has been, or is reasonably believed by the Business Associate to have

36669586.4

3

been accessed, acquired, or disclosed during the actual or suspected breach of privacy or security.

4. *Mitigation.* Business Associate agrees to cooperate and collaborate with the Covered Entity in mitigating any harmful effect that is known to Business Associate, its employees or Subcontractors, of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement. The Business Associate also agrees to be responsible for any mitigation or compliance costs related to a breach of privacy or security caused by the Business Associate.

G. **Patient Rights With Respect To PHI.** To the extent that Business Associate maintains a Designated Record Set on behalf of the Covered Entity, Business Associate acknowledges that under HIPAA patients have the right to access and review their PHI; amend their health records; and request restrictions on the use and disclosure of PHI.

H. **Notification of Restrictions to Use or Disclosure of PHI.** Covered Entity will notify Business Associate of any restrictions to the use or disclosure of PHI that Covered Entity has agreed to in accordance HIPAA and HITECH to the extent that such restrictions or confidential communication may affect Business Associate's use or disclosure of such PHI.

I. **Notice of Patient Contact.** Business Associate will promptly notify the privacy officer of Covered Entity if a patient contacts Business Associate in connection with the patient's PHI. Covered Entity shall be responsible for communicating with patients regarding their patient rights.

J. **Electronic Health Records Related to Treatment, Payment or Health Care Operations.** In the case of a direct request from an individual to Business Associate related to treatment, payment or health care operations disclosures from electronic health records, Business Associate shall, in collaboration with the Covered Entity, provide such accounting to the individual in accordance with the applicable effective date of Section 13405(c) of HITECH. Business Associate shall document such disclosures and provide Covered Entity notice of the disclosure.

K. **Amendment.** Upon enactment of any law, regulation, court decision or relevant government publication and/or interpretive policy affecting the use or disclosure of PHI, the parties agree to amend this Agreement to comply with the same.

L. **Access for Audit.** Business Associate will make its internal practices, books and records relating to the use and disclosure of any PHI available to Covered Entity and to authorized government investigators for purposes of determining the Covered Entity's and Business Associate's compliance with HIPAA. Business Associate agrees that Covered Entity has the right to audit, investigate, monitor, access, review and report on Business Associate's use of any Covered Entity PHI.

36669586.4

4

**M.** <u>Laws</u>. Business Associate will comply with all federal and state security and privacy laws applicable to Business Associate and more protective of individual privacy than HIPAA or HITECH.

**N.** <u>Termination of Relationship for Failure to Comply</u>.

1. *Covered Entity* - Termination and Cure. In the event of Business Associate's material failure to comply with this Agreement, the Covered Entity may terminate its relationship with Business Associate upon 30-days advanced written notice to Business Associate; provided, however, that Business Associate has not cured the material failure to comply within 30-days after receiving written notice from the Covered Entity.

2. *Business Associate - Termination and Cure*. In the event of Covered Entity's material failure to comply with this Agreement, the Business Associate may terminate its relationship with Covered Entity upon 30-days advanced written notice to Covered Entity; provided, however, that Covered Entity has not cured the material failure to comply within 30-days after receiving written notice from Business Associate.

3. *PHI Obligations upon Termination or Expiration*. Unless Business Associate is required by law to maintain PHI, Business Associate will return (and not retain any copies of) all PHI in its possession or under its control within 30 days after the termination/expiration of this Agreement. If Business Associate is unable to return PHI, then Business Associate will notify the Covered Entity of the reasons for being unable to return PHI in writing and must, at a minimum, maintain PHI as required by this Agreement and HIPAA for so long as the Covered Entity's PHI exists.

Authorized representatives of the parties have executed this as of the last date written below.

COVERED ENTITY

Name: _____

Title: _Interim President and CEO_

Date: _May 1, 2017_

BUSINESS ASSOCIATE

Name: _____

Title: _President + CEO_

Date: _May 2, 2017_

5

**Attachment 2**
**Sample Conflict of Interest Policy**

**Article I**
**Purpose**

The purpose of the conflict of interest policy is to protect the interests of _____ [Name of Hospital] ("Organization") when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the Organization or other interested person (as defined below).

It is important to note, however, that not every situation described in this policy necessarily constitutes an actual conflict of interest. Rather, it is the purpose and intent of this policy to stimulate an examination of the relationships described herein (and others suggested by this policy) that could be an actual conflict of interest requiring the formal disclosure and other procedures described herein.

Entirely separate from the policies and procedures on conflicts is the legally imposed obligation of loyalty owed by every fiduciary to place the Organization's interests above any personal interest when functioning as a fiduciary. This duty is a court-imposed duty that extends to safeguarding the Organization's best interests. All persons associated with the Organization (including any director or trustee, principal officer (vice president or above), or member of a committee with board delegated powers) are expected to discharge their duties in a manner the person reasonably believes to be in the best interests of the Organization and to avoid situations involving a conflict of interest.

**Article II**
**Definitions**

**1. Interested Person**
Any director, principal officer, or member of a committee with board delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

If a person is an interested person with respect to any entity in the health care system of which the Organization is a part, he or she is an interested person with respect to all entities in the health care system.

**2. Financial Interest**
A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:
   a) An ownership or investment interest (other than ownership of not more than one percent (1%) of the publically traded stock of a widely held company) in any entity with which the Organization has a transaction or arrangement;
   b) A compensation arrangement with the Organization or with any entity or individual with which the Organization has a transaction or arrangement; or

c) A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Organization is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are substantial in nature.

## 3. Conflict of Interest
a) A conflict of interest may occur whenever a person:
b) Has a financial interest as defined above;
c) Is an officer, member, owner, or agent of any entity which has or reasonably anticipates to have, a competitive or business relationship with the Organization or any entity in the health care system of which the Organization is a part;
d) Has accepted gifts, gratuities, or entertainment which might influence his or her judgment or actions as a director or trustee, principal officer, or member of a committee with board delegated powers;
e) Has engaged or reasonably anticipates to engage in any substantive participation in any entity which has, or is expected to have, a business or competitive relationship with the Organization or any entity in the health care system of which the Organization is a part; except as specifically approved by the Organization's body. For purposes of this Policy, "substantive participation" means:
   i) participation as a private investor, except for the holding of not more than one percent (1%) of the publically traded stock of a widely held company; or
   ii) service in any governance, management, operational, or consultative capacity;
   iii) receipt of compensation for service in any governance, management, operational, or consultative capacity.

A financial interest is not necessarily a conflict of interest. Under Article III, Section 2, a person who has a financial interest may have a conflict of interest only if the appropriate board or committee decides that a conflict of interest exists.

## Article III
## Procedures

### 1. Duty to Disclose
In connection with any actual or possible conflict of interest, an interested person must disclose the existence and nature of his or her financial interest and be given the opportunity to disclose all material facts to the directors and members of committees with board delegated powers considering the proposed transaction or arrangement.

### 2. Determining Whether a Conflict of Interest Exists
After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the board or committee meeting while the determination of a conflict of interest is discussed and voted upon. The remaining board or committee members shall decide if a conflict of interest exists.

### 3. Procedures for Addressing the Conflict of Interest

36669586.4

2

a) An interested person may make a presentation at the board or committee meeting, but after the presentation, he/she shall leave the meeting during the discussion of and the vote on the transaction or arrangement that results in the conflict of interest.

b) The chairperson of the board or committee may, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

c) After exercising due diligence, the board or committee may determine whether the Organization can obtain, with reasonable efforts, a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

d) If a more advantageous transaction or arrangement is not reasonably attainable under circumstances that would not give rise to a conflict of interest, the board or committee shall determine by a majority vote of the disinterested directors or committee members whether the transaction or arrangement is in the Organization's best interest, and for its own benefit, and whether the transaction is fair and reasonable to the Organization. In conformity with the above determination the board or committee shall make its decision as to whether to enter into the transaction or arrangement.

**4. Violations of the Conflicts of Interest Policy**

a) If the board or committee has reasonable cause to believe a member has failed to disclose actual or possible conflicts of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

b) If, after hearing the member's response and after making further investigation as warranted by the circumstances, the board or committee determines the member has failed in fact to disclose an actual or possible conflict of interest, it may take appropriate disciplinary and corrective action.

**Article IV**
**Records of Proceedings**

In matters where a potential conflict of interest has been identified, the minutes of the board (and all committees with board delegated powers) shall contain:

a) The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the board's or committee's decision as to whether a conflict of interest in fact existed.

b) The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection with the proceedings.

**Article V**
**Compensation**

a) A voting member of the board who receives compensation, directly or indirectly, from the Organization for services (other than service as a board or committee member) is precluded from voting on matters pertaining to that member's compensation.

36669586.4

b) A voting member of any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Organization for services (other than service as a board or committee member) is precluded from voting on matters pertaining to that member's compensation.

c) No voting member of the board or any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Organization, either individually or collectively, is prohibited from providing information to any committee regarding compensation.

d) Physicians who receive compensation from the Organization, whether directly or indirectly or as employees or independent contractors, are precluded from membership on any committee whose jurisdiction includes compensation matters.  A physician (other than a non-practicing physician, which means a physician who does not see patients and is not part of a group of physicians who sees patients) who is a voting member of the board of directors or member of a committee with board delegated powers and receives compensation, directly or indirectly, from the Organization for services, other than serving as a member of a board or committee, is precluded from discussing and voting on matters pertaining to that member's compensation and other physician's compensation. This provision does not automatically exclude physicians who are employed solely as administrative staff and who neither continue to practice medicine nor are associated in any way with any medical practice.  No physician, either individually or collectively, is prohibited from providing information to any committee regarding physician compensation.

<u>**Article VI**</u>
<u>**Annual and Periodic Statements**</u>

a) Each director, principal officer and member of a committee with board delegated powers shall sign a statement provided by the Organization annually and whenever (1) the person first becomes subject to this Policy, and (2) there has been any material change in the person's responses to the previously provided statement.  Such statement shall disclose any known or potential conflict of interest and affirm that such person:
   i)   Has received a copy of the conflicts of interest policy;
   ii)  Has read and understands the policy; and
   iii) Has agreed to comply with the policy.

b) The statements should be provided to the Organization's chief executive officer or his or her designee who shall present a report to the Organization's Board of Directors (or delegated committee of the Board).

36669586.4

4